UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

VILLAGE OF OLD MILL CREEK,
FERRITE INTERNATIONAL COMPANY,
GOT IT MAID, INC., NAFISCA ZOTOS,
ROBERT DILLON, RICHARD OWENS,
And ROBIN HAWKINS, both individually and
d/b/a ROBIN'S NEST,

No.   17-cv-1163

     Plaintiffs,

     v.

ANTHONY STAR, in his official capacity
As Director of the Illinois Power Agency,

     Defendant.

## COMPLAINT

Plaintiffs Village of Old Mill Creek, Ferrite International Company, Got it Maid, Inc.,

Nafisca Zotos, Robert Dillon, Richard S. Owens, and Robin Hawkins, both individually and

d/b/a Robin's Nest, complain against Defendant Anthony Star, in his official capacity as

Director of the Illinois Power Agency, as follows:

## NATURE OF THE CASE

1.     This case arises from unlawful Illinois legislation that invades the exclusive

jurisdiction of the Federal Energy Regulatory Commission ("FERC") over "the sale of electric

energy at wholesale in interstate commerce" pursuant to the Federal Power Act. 16 U.S.C.

824(b)(1). The unlawful legislation is contained in subsection (d-5) Zero emission standard of Illinois Public Act 99-0906 ("P.A. 99-0906"), which was enacted on December 7, 2016.[1]

2.     By invading the exclusive jurisdiction of the Federal Energy Regulatory Commission, P.A. 99-0906 violates the U.S. Constitution's Supremacy Clause (Article VI, Section 2), and the 14th Amendment (Equal Protection Clause). By discriminating against and burdening interstate commerce, P.A. 99-0906 also violates the dormant Commerce Clause of the U.S. Constitution (Article I, Section 8).

3.     FERC has determined that competitive market forces best set wholesale prices for electricity supply and thus has approved the use of auction-based markets and competitive bilateral contracts for wholesale electric energy and capacity within the PJM Interconnection, LLC ("PJM") regional transmission organization ("RTO"), which includes northern Illinois, and the Midcontinent Independent System Operator ("MISO"), which includes central and southern Illinois. *See, e.g.*, FERC Orders 888 and 889.

4.     Through P.A. 99-0906, Illinois seeks to change the results of the effectively competitive wholesale electricity market by requiring the Illinois Power Agency to procure zero emission credits ("ZECs") from certain nuclear-fueled generating plants under ten-year contracts for each of Commonwealth Edison Company ("ComEd"), the electric utility for northern Illinois, and Ameren Illinois Company ("Ameren Illinois"), the electric utility for central and southern Illinois. 20 ILCS 3855/1-10; 20 ILCS 3855/1-75(d-5)(1); and 220 ILCS 5/16-111.5(*l*).

---

[1] Illinois P.A. 99-0906 is available at http://www.ilga.gov/legislation/99/HB/09900HB65761v.htm. P.A. 99-0906 amends both the Illinois Public Utilities Act (220 ILCS 5/1-101 *et seq.*) and the Illinois Power Agency Act. (20 ILCS 3855/1 *et seq.*) Although P.A. 99-0906 has many other provisions, this case concerns only subsection (d – 5) Zero emission standard. Subsection (d-5) Zero emission standard of P.A. 99-0906 is attached hereto as Exhibit A. Plaintiffs are not challenging any other provisions of P.A. 99-0906. Section 97 of P.A. 99-0906 provides that the provisions of the act are severable under Section 1.31 of the Illinois Statute on Statutes. P.A. 99-0906, Section 97; 5 ILCS 70/1.31.

5.      Zero emission credit is defined as "a tradable credit that represents the environmental attributes of one megawatt hour of energy from a zero emissions facility, which is defined as a facility fueled by nuclear power interconnected with PJM or MISO or their successors. 20 ILCS 3855/1-10, Definitions.

6.      P.A. 99-0906 provides that the ten-year ZEC purchase contracts must require each of ComEd and Ameren Illinois to procure contracts with zero emission facilities that are reasonably capable of generating ZECs in an amount approximately equal to 16% of the actual amount of megawatt hours ("MWh") of electricity delivered by the utility to Illinois retail customers during calendar year 2014[2] for each of ten delivery years.[3] 20 ILCS 3855/1-75(d-5)(1) Retail customers include all residential, commercial, industrial, and governmental customers of each utility. P.A. 99-0906 requires that the contracts provide that the quantity of ZECs procured from a zero emission facility shall be all the ZECs produced by the facility in each delivery year. 20 ILCS 3855/1-75(d-5)(1).

7.      P.A. 99-0906 is designed so that the Illinois-based Quad Cities and Clinton nuclear plants, which are owned by Exelon Generation Company ("Exelon Generation"), will sell all of the ZECs to ComEd and Ameren Illinois. Exelon Corporation ("Exelon Corp.") owns both Exelon Generation and the electric public utility ComEd.

8.      P.A. 99-0906 establishes the initial ZEC price at $16.50 per MWh. P.A. 99-0906 further provides that this ZEC price will be increased by $1 per MWh for each of delivery years 7-10. But P.A. 99-0906 also provides that the ZEC price must be reduced for each delivery year

---

[2] For calendar year 2014, ComEd delivered 88,580,643 MWh, and Ameren Illinois delivered 36,897,391 MWh to Illinois retail customers. Illinois Commerce Commission, Report on Comparison of Electric Sales Statistics for Calendar Years 2015 and 2014 (May 2016), available at https://www.icc.illinois.gov/publicutility/salesstatistics.aspx?type=e .
[3] Under P.A. 99-0906, delivery years are defined as June 1 of a given year through May 31 of the following year. 20 ILCS 3855/1-10, Definitions.

by the amount, if any, by which the projected market index price for the delivery year exceeds a baseline market electricity price index of $31.40 per MWh. 20 ILCS 3855/1-75(d-5)(1)(B)(i).

9.      P.A. 99-0906 provides that each Illinois electric utility required to purchase ZECs is entitled to pass through the costs of the ZECs to consumers through "automatic adjustment" tariffs. 20 ILCS 3855/1-75(d-5)(6). Therefore, the electric utility is merely a conduit for charges imposed on consumers.

10.     P.A. 99-0906 is narrowly tailored so that Exelon Corp. is the sole beneficiary of the ZEC payments. Unless enjoined or eliminated, P.A. 99-0906's ZEC purchase requirement will result in the transfer from consumers to Exelon Corp. of as much as $3.3 billion over the 10-year contract term.[4]

11.     A typical residential customer using 1 MWh (1,000 kWh) per month would pay an additional $2.64 per month beginning June 1, 2017 based on the initial ZEC price.[5]

12.     A manufacturing company using 10,000 MWh per month would pay an additional $26,400 per month beginning June 1, 2017 based on the initial ZEC price.[6]

13.     If this Court allows P.A. 99-0906's ZEC purchase requirement to go into effect for the delivery year beginning June 1, 2017, as required under P.A. 99-0906, the State of Illinois will profoundly disrupt competitive wholesale electricity markets in PJM and MISO and transgress FERC's exclusive jurisdiction over wholesale electricity pricing.

14.     At the baseline market price set forth in P.A. 99-0906 of $31.40 per MWh, electricity generators who can't issue and sell ZECs to Illinois utilities would receive the $31.40 for every MWh of electricity they sell in the wholesale market. But Exelon's Quad Cities and Clinton nuclear

[4] Calculated as 125,475,034 MWh per year x $16.50 per MWh x 16% x 10 (years).
[5] Calculated as 1 MWh x $16.50 per MWh x 16%.
[6] Calculated as 10,000 MWh x $16.50 per MWh x 16%.

plants would receive $47.90 per MWh based on the baseline market price and initial ZEC price of $16.50 per MWh – a more than 50 percent premium over their wholesale market competitors as a result of the ZEC purchase requirements.

15.     P.A. 99-0906 requires that all ComEd and Ameren Illinois retail customers will pay the extra ZEC charges as part of their delivery service (i.e., "wires") charges beginning June 1, 2017, regardless of whether they purchase electricity supply from their local electric utility (i.e., ComEd or Ameren Illinois). 200 ILCS 5/16-108(k). Therefore, even the thousands of ComEd and Ameren Illinois customers who use the utility's wires only to deliver electricity supply purchased from a competitive supplier will be forced to pay for the Quad Cities and Clinton nuclear plant subsidies to Exelon Generation. This results in an electricity consumer paying a subsidy for Exelon Generation's Quad Cities and Clinton nuclear plants even when a competitive supplier is supplying 100% of that consumer's electricity from wholesale producers other than the nuclear plants.

16.     P.A. 99-0906, a state law, purports to modify the results of wholesale electricity markets, which are under FERC's exclusive jurisdiction pursuant to the Federal Power Act. 16 U.S.C. 824(b)(1). The ZEC price is specifically tethered to the wholesale electricity market price because the statutorily established ZEC price is reduced for each delivery year to the extent that the projected market price index for that delivery year exceeds the statutorily established baseline market price of $31.40 per MWh. 220 ILCS 3855 11(d-5)(1)(B)(ii) and (iii). As a result, certain Illinois-based nuclear generators would get a guaranteed higher amount for their electricity than their competitors, regardless of wholesale market prices.

17.     P.A. 99-0906 provides for revenues (from ZECs) to certain Illinois nuclear plants in addition to the revenues obtained by these nuclear plants from the wholesale electricity markets. The ZECs solely benefit a specific producer of nuclear energy in Illinois, to the disadvantage of

out-of-state electricity producers who compete in the wholesale market and electricity consumers who purchase (or are eligible to purchase) electricity supply provided by competitive electricity suppliers from the out-of-state producers.

18.     P.A. 99-0906 violates the Supremacy Clause of the U.S. Constitution (Article VI, Section 2) because it regulates an area in which federal law has preempted the field.  P.A. 99-0906 also violates the Supremacy Clause because it conflicts with federal law and frustrates the purpose of a federal law. *Hughes v. Talen Energy Marketing, LLC*, 136 at S. Ct. 1288, 1298-99 (2016). The Illinois legislation in question also is invalid under the dormant Commerce Clause of the U.S. Constitution (Article I, Section 8). Illinois has failed to regulate evenhandedly to effectuate a legitimate local public interest, and the effects of its regulation on interstate commerce are more than incidental. *State of Missouri ex rel. Barrett v Kansas Natural Gas Co*., 265 U.S. 298, 306-307 (1924). Also, by favoring certain Illinois nuclear generators over other wholesale electricity producers and thereby imposing certain costs on Illinois electricity consumers that are not imposed on electricity consumers located elsewhere in PJM or MISO, P.A. 99-0906 violates the equal protection clause of the 14th Amendment of the U.S. Constitution. For all of these reasons, the Court should enter appropriate declaratory and injunctive relief.

## PARTIES

19.     Plaintiff Village of Old Mill Creek is a municipality located in Lake County, Illinois. Village of Old Mill Creek is a delivery services customer of ComEd.

20.     Plaintiff Ferrite International Company is a manufacturing company located at 39105 Magnetics Blvd., Wadsworth, Illinois. Ferrite International Company is a delivery services customer of ComEd.

21.     Plaintiff Got It Maid, Inc. is an Illinois business corporation located at 1421 Old Deerfield Road, Highland Park, Illinois. Got it Maid, Inc. is a delivery services customer of ComEd.

22.     Plaintiff Nafisca Zotos is an individual whose address is 118 Lawton Road, Riverside, Illinois. Nafisca Zotos is a delivery services customer of ComEd.

23.     Plaintiff Robert Dillon is an individual whose address is 760 Marion Avenue, Highland Park, Illinois. Robert Dillon is a delivery services customer of ComEd.

24.     Plaintiff Richard Owens is an individual whose address is 6172 Brown Trail, Harvel, Illinois. Richard Owens is a delivery services customer of Ameren Illinois.

25.     Plaintiff Robin Hawkins is an individual whose address is 4341 South Ellis Avenue, Chicago, Illinois. She also is owner and operator of Robin's Nest, a sole proprietorship and childcare provider licensed by the State of Illinois with a place of business at the same address. Ms. Hawkins is a delivery services customer of ComEd.

26.     Defendant Anthony Star is Director of the Illinois Power Agency and is sued only in his official capacity.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. 1331, because the claims arise under federal law, specifically the Federal Power Act, 16 U.S.C. 824 *et seq*., the Supremacy Clause and Commerce Clause of the U.S. Constitution, Amendment XIV of the U.S. Constitution, and 42 U.S.C. 1983.

28.    This Court has authority to grant the requested declaratory relief under 28 U.S.C. 2201 and Federal Rule of Civil Procedure 57, and authority to grant the requested injunctive relief under 28 U.S.C. 1651(a) and 2202, and Federal Rule of Civil Procedure 65.

29.    This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and/or an injunction against Defendant Anthony Star in his official capacity as Director of the Illinois Power Agency. *Ex parte Young,* 209 U.S. 123, 129 (1908).

30.    Venue is properly in this district, pursuant to 28 U.S.C. 1391, because Defendant, as the Director of the Illinois Power Agency, has a major office in this district.

## FACTS

### Exclusive Federal Jurisdiction Over the Wholesale Electricity Market

32.    Under the Federal Power Act, FERC has exclusive regulatory authority, to the exclusion of state and local governments, over "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. 824(b)(1); *see also id. §* 824(d) (defining a "wholesale" sale as a sale of electric energy to a buyer "for resale" to another buyer).

33.    The scope of interstate regulation has grown over the years, as technological developments made it increasingly possible to transmit electricity over long distances. Local

delivery networks gave way to the modern "grid" network, with electricity constantly moving in interstate commerce throughout the United States.

34.     FERC is exclusively empowered to regulate the interstate wholesale market to ensure, *inter alia,* that rates are "just and reasonable." 16 U.S.C. 824d(a).

### The FERC Regulatory Regime

35.     Instead of directly setting wholesale rates, FERC has opted to utilize competitive market-based auctions that are administered to establish the "just and reasonable rates" the Federal Power Act requires. FERC also allows bilateral wholesale contracts at negotiated prices for electricity supply. FERC has explained that it relies on competitive market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.,* FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

36.     FERC authorizes and regulates regional transmission organizations ("RTOs") and independent system operators ("ISOs") to oversee the interstate auctions that are part of competitive market processes. For purposes of supplying electricity to the northern Illinois region, wholesale electricity is bought and sold via auctions conducted by an RTO called PJM. For electricity supply to the central and southern Illinois regions, wholesale electricity is bought and sold via auctions conducted by an ISO known as MISO.

37.     PJM and MISO operate two distinct types of wholesale auctions: energy and capacity (among others, which are not relevant to this Complaint).[7]  The electricity suppliers in the wholesale auctions of PJM and MISO include generators located inside and outside of Illinois.

---

[7] The capacity auctions are for the purchase and sale of options to buy electricity.

The PJM and MISO auctions are considered interstate wholesale markets, and FERC regulates them. Bilateral wholesale transactions also occur between wholesale electricity suppliers and wholesale purchasers such as the utility ComEd (in northern Illinois), the utility Ameren Illinois (in central and southern Illinois), and other wholesale buyers of electricity.

## **Wholesale Energy Markets**

38.    With respect to the energy market, PJM and MISO must dispatch (that is, turn on and regulate the output level of) sufficient generation resources to meet the actual amount of electricity used by consumers — or "load" in energy parlance — at any given moment. Unlike most other commodities that can be bought and sold in markets, electricity cannot be economically stored in appreciable quantities. If the amount of generation on the system falls short of demand levels, PJM and MISO take a series of FERC-mandated steps to limit the negative consequences, starting with voltage reductions or "brownouts" and ending, in more severe cases, with load shedding or "rotating blackouts" to restore system balance. If these measures to reduce load to meet available supply are not successful, uncontrolled widespread blackouts may result.

39.    PJM and MISO aim to prevent supply/demand mismatches by running sophisticated day-ahead and real-time energy markets that take into account physical limitations on the transmission lines, generator availability, predicted energy usage, and many other factors.

40.    In the day-ahead energy market, generators bid the price at which they are willing to generate a particular quantity of electricity for next-day delivery. In the real-time energy markets, the PJM or MISO price increases or decreases in real time, signaling the need for participating generators to produce more or less electricity as real-time conditions change.

41.     The economic theory behind the energy markets is straightforward: PJM and MISO accept offers from generators, beginning with the lowest-priced and moving up until all electricity demand is satisfied. The price of the final bid that satisfies all demand for a given location is known as the "market clearing price" or "locational based marginal price." This price is paid to all successful supply-side bidders in that location, including those who offered to sell at a lower price. Subject to insuring system reliability, markets deploy the most efficient and cheapest generators first, and additional quantity is provided by less efficient generators that cost more to run. The wholesale price of electricity in both the day-ahead and real-time energy markets can rise very steeply at times of peak demand.

42.     Unlike other types of electricity generators, which can be turned on and off, or adjusted quickly to produce more or less energy, as conditions warrant, nuclear generators are typically dispatched in the day-ahead market and run continuously at maximum output.

**<u>Wholesale Capacity Markets</u>**

43.     In order to ensure that PJM and MISO have the electricity-producing resources (the generating capacity) needed to operate the grid reliably, PJM and MISO also operate capacity auctions. PJM and MISO establish the amount of electricity-generation capacity that Illinois utilities and competitive retail electricity suppliers are required to have in order to meet customer demand under peak conditions. Illinois utilities and competitive retail electricity suppliers can meet their capacity obligations either through the PJM and MISO administered auction markets for capacity which FERC has established, or through bilateral contracts with generation owners (or with generation that they own).

44.     In contrast to the day-ahead and real-time energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to produce electricity. PJM and MISO, as buyers of capacity-market options, receive the right, at their sole discretion, to call upon the seller of the option (a power generator or demand response provider) to produce a specified amount of energy if and when needed. While the buyer of an option — in this case, PJM or MISO — need not exercise its option to require the seller to produce energy, the capacity market ensures that the grid will have the *ability* to furnish the amount of energy needed by consumers at any given moment in time.

45.     The amounts of capacity that ComEd is required to purchase in the PJM capacity markets and Ameren Illinois is required to purchase in the MISO capacity markets are determined through a rigorous reliability planning processes conducted by PJM and MISO, respectively, and overseen by FERC. Under FERC oversight, PJM and MISO each first determine the required amount of capacity, and then administer FERC-approved capacity auctions.

### Total Energy and Capacity Market Compensation to Electricity Generators

46.     The total compensation an electricity generator receives in the wholesale market is the sum of its energy-market and capacity-market revenues (as well as ancillary services market revenues, which account for only a small part of a generator's total revenue).

### How the ZEC Purchase Requirement of P.A. 99-0906 Distorts the Wholesale Electricity Market

47.     Under the ZEC purchase requirement of P.A. 99-0906, certain Illinois-based nuclear generators will receive higher prices per MWh of electricity than the wholesale prices established pursuant to FERC-approved market rules. The electricity delivery service customers

of the utilities ComEd and Ameren Illinois, including customers who do not even purchase electricity supply from the applicable utility, will be required to fund the difference between the wholesale electricity prices authorized by FERC and the higher prices established by the State of Illinois. These state-determined "revised" prices contradict FERC's determination that competitive wholesale prices are the just and reasonable rates for resources participating in the wholesale electricity market. Implementation of the ZEC purchase requirement will distort the functioning of the FERC-regulated energy and capacity markets in PJM, MISO, and nationwide.

48.     P.A. 99-0906, the legislation signed by Illinois Governor Bruce Rauner on December 7, 2016, enacted a zero emission standard requiring the Illinois Power Agency to procure contracts for electric utilities which serve at least 100,000 customers (i.e., ComEd and Ameren Illinois) for purchases of ZECs from nuclear fueled generating plants interconnected with PJM or MISO that are reasonably capable of generating ZECs for each delivery year (i.e., June 1 – May 31) in an amount approximately equal to 16% of the amount of MWhs of electricity delivered by the electric utility in calendar year 2014.[8]

49.     P.A. 99-0906 requires that the duration of the ZEC contracts be from June 1, 2017 through May 31, 2027 and that the contracts provide that the quantity of ZECs procured from a nuclear generating facility shall be all of the ZECs generated by the facility in each delivery year. 20 ILCS 3855/1-75(d-5)(1).

50.     P.A. 99-0906 provides that the price for each ZEC shall initially be $16.50 per MWh, which, according to the state law, is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate,

---

[8] For utilities that serve fewer than 100,000 customers the IPA must procure contracts with nuclear generating plants interconnected with PJM or MISO that are reasonably capable of generating cost-effective ZECs for each delivery year in an amount approximately equal to 16% of the portion of electricity to be procured by the Illinois Power Agency for the utility. 20 ICLS 3855/1-75(d-5)(1).

adjusted for inflation due to the ten-year contract duration. 220 ILCS 3855/1-75(d-5)(1)(B)(i). Beginning with the delivery year commencing June 1, 2023, the ZEC price also increases by $1 per MWh and continues to increase an additional $1 per MWh annually in the delivery years commencing June 1, 2024, June 1, 2025, and June 1, 2026. *Id.*

51.    P.A. 99-0906 further provides that the price of ZECs for each delivery year shall be reduced by the amount by which the projected wholesale market price index for the delivery year exceeds a baseline wholesale market price index, which P.A. 99-0906 sets at $31.40 per MWh. 20 ILCS 3855/1-75(d-5)(1)(B)(ii). The wholesale market price index for the applicable delivery year is the sum of projected wholesale energy prices and projected wholesale capacity prices for the delivery year. 220 ILCS 3855/1-75(d-5)(1)(B)(i).

52.    Under P.A. 99-0906, the electric utilities ComEd and Ameren Illinois will each charge all of their retail customers through their delivery service charges, including those customers who purchase electricity supply from competitive suppliers rather than the electric utility, for the cost of the ZECs sold to the electric utility under its contract with the provider of the ZECs. 20 ILCS 3855/1-75(d-5)(2); 220 ILCS 5/16-108(k). Furthermore, the state law authorizes the utility to recover these costs from all of its retail customers through an "automatic adjustment clause tariff."[9] 20 ILCS 3855/1-75(d-5)(6); 220 ILCS 5/16-108(k).

53.    P.A. 99-0906 is specifically designed so that Exelon Generation's Quad Cities and Clinton nuclear plants will sell all of the ZECs to ComEd and Ameren Illinois. Exelon Generation

---

[9] The ZEC purchase requirement cannot cause a net increase due to the cost of the ZECs in a delivery year for eligible retail customers, defined as retail customers purchasing electricity supply and delivery from the utility under fixed priced bundled service tariffs (other than retail customers whose service is declared competitive under Section 16-113 of the Public Utilities Act), of 1.65% or more of the amount per kWh paid for electric service by eligible retail customers during the twelve months ending May 31, 2009. To the extent that ZEC payments are reduced in a particular delivery year to avoid such an increase, the foregone ZEC payments are made up in any subsequent delivery year in which they can be made without violating the 1.65% cap for eligible retail customers. 20 ILCS 3855/1-75(d-5)(2).

is an Exempt Wholesale Generator ("EWG") under the Public Utility Holding Company Act. 42 U.S.C. 16451 *et seq.* An EWG is a person engaged "exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible facilities and selling electric energy at wholesale." *Id.* Exelon Generation's nuclear facilities can only produce electricity to sell in wholesale markets.

54.     Exelon Generation sells electric energy and capacity from the Quad Cities and Clinton nuclear plants to the utilities ComEd and Ameren Illinois pursuant to wholesale bilateral transactions procured by the Illinois Power Agency. 20 ILCS 3855/1-75. Exelon Generation also sells electric energy and capacity from these nuclear plants in the wholesale auctions conducted by PJM and MISO.

55.     The Quad Cities and Clinton nuclear plants were owned by electric utilities prior to the Illinois Customer Choice and Rate Relief Law of 1997. 220 ILCS 5/16-101 *et seq.* This law allowed the utilities to divest the plants to non-utilities. 220 ILCS 5/16-111(g). After the nuclear plants were divested to non-utilities and entered the wholesale markets, prices charged by the plants were subject to FERC rather than State of Illinois jurisdiction. The Illinois Customer Choice and Rate Relief Law of 1997 also allowed competitive suppliers to sell electricity to Illinois retail customers and required the utilities to deliver the competitive electricity to these customers on a non-discriminatory basis. 220 ILCS 5/16-115, 5/16-118. This Illinois law specifically found that: "All consumers must benefit in an equitable and timely fashion from the lower costs for electricity that result from retail and wholesale competition…." 220 ILCS 5/16-101A(e).

56.     The ZEC purchase requirement of P.A. 99-0906 establishes a new state-created electricity price "adder" that will inure only to Exelon Generation's Illinois-based Quad Cities and Clinton nuclear plants.

57.     The amount of the adder is directly tied to electricity prices in the FERC-regulated PJM and MISO wholesale markets. That is, the price of the ZEC will be reduced by the amount the projected wholesale market electricity price index for the applicable delivery year exceeds the baseline wholesale electricity market price index of $31.40 per MWh. In other words, if wholesale electricity prices increase, the ZEC subsidies directly decrease. For example, if the projected electricity market price index for delivery year 2 is $38.40 per MWh, the ZEC price for that year will be $9.50 per MWh. But if the projected electricity market price index for delivery year 3 is $39.40 per MWh, the ZEC price for that year will be $8.50 per MWh.

58.     The ZEC purchase requirement mechanism is analogous to the contract for differences ("CFD") mechanism adopted by Maryland and found unconstitutional by the U.S. Supreme Court in April 2016. *Hughes v Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016). In *Hughes*, the CFD mechanism ordered by the Maryland Public Service Commission annually changed the amount that an electric utility had to pay to a generator over the life of a twenty-year contract based on the clearing price in PJM's capacity auction. Each year the generator would receive the amount for capacity it received from participating in the PJM capacity auction and whatever additional subsidy was necessary from the utility for the generator to receive a specific amount for capacity each year.[10] Likewise, the ZEC pricing mechanism in P.A. 99-0906 is tied to an electricity market index which annually revises the amount of the ZEC price so it is exactly the amount necessary to provide a "sufficient" subsidy to Clinton and Quad Cities.

59.     In *Hughes*, the U.S. Supreme Court stated that FERC has jurisdiction to approve the PJM capacity auction as the sole rate-setting mechanism for capacity, and FERC's approval of

---

[10] In *Hughes*, to the extent the PJM capacity clearing price was higher than the price guaranteed in the CFD in a particular year, the price difference between the clearing price and contract price would be paid by the generator to the utility and the savings passed through to the utility's customers. 136 S. Ct. at 1295.

that mechanism means that the clearing price in the PJM capacity auction is *per se* just and reasonable. 136 S. Ct. at 1297. The U.S. Supreme Court found that "by adjusting an interstate wholesale rate, Maryland's [CFD] program invade[d] FERC's regulatory turf." 136 U.S. at 1297. Like Maryland's CFD program, the Illinois ZEC program under P.A. 99-0906 is invalid because it is aimed directly at prices in the wholesale electricity market, a market over which FERC holds plenary power.

60.     In *Hughes*, the U.S. Supreme Court's holding was that it rejected "Maryland's program only because it disregards an interstate wholesale rate required by FERC." 136 S. Ct. at 1299. In enacting P.A. 99-0906, the State of Illinois has disregarded the wholesale rates for capacity and energy established by the competitive market under FERC jurisdiction. This approach violates the Federal Power Act. 16 U.S.C. 824(b)(1). It does not matter whether the State believed that the generators were not receiving sufficient revenues from the wholesale market, as in the instant case and *Hughes*, or that a State believed the wholesale rate was too low, as the States of Mississippi and North Carolina did in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354(1988),* and *Nantahala Power & Light v. Thornburg,* 476 U.S. 953 (1986), respectively. A state simply cannot transgress the federal government's authority over wholesale rates.

61.     State laws are preempted when "they deny full effect to the rates set by FERC, even though [they do] not seek to tamper with the actual terms of an interstate transaction." *PPL Energyplus, LLC v. Nazarian*, 753 F. 3d 467, 476 (2014). The Federal Power Act '"leaves no room either for direct state regulation of the prices' or for regulation that 'would indirectly achieve the same result.'" *FERC v. Electric Power Association* 136 S.Ct. 760, 780, quoting *Northern Natural Gas Co. v. State Corporation Comm*. of Kansas 372 U.S. 84, 91 (1963).

62.     All of the utilities' retail customers, including customers that do not purchase electricity supply from them, must pay for the ZEC subsidies as part of the utilities' delivery services charges pursuant to automatic adjustment tariffs. 220 ILCS 5/16-108(k). Even customers of competitive suppliers providing 100 percent carbon emission-free wind and/or solar renewable energy to them as a premium service are required to pay for the utilities' cost of purchasing ZECs from Exelon Generation's Quad Cities and Clinton nuclear plants.

63.     The ZEC purchase requirement of P.A. 99-0906 bastardizes the competitive wholesale electricity market and thereby harms Illinois electricity consumers who currently purchase or are eligible to purchase electricity provided by competitive retail suppliers from interstate wholesale sources. Accordingly, the ZEC purchase requirement violates the dormant Commerce Clause of the U.S. Constitution.

64.     Under the 14th Amendment to the Constitution, electricity consumers are entitled to the equal protection of the laws of the United States, among which is the Federal Power Act. 16 U.S.C 791a, *et seq.; Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 890 n.9 (1985). The 14th Amendment to the United States Constitution provides, in relevant part, as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*" U.S. Constitution, Amendment XIV (emphasis added).

65.     As discussed above, under the Federal Power Act FERC regulates wholesale electricity markets in PJM and MISO. In addition to northern Illinois, the PJM regional transmission organization footprint covers parts or all of twelve other states and the District of

Columbia.[11] Likewise, in addition to central and southern Illinois, the MISO independent system operator footprint covers all or parts of fourteen other states.[12] By favoring certain Illinois-based nuclear generators over other electricity producers and thereby imposing on Illinois consumers wholesale electricity costs not imposed on electricity consumers of the several other states in the PJM and MISO footprints, P.A. 99-0906 denies to Plaintiffs the equal protection of federal laws governing the wholesale electricity markets in violation of the 14th Amendment to the U.S. Constitution.

66.     Implementation of the unconstitutional ZEC purchase requirement will cause irreparable harm to Plaintiffs because the State of Illinois and Defendant Anthony Star, in his official capacity as Director of the Illinois Power Agency, is immune from damages liability.

### CLAIMS FOR RELIEF

### COUNT I

### FIELD PREEMPTION — SUPREMACY CLAUSE

67.     Plaintiffs herein incorporate all previous allegations.

68.     Under the Supremacy Clause, if Congress enacts a federal regulatory scheme and intends to fully occupy the field it has chosen to regulate, any state law in this field is "field preempted" and thus invalid.

---

[11] Delaware, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.
[12] Arkansas, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Dakota, South Dakota, Wisconsin and Texas. MISO also includes the Province of Manitoba, Canada.

69.     Under the Federal Power Act, 16 U.S.C. 824(b), FERC has exclusive jurisdiction over the sale of electric energy and the sale of capacity at wholesale in interstate commerce. Federal law exclusively occupies the entire field of wholesale electricity sales.

70.     Sales of electricity from generators to electric utilities within PJM and MISO are wholesale sales of electricity, and therefore fall within the field of FERC's exclusive authority. The ZEC purchase requirement is field preempted because FERC has exclusive jurisdiction over wholesale prices, yet the ZEC program guarantees favored generators higher prices than the competitive wholesale market prices authorized by FERC.

71.     Plaintiffs will be injured if the ZEC purchase requirement goes ino effect and therefore are entitled to declaratory and injunctive relief.

**COUNT II**

**CONFLICT PREEMPTION — SUPREMACY CLAUSE**

72.     Plaintiffs herein incorporate all previous allegations.

73.     Even in the absence of field preemption, any state law or regulation is "conflict preempted" and thus invalid if it conflicts with federal law or frustrates the purpose of a federal law.

74.     The ZEC purchase requirement of P.A. 99-0906 is conflict preempted by the Federal Power Act. 16 U.S.C. 824. FERC, the agency charged with implementing the Federal Power Act, has determined that market-based processes — approved and overseen by FERC — are the best way to bring more efficient, lower cost power to the nation's electricity consumers.

75.     The ZEC purchase requirement requires Illinois utilities to charge all of their retail customers, including customers that do not purchase electricity supply from the utilities, for the costs of purchasing ZECs from favored nuclear generators.

76.     The ZEC purchase requirement makes a mockery of the competitive wholesale electricity market under FERC jurisdiction and violates federal law.

77.     The Illinois law directly contravenes FERC's determination that competitive markets should reasonably determine the wholesale price for electricity within PJM and MISO. This contravention violates Section 824 of the Federal Power Act. 16 U.S.C. 824.

78.     If Illinois truly believes that nuclear generators should get higher payments for their electricity, it is entitled to petition FERC to adopt market rule changes designed to accomplish this goal. At Exelon Generation's urging, PJM did this in 2014 when it asked FERC to approve a change to PJM's capacity auction which required that generators meet certain capacity performance standards. *PJM Interconnection, LLC,* 151 FERC Par. 61,208 (June 9, 2015) and 155 FERC Par. 61,157 (May 10, 2016) (Order on Rehearing and Compliance).  After FERC approved this approach, Exelon Generation's nuclear generators obtained much higher capacity payments through PJM's capacity auction.[13] Instead of following this course of petitioning FERC for changes designed to result in higher wholesale electricity prices, Illinois has opted to disregard FERC's exclusive jurisdiction over wholesale electricity rates.

79.     The ZEC purchase requirement stands as an obstacle to FERC's regulatory scheme, which depends upon fair competition and the functioning of competitive markets without

---

[13] See http://www.pjm.com/~/media/markets-ops/rpm/rpm-auction-info/2018-2019-base-residual-auction-report.ashx. Compare the clearing price for the first annual base capacity performance auction of $215/MW-day for the delivery year June 2018-May 2019 applicable to northern Illinois with the annual base capacity auction clearing price of $120/MW-day applicable to northern Illinois for the prior delivery year (June 2017-May 2018).

interference from out-of-market subsidies. Under the Supremacy Clause, the State of Illinois may not supplant FERC's scheme with its own preferred approach.

80.     Plaintiffs will be injured if the ZEC purchase requirement goes into effect and therefore are entitled to declaratory and injunctive relief.

## COUNT III

## DORMANT COMMERCE CLAUSE, UNDER 42 U.S.C. 1983

81.     Plaintiffs herein incorporate all previous allegations.

82.     The ZEC purchase requirement of P.A. 99-0906 is invalid under the dormant Commerce Clause of the U.S. Constitution, Article I, Section 8. Under this provision of the U.S. Constitution, states cannot discriminate against interstate commerce nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity. Any state action that burdens interstate commerce is invalid if it does not regulate evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are more than incidental. *E.g., State of Missouri ex rel. Barrett v Kansas Natural Gas Co.*, 265 U.S. 298, 306-07 (1924).

83.     Although states have the right to regulate retail sales of electricity within their own borders, the wholesale sale of electricity involves interstate commerce, which a state may not regulate. PJM's and MISO's wholesale markets are interstate and international in nature, as they involve the sale and transmission of energy and capacity from generators located in other states and Canada.

84.     The ZEC purchase requirement directly discriminates against electricity suppliers that buy and sell electricity in the interstate wholesale market.

85. The ZEC purchase requirement is directly discriminatory, as only certain Illinois nuclear facilities will be selling ZECs to the utilities ComEd and Ameren Illinois. The program is not even-handed with respect to out-of-state generation and its effects on interstate commerce are more than incidental. It therefore violates the Commerce Clause.

86. The ZEC purchase requirement harms Illinois consumers that purchase or are eligible to purchase electricity supply from competitive retail suppliers who purchase electricity from interstate wholesale suppliers.

87. Defendant's actions in enacting and implementing the ZEC purchase requirement deprive Plaintiffs of their Commerce Clause "rights, privileges, or immunities" within the meaning of the Commerce Clause. Plaintiffs have been injured by these deprivations and are entitled to redress under 42 U.S.C. 1983. *Dennis v. Higgins,* 498 U.S. 439 (1991).

## COUNT IV

### 14th AMENDMENT, EQUAL PROTECTION, UNDER 42 U.S.C. 1983

88. Plaintiffs herein incorporate all previous allegations.

89. Plaintiffs are persons entitled to the equal protection of the laws of the United States. Among those laws is the Federal Power Act, 16 U.S.C 791a, *et seq*., pursuant to which FERC, an agency of the United States Government, has authorized and regulates wholesale electricity markets in both PJM and MISO.

90. P.A. 99-0906 will impose on all retail customers of the electric utilities ComEd and Ameren Illinois certain costs of ZEC purchases from Exelon Generation's Quad Cities and Clinton nuclear plants that are not imposed on electricity consumers in other states within PJM and MISO.

91.     The imposition of ZEC charges would be actions taken under color of state law, i.e. P.A. 99-0906.

92.     Enactment of P.A. 99-0906 denied to Plaintiffs the equal protection of the laws in violation of the 14th Amendment to the U.S. Constitution.

93.     Implementation and enforcement of P.A. 99-0906 will deny to Plaintiffs the equal protection of the laws in violation of the 14th Amendment to the U.S. Constitution.

94.     Plaintiffs have been injured by these deprivations of their rights to equal protection of the laws and are entitled to redress under 42 U.S.C. 1983. *Dennis v. Higgins,* 498 U.S. 439 (1991).

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs seek:

A.     a declaration that subsection (d-5) of Illinois Public Act 99-0906 is invalid because it is preempted by federal law and unconstitutional;

B.     a permanent injunction prohibiting Defendant Illinois Power Agency Director Anthony Star from implementing subsection (d-5) of Illinois Public Act 99-0906;

C.     reasonable attorneys' fees and costs (42 U.S.C. 1988); and

D.     all such other relief to which they may be entitled.


Dated: February 14, 2017

                                        Respectfully submitted,


                                        /s/ Patrick N. Giordano
                                        _____
Paul G. Neilan                           Patrick N. Giordano
LAW OFFICES OF PAUL G. NEILAN,           GIORDANO & ASSOCIATES, LTD.
P.C.                                     1710 Wesley Avenue
1954 First Street #390                   Evanston, Illinois 60201
Highland Park, Illinois 60035            Telephone: 847-905-0703
pgneilan@energy.law.pro                  patrickgiordano@dereglaw.com
Telephone: 847-266-0464                  Direct: 847-905-05