UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

VILLAGE OF OLD MILL CREEK,
FERRITE INTERNATIONAL COMPANY,
GOT IT MAID, INC., NAFISCA ZOTOS,
ROBERT DILLON, RICHARD OWENS,
And ROBIN HAWKINS, both individually and
d/b/a ROBIN'S NEST,

No. 17-cv-1163

    Plaintiffs,

    v.

ANTHONY STAR, in his official capacity
As Director of the Illinois Power Agency,

    Defendant.

**EXHIBIT A TO COMPLAINT**

    Section (d-5) of P.A. 99-0906

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 2 of 8 PageID #:28

(E) Amounts paid to third parties unrelated to the owner or owners of the initial clean coal facility to prepare the core plant construction cost quote, including the front end engineering and design study, and the operating and maintenance cost quote will be reimbursed through Coal Development Bonds.

(5) Re–powering and retrofitting coal-fired power plants previously owned by Illinois utilities to qualify as clean coal facilities. During the 2009 procurement planning process and thereafter, the Agency and the Commission shall consider sourcing agreements covering electricity generated by power plants that were previously owned by Illinois utilities and that have been or will be converted into clean coal facilities, as defined by Section 1–10 of this Act. Pursuant to such procurement planning process, the owners of such facilities may propose to the Agency sourcing agreements with utilities and alternative retail electric suppliers required to comply with subsection (d) of this Section and item (5) of subsection (d) of Section 16–115 of the Public Utilities Act, covering electricity generated by such facilities. In the case of sourcing agreements that are power purchase agreements, the contract price for electricity sales shall be established on a cost of service basis. In the case of sourcing agreements that are contracts for differences, the contract price from which the reference price is subtracted shall be established on a cost of service basis. The Agency and the Commission may approve any such utility sourcing agreements that do not exceed cost-based benchmarks developed by the procurement administrator, in consultation with the Commission staff, Agency staff and the procurement monitor, subject to Commission review and approval. The Commission shall have authority to inspect all books and records associated with these clean coal facilities during the term of any such contract.

(6) Costs incurred under this subsection (d) or pursuant to a contract entered into under this subsection (d) shall be deemed prudently incurred and reasonable in amount and the electric utility shall be entitled to full cost recovery pursuant to the tariffs filed with the Commission.

**(d–5) Zero emission standard.**

**(1) Beginning with the delivery year commencing on June 1, 2017, the Agency shall, for electric utilities that serve at least 100,000 retail customers in this State, procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014. For an electric utility serving fewer than 100,000 retail customers in this State that requested, under Section 16–111.5 of the Public Utilities Act, that the Agency procure power and energy for all or a portion of the utility's Illinois load for the delivery year commencing June 1, 2016, the Agency shall procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the portion of power and energy to be procured by the Agency for the utility. The duration of the contracts procured under this subsection (d–5) shall be for a term of 10 years ending May 31, 2027. The quantity of zero emission credits to be procured under the contracts shall be all of the zero emission credits generated by the zero emission facility in each delivery year; however, if the zero emission facility is owned by more than one entity, then the quantity of zero emission credits to be procured under the contracts shall be the amount of zero emission credits that are generated from the portion of the zero emission facility that is owned by the winning supplier.**

**The 16% value identified in this paragraph (1) is the average of the percentage targets in subparagraph (B) of paragraph (1) of subsection (c) of Section 1–75 of this Act for the 5 delivery years beginning June 1, 2017.**

**The procurement process shall be subject to the following provisions:**

**(A) Those zero emission facilities that intend to participate in the procurement shall submit to the Agency the following eligibility information for each zero emission facility on or before the date established by the Agency:**

**(i) the in-service date and remaining useful life of the zero emission facility;**

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 3 of 8 PageID #:29

(ii) the amount of power generated annually for each of the years 2005 through 2015, and the projected zero emission credits to be generated over the remaining useful life of the zero emission facility, which shall be used to determine the capability of each facility;

(iii) the annual zero emission facility cost projections, expressed on a per megawatthour basis, over the next 6 delivery years, which shall include the following: operation and maintenance expenses; fully allocated overhead costs, which shall be allocated using the methodology developed by the Institute for Nuclear Power Operations; fuel expenditures; non–fuel capital expenditures; spent fuel expenditures; a return on working capital; the cost of operational and market risks that could be avoided by ceasing operation; and any other costs necessary for continued operations, provided that "necessary" means, for purposes of this item (iii), that the costs could reasonably be avoided only by ceasing operations of the zero emission facility; and

(iv) a commitment to continue operating, for the duration of the contract or contracts executed under the procurement held under this subsection (d–5), the zero emission facility that produces the zero emission credits to be procured in the procurement.

The information described in item (iii) of this subparagraph (A) may be submitted on a confidential basis and shall be treated and maintained by the Agency, the procurement administrator, and the Commission as confidential and proprietary and exempt from disclosure under subparagraphs (a) and (g) of paragraph (1) of Section 7 of the Freedom of Information Act. The Office of Attorney General shall have access to, and maintain the confidentiality of, such information pursuant to Section 6.5 of the Attorney General Act.

(B) The price for each zero emission credit procured under this subsection (d–5) for each delivery year shall be in an amount that equals the Social Cost of Carbon, expressed on a price per megawatthour basis. However, to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase, the price in an applicable delivery year shall be reduced below the Social Cost of Carbon by the amount ("Price Adjustment") by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12–month period ending May 31, 2016. If the Price Adjustment is greater than or equal to the Social Cost of Carbon in an applicable delivery year, then no payments shall be due in that delivery year. The components of this calculation are defined as follows:

(i) Social Cost of Carbon: The Social Cost of Carbon is $16.50 per megawatthour, which is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each year of the program. Beginning with the delivery year commencing June 1, 2023, the price per megawatthour shall increase by $1 per megawatthour, and continue to increase by an additional $1 per megawatthour each delivery year thereafter.

(ii) Baseline market price index: The baseline market price index for the consecutive 12–month period ending May 31, 2016 is $31.40 per megawatthour, which is based on the sum of (aa) the average day-ahead energy price across all hours of such 12–month period at the PJM Interconnection LLC Northern Illinois Hub, (bb) 50% multiplied by the Base Residual Auction, or its successor, capacity price for the rest of the RTO zone group determined by PJM Interconnection LLC, divided by 24 hours per day, and (cc) 50% multiplied by the Planning Resource Auction, or its successor, capacity price for Zone 4 determined by the Midcontinent Independent System Operator, Inc., divided by 24 hours per day.

(iii) Market price index: The market price index for a delivery year shall be the sum of projected energy prices and projected capacity prices determined as follows:

(aa) Projected energy prices: the projected energy prices for the applicable delivery year shall be calculated once for the year using the forward market price for the PJM Interconnection, LLC Northern Illinois Hub. The forward market price shall be calculated as follows: the energy forward

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 4 of 8 PageID #:30

> prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year to produce a single energy forward price for the delivery year. The forward market price calculation shall use data published by the Intercontinental Exchange, or its successor.
>
> (bb) Projected capacity prices:
>
>> (I) For the delivery years commencing June 1, 2017, June 1, 2018, and June 1, 2019, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the rest of the RTO zone group as determined by PJM Interconnection LLC, divided by 24 hours per day and, (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.
>
>> (II) For the delivery year commencing June 1, 2020, and each year thereafter, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the ComEd zone as determined by PJM Interconnection LLC, divided by 24 hours per day, and (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

For purposes of this subsection (d–5):

> "Rest of the RTO" and "ComEd Zone" shall have the meaning ascribed to them by PJM Interconnection, LLC.
>
> "RTO" means regional transmission organization.

(C) No later than 45 days after the effective date of this amendatory Act of the 99th General Assembly, the Agency shall publish its proposed zero emission standard procurement plan. The plan shall be consistent with the provisions of this paragraph (1) and shall provide that winning bids shall be selected based on public interest criteria that include, but are not limited to, minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State. In particular, the selection of winning bids shall take into account the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would cease to exist if the procurements were not held, including the preservation of zero emission facilities. The plan shall also describe in detail how each public interest factor shall be considered and weighted in the bid selection process to ensure that the public interest criteria are applied to the procurement and given full effect.

For purposes of developing the plan, the Agency shall consider any reports issued by a State agency, board, or commission under House Resolution 1146 of the 98th General Assembly and paragraph (4) of subsection (d) of Section 1–75 of this Act, as well as publicly available analyses and studies performed by or for regional transmission organizations that serve the State and their independent market monitors.

Upon publishing of the zero emission standard procurement plan, copies of the plan shall be posted and made publicly available on the Agency's website. All interested parties shall have 10 days following the date of posting to provide

PUBLIC UTILITIES — ENERGY — ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 5 of 8 PageID #:31

comment to the Agency on the plan. All comments shall be posted to the Agency's website. Following the end of the comment period, but no more than 60 days later than the effective date of this amendatory Act of the 99th General Assembly, the Agency shall revise the plan as necessary based on the comments received and file its zero emission standard procurement plan with the Commission.

If the Commission determines that the plan will result in the procurement of cost-effective zero emission credits, then the Commission shall, after notice and hearing, but no later than 45 days after the Agency filed the plan, approve the plan or approve with modification. For purposes of this subsection (d–5), "cost effective" means the projected costs of procuring zero emission credits from zero emission facilities do not cause the limit stated in paragraph (2) of this subsection to be exceeded.

(C–5) As part of the Commission's review and acceptance or rejection of the procurement results, the Commission shall, in its public notice of successful bidders:

> (i) identify how the winning bids satisfy the public interest criteria described in subparagraph (C) of this paragraph (1) of minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State;
>
> (ii) specifically address how the selection of winning bids takes into account the incremental environmental benefits resulting from the procurement, including any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would have ceased to exist if the procurements had not been held, such as the preservation of zero emission facilities;
>
> (iii) quantify the environmental benefit of preserving the resources identified in item (ii) of this subparagraph (C–5), including the following:
>
>> (aa) the value of avoided greenhouse gas emissions measured as the product of the zero emission facilities' output over the contract term multiplied by the U.S. Environmental Protection Agency eGrid subregion carbon dioxide emission rate and the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each delivery year; and
>>
>> (bb) the costs of replacement with other zero carbon dioxide resources, including wind and photovoltaic, based upon the simple average of the following:
>>
>>> (I) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale wind projects in the procurement events specified in item (i) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1–75 of this Act; and
>>>
>>> (II) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale solar projects and brownfield site photovoltaic projects in the procurement events specified in item (ii) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1–75 of this Act and, after January 1, 2015, renewable energy credits from photovoltaic distributed generation projects in procurement events held under subsection (c) of Section 1–75 of this Act.

Each utility shall enter into binding contractual arrangements with the winning suppliers.
> The procurement described in this subsection (d–5), including, but not limited to, the execution of all contracts procured, shall be completed no later than May 10, 2017. Based on the effective date of this amendatory Act of the 99th General Assembly, the Agency and Commission may, as appropriate, modify the various dates and timelines under

PUBLIC UTILITIES — ENERGY — ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 6 of 8 PageID #:32

this subparagraph and subparagraphs (C) and (D) of this paragraph (1). The procurement and plan approval processes required by this subsection (d–5) shall be conducted in conjunction with the procurement and plan approval processes required by subsection (c) of this Section and Section 16–111.5 of the Public Utilities Act, to the extent practicable. Notwithstanding whether a procurement event is conducted under Section 16–111.5 of the Public Utilities Act, the Agency shall immediately initiate a procurement process on the effective date of this amendatory Act of the 99th General Assembly.

(D) Following the procurement event described in this paragraph (1) and consistent with subparagraph (B) of this paragraph (1), the Agency shall calculate the payments to be made under each contract for the next delivery year based on the market price index for that delivery year. The Agency shall publish the payment calculations no later than May 25, 2017 and every May 25 thereafter.

(E) Notwithstanding the requirements of this subsection (d–5), the contracts executed under this subsection (d–5) shall provide that the zero emission facility may, as applicable, suspend or terminate performance under the contracts in the following instances:

> (i) A zero emission facility shall be excused from its performance under the contract for any cause beyond the control of the resource, including, but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which, in any of the foregoing cases, by exercise of commercially reasonable efforts the zero emission facility could not reasonably have been expected to avoid, and which, by the exercise of commercially reasonable efforts, it has been unable to overcome. In such event, the zero emission facility shall be excused from performance for the duration of the event, including, but not limited to, delivery of zero emission credits, and no payment shall be due to the zero emission facility during the duration of the event.

> (ii) A zero emission facility shall be permitted to terminate the contract if legislation is enacted into law by the General Assembly that imposes or authorizes a new tax, special assessment, or fee on the generation of electricity, the ownership or leasehold of a generating unit, or the privilege or occupation of such generation, ownership, or leasehold of generation units by a zero emission facility. However, the provisions of this item (ii) do not apply to any generally applicable tax, special assessment or fee, or requirements imposed by federal law.

> (iii) A zero emission facility shall be permitted to terminate the contract in the event that the resource requires capital expenditures in excess of $40,000,000 that were neither known nor reasonably foreseeable at the time it executed the contract and that a prudent owner or operator of such resource would not undertake.

> (iv) A zero emission facility shall be permitted to terminate the contract in the event the Nuclear Regulatory Commission terminates the resource's license.

(F) If the zero emission facility elects to terminate a contract under this subparagraph (E, of this paragraph (1), then the Commission shall reopen the docket in which the Commission approved the zero emission standard procurement plan under subparagraph (C) of this paragraph (1) and, after notice and hearing, enter an order acknowledging the contract termination election if such termination is consistent with the provisions of this subsection (d–5).

(2) For purposes of this subsection (d–5), the amount paid per kilowatthour means the total amount paid for electric service expressed on a per kilowatthour basis. For purposes of this subsection (d–5), the total amount paid for electric service includes, without limitation, amounts paid for supply, transmission, distribution, surcharges, and add-on taxes.

Notwithstanding the requirements of this subsection (d–5), the contracts executed under this subsection (d–5) shall provide that the total of zero emission credits procured under a procurement plan shall be subject to the limitations of this paragraph (2). For each delivery year, the contractual volume receiving payments in such year shall be reduced for all retail customers

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 7 of 8 PageID #:33

based on the amount necessary to limit the net increase that delivery year to the costs of those credits included in the amounts paid by eligible retail customers in connection with electric service to no more than 1.65% of the amount paid per kilowatthour by eligible retail customers during the year ending May 31, 2009. The result of this computation shall apply to and reduce the procurement for all retail customers, and all those customers shall pay the same single, uniform cents per kilowatthour charge under subsection (k) of Section 16–108 of the Public Utilities Act. To arrive at a maximum dollar amount of zero emission credits to be paid for the particular delivery year, the resulting per kilowatthour amount shall be applied to the actual amount of kilowatthours of electricity delivered by the electric utility in the delivery year immediately prior to the procurement, to all retail customers in its service territory. Unpaid contractual volume for any delivery year shall be paid in any subsequent delivery year in which such payments can be made without exceeding the amount specified in this paragraph (2). The calculations required by this paragraph (2) shall be made only once for each procurement plan year. Once the determination as to the amount of zero emission credits to be paid is made based on the calculations set forth in this paragraph (2), no subsequent rate impact determinations shall be made and no adjustments to those contract amounts shall be allowed. All costs incurred under those contracts and in implementing this subsection (d–5) shall be recovered by the electric utility as provided in this Section.

No later than June 30, 2019, the Commission shall review the limitation on the amount of zero emission credits procured under this subsection (d–5) and report to the General Assembly its findings as to whether that limitation unduly constrains the procurement of cost-effective zero emission credits.

(3) Six years after the execution of a contract under this subsection (d–5), the Agency shall determine whether the actual zero emission credit payments received by the supplier over the 6–year period exceed the Average ZEC Payment. In addition, at the end of the term of a contract executed under this subsection (d–5), or at the time, if any, a zero emission facility's contract is terminated under subparagraph (E) of paragraph (1) of this subsection (d–5), then the Agency shall determine whether the actual zero emission credit payments received by the supplier over the term of the contract exceed the Average ZEC Payment, after taking into account any amounts previously credited back to the utility under this paragraph (3). If the Agency determines that the actual zero emission credit payments received by the supplier over the relevant period exceed the Average ZEC Payment, then the supplier shall credit the difference back to the utility. The amount of the credit shall be remitted to the applicable electric utility no later than 120 days after the Agency's determination, which the utility shall reflect as a credit on its retail customer bills as soon as practicable; however, the credit remitted to the utility shall not exceed the total amount of payments received by the facility under its contract.

For purposes of this Section, the Average ZEC Payment shall be calculated by multiplying the quantity of zero emission credits delivered under the contract times the average contract price. The average contract price shall be determined by subtracting the amount calculated under subparagraph (B) of this paragraph (3) from the amount calculated under subparagraph (A) of this paragraph (3), as follows:

(A) The average of the Social Cost of Carbon, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5), during the term of the contract.

(B) The average of the market price indices, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5), during the term of the contract, minus the baseline market price index, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5).

If the subtraction yields a negative number, then the Average ZEC Payment shall be zero.

(4) Cost–effective zero emission credits procured from zero emission facilities shall satisfy the applicable definitions set forth in Section 1–10 of this Act.

(5) The electric utility shall retire all zero emission credits used to comply with the requirements of this subsection (d–5).

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 8 of 8 PageID #:34

**(6) Electric utilities shall be entitled to recover all of the costs associated with the procurement of zero emission credits through an automatic adjustment clause tariff in accordance with subsection (k) and (m) of Section 16–108 of the Public Utilities Act, and the contracts executed under this subsection (d–5) shall provide that the utilities' payment obligations under such contracts shall be reduced if an adjustment is required under subsection (m) of Section 16–108 of the Public Utilities Act.**

**(7) This subsection (d–5) shall become inoperative on January 1, 2028.**

(e) The draft procurement plans are subject to public comment, as required by Section 16–111.5 of the Public Utilities Act.

(f) The Agency shall submit the final procurement plan to the Commission. The Agency shall revise a procurement plan if the Commission determines that it does not meet the standards set forth in Section 16–111.5 of the Public Utilities Act.

(g) The Agency shall assess fees to each affected utility to recover the costs incurred in preparation of the annual procurement plan for the utility.

(h) The Agency shall assess fees to each bidder to recover the costs incurred in connection with a competitive procurement process.

**(i) A renewable energy credit, carbon emission credit, or zero emission credit can only be used once to comply with a single portfolio or other standard as set forth in subsection (c), subsection (d), or subsection (d–5) of this Section, respectively. A renewable energy credit, carbon emission credit, or zero emission credit cannot be used to satisfy the requirements of more than one standard. If more than one type of credit is issued for the same megawatt hour of energy, only one credit can be used to satisfy the requirements of a single standard. After such use, the credit must be retired together with any other credits issued for the same megawatt hour of energy.**

(Source: P.A. 98–463, eff. 8–16–13; 99–536, eff. 7–8–16.)

Section 10. The Illinois Procurement Code is amended by changing Section 20–10 as follows:

<< IL ST CH 30 § 500/20–10 >>

**[S.H.A. 30 ILCS 500/20–10]** (30 ILCS 500/20–10)

(Text of Section from P.A. 96–159, 96–588, 97–96, 97–895, and 98–1076)

§ 20–10. Competitive sealed bidding; reverse auction.

(a) Conditions for use. All contracts shall be awarded by competitive sealed bidding except as otherwise provided in Section 20–5.

(b) Invitation for bids. An invitation for bids shall be issued and shall include a purchase description and the material contractual terms and conditions applicable to the procurement.

(c) Public notice. Public notice of the invitation for bids shall be published in the Illinois Procurement Bulletin at least 14 calendar days before the date set in the invitation for the opening of bids.

(d) Bid opening. Bids shall be opened publicly in the presence of one or more witnesses at the time and place designated in the invitation for bids. The name of each bidder, the amount of each bid, and other relevant information as may be