**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VILLAGE OF OLD MILL CREEK, FERRITE INTERNATIONAL COMPANY, GOT IT MAID, INC., NAFISCA ZOTOS, ROBERT DILLON, RICHARD OWENS, And ROBIN HAWKINS, both individually and d/b/a ROBIN'S NEST, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:17-cv-01163 |
| v. | ) ) | District Judge Manish S. Shah |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, | ) ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASSOCIATION, DYNEGY INC., EASTERN GENERATION LLC, NRG ENERGY, INC., and CALPINE CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:17-cv-01164 |
| v. | ) ) | District Judge Manish S. Shah |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, and BRIEN J. SHEAHAN, JOHN R. ROSALES, SADZI MARTHA OLIVA, MIGUEL DEL VALLE, and SHERINA MAYE EDWARDS, in their official capacities as Commissioners of the Illinois Commerce Commission, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS OF INTERVENOR
EXELON GENERATION COMPANY, LLC**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

ARGUMENT .......................................................................................................................... 2

I.     Plaintiffs Are Not Entitled To Pursue Their Arguments In Court. ................................. 2

      A.     Plaintiffs Lack A Preemption Cause Of Action. .................................................. 2

      B.     Retail Plaintiffs Lack Prudential Standing To Invoke Preemption. ...................... 4

      C.     Plaintiffs Lack Standing To Challenge The ZEC Price Adjustment. .................... 5

      D.     Plaintiffs Lack Standing To Bring A Dormant Commerce Clause Claim. ............ 5

II.    Plaintiffs' Field Preemption Claim Fails As A Matter Of Law. ..................................... 7

      A.     Plaintiffs' Effects-Based Arguments Fail. ........................................................... 8

           1.     The FPA Does Not Preempt State Programs Just Because They Are Intended To Affect Generators' Decisions. ................................................ 8

           2.     Plaintiffs Cannot Rely On FERC's "Directly Affecting" Jurisdiction. ................................................................................................ 10

           3.     Plaintiffs Cannot Dodge *WSPP*'s Clear Holding. ................................... 12

      B.     *Hughes*'s Careful Holding Preserves The ZEC Program. ................................... 15

      C.     Plaintiffs' Other Miscellaneous Cases Are Off Point. ........................................ 19

      D.     Exelon's Arguments Do Not Turn On The Label "Environmental," And Plaintiffs Also Have Not Properly Pled Anything To The Contrary. ................... 20

III.   Plaintiffs' Conflict Preemption Claim Fails As A Matter Of Law. ............................... 21

IV.   Plaintiffs' Dormant Commerce Clause Claims Should Be Dismissed. ........................... 22

      A.     The ZEC Program Is Constitutional Under *Alexandria Scrap*. ........................... 22

      B.     Plaintiffs' Discrimination-Based Claims Fail On The Merits. ............................. 23

CONCLUSION ...................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**CASES**

*Allco Finance Ltd. v. Klee*, No. 3:15-CV-608 (CSH), 2016 WL 4414774 (D. Conn. Aug. 18, 2016), *appeal docketed*, No. 16-2946 (2d Cir. Aug. 23, 2016) ...................................22, 23

*Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) .....................................................6

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) ........................................2, 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................21

*Associated General Contractors of America, San Diego Chapter, Inc. v. California Department of Transportation*, 713 F.3d 1187 (9th Cir. 2013) .................................................6

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) ................................................................6, 24

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372 (8th Cir. 1997) ....................................................................................................................................7

*Building & Construction Trades Council of Metropolitan District v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993) ...........................17

*Blue Circle Cement, Inc. v. Board of County Commissioners of County of Rogers*, 27 F.3d 1499 (10th Cir. 1994)........................................................................................................17

*California Public Utilities*, 133 FERC ¶ 61,059 (2010) ...............................................................9

*Cavel International, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007)...........................................25

*Chamber of Commerce of United States v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) .........................6

*City of Gainesville v. Florida Power & Light Co.*, 488 F. Supp. 1258 (S.D. Fla. 1980)................2

*Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) .................................................................................................................9, 11, 12

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008)...........................................23

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) .....................................................24

*FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016) ......................................8, 11, 12, 16

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) .....................................................................................................................................2

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000)....................................................20

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)........................................................7

*Goodpaster v. City of Indianapolis*, 736 F.3d 1060 (7th Cir. 2013)................................25

*Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950 (D.C. Cir. 2000)...............4

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) ...........................................22, 23

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) .....1, 4, 8, 15, 16, 17, 18, 20, 22

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .........24

*Individuals for Responsible Government, Inc. v. Board of County Commissioners ex rel. Washoe County*, 110 F.3d 699 (9th Cir. 1997) .........................................................7

*International Academy of Oral Medicine & Toxicology v. FDA*, 195 F. Supp. 3d 243 (D.D.C. 2016) ...........................................................................................................6

*ISO New England, Inc.*, 147 FERC ¶ 61,173 (2014) ....................................................15

*ISO New England Inc.*, 158 FERC ¶ 61,138 (2017) .....................................................16

*Johnson v. United States Office of Personnel Management*, 783 F.3d 655 (7th Cir. 2015)............5

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .................................24, 25

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)................11, 20

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951) .........2, 4

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) .............................20

*New Energy Co. of Indiana v. Limbach*, 486 U.S. 269 (1988) ......................................6

*New York v. FERC*, 535 U.S. 1 (2002) ........................................................................11

*New York State Public Service Commission*, 158 FERC ¶ 61,137, 2017 WL 496267 (2017)............................................................................................................1, 8

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987)............................24, 25

*Northern Natural Gas Co. v. State Corporation Commission*, 372 U.S. 84 (1963)...............19

*Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas*, 489 U.S. 493 (1989)...................................................................................................8, 21

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015)............................................10, 17, 19, 20, 22

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................................25

*Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) ......................17

*Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99
(2d Cir. 1985).........................................................................................................18

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) ............................................19

*South Dakota Mining Ass'n, Inc. v. Lawrence County*, 155 F.3d 1005 (8th Cir. 1998)...............17

*Southern California Edison Co.*, 71 FERC ¶ 61,269 (1995) .....................................9, 12

*Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713
F.3d 175 (4th Cir. 2013) ..........................................................................................7

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) ................................................11, 21

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ...............................................6

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994)..........................................5, 6

*Wheelabrator Lisbon, Inc. v. Connecticut Department of Public Utility Control*, 531 F.3d
183 (2d Cir. 2008)..................................................................................................13

*WSPP, Inc.*, 139 FERC ¶ 61,061 (2012)..............................................................12, 13

S<span>TATUTES</span>

20 ILCS 3855/1-56(b)(2) ..............................................................................................24

20 ILCS 3855/1-56(b)(3) ..............................................................................................14

20 ILCS 3855/1-56(b)(4) ..............................................................................................14

20 ILCS 3855/1-75(c)(1)(D) .........................................................................................15

20 ILCS 3855/1-75(c)(1)(J) ..........................................................................................14

20 ILCS 3855/1-75(c)(1)(K) .........................................................................................14

20 ILCS 3855/1-75(c)(7) ...............................................................................................24

20 ILCS 3855/1-75(d-5)(1).............................................................................................13

20 ILCS 3855/1-75(d-5)(1)(C) .......................................................................................24

220 ILCS 5/16-108.12 ...................................................................................................24

16 U.S.C. § 824(b) ..................................................................................................17

16 U.S.C. § 824d(a) ...............................................................................................11

16 U.S.C. § 825m(a) ................................................................................................2

16 U.S.C. § 825p ......................................................................................................2

Colo. Rev. Stat. § 40-2-124(1)(c)(VII)(A)...........................................................14

Colo. Rev. Stat. § 40-2-124(1)(c)(IX) ..................................................................14

Conn. Gen. Stat. § 16-1(20) ..................................................................................14

26 Del. Code Ann. § 352(25)..................................................................................14

26 Del. Code Ann. § 354(a) ...................................................................................14

26 Del. Code Ann. § 356 ........................................................................................14

Md. Code Ann. Pub. Utils. § 7-704.1 ....................................................................14

Minn. Stat. § 216B.1691 Subd. 2f .........................................................................14

N.C. Gen. Stat. § 62-133.8(a)(7)............................................................................14

N.J. Stat. Ann. § 48:3-87.1.....................................................................................14

52 Pa. Code § 75.1 ..................................................................................................14

## LEGISLATIVE MATERIALS

SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016), http://www.ilga.gov/legislation/99/SB/PDF/09900SB2814enr.pdf ................................20, 25

## OTHER AUTHORITIES

18 C.F.R. § 366.7(c)(3).........................................................................................18

Amicus Brief of United States, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), 2016 WL 344494.......................................................................................9, 21

Matthew R. Christiansen, *The FPA and the Private Right to Preempt*, 84 Geo. Wash. L. Rev. Arguendo 130 (2016) ...................................................................................4

Steven Ferrey, 2 L. of Indep. Power § 10:115 (2017) .................................................14

Ivan Gold & Nidhi Thakar, *A Survey of State Renewable Portfolio Standards: Square Pegs for Round Climate Change Holes?*, 35 Wm. & Mary Envtl. L. & Pol'y Rev. 183 (2010)...............................................................................................................................14

Illinois Commerce Commission, *Potential Nuclear Power Plant Closings in Illinois* (Jan. 5, 2015), http://bit.ly/2qg5hWA...............................................................................20

Motion to Amend, and Amendment to, Complaint and Request for Expedited Action on Amended Complaint, *Calpine Corp. v. PJM Interconnection, LLC*, Docket No. EL16-49-000 (FERC filed Jan. 9, 2017), http://bit.ly/2oWAtf9............................................. 3, 21-22

Motion for Leave to Answer and Answer, *Calpine Corp. v. PJM Interconnection, LLC*, Docket No. EL16-49-000 (Feb. 14, 2017), http://bit.ly/2oMdXoO...........................................3

Notice of Technology Conference, Docket No. AD17-11-000 (Mar. 3, 2017).............................3

Order Adopting a Clean Energy Standard, *Proceeding on Motion of the Commission to Implement a Large-Scale Renewable Program and a Clean Energy Standard*, No. 15-E-0302 (N.Y. P.S.C. Aug. 1, 2016) .......................................................................................14

PJM Interconnection, *PJM Economic Analysis of EPA's Proposed Clean Power Plan: State-Level Detail* (Mar. 2, 2015), http://bit.ly/2pdKToc ......................................................24

Transcript of Oral Argument, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) (Nos. 14-614, 14-623), http://bit.ly/2q6rjeq................................................................18

Plaintiffs' theme is that the ZEC Program is preempted because it is intended to affect generators' decisions about whether to retire or remain in operation. Opp. 1.[1] That simplistic theory is not the law. Under their reserved authority over generation, states take many actions intended to affect the mix of generation facilities, and the Federal Power Act ("FPA") expressly protects this authority. As Plaintiffs concede, states may lawfully exercise this authority to enact programs promoting clean generation and discouraging emitting generation—renewable energy credits ("RECs"), tax incentives, emissions allowances, carbon taxes, and so on. In short, "states are permitted to enact a wide range of policy choices that can affect the wholesale market." *N.Y. State Pub. Serv. Comm'n*, 158 FERC ¶ 61,137, 2017 WL 496267, at *11 (2017) (Bay, concurring).

Plaintiffs fall back on trying to shoehorn the ZEC Program into *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1293 (2016). But *Hughes*'s rule was intentionally narrow: a payment sets wholesale rates only if the state conditions payment on a wholesale sale. *Id.* at 1299. Plaintiffs seek to expand *Hughes*, but the Court should not do what *Hughes* carefully avoided.

Plaintiffs' conflict preemption claim fails. They cite no FERC order conflicting with the ZEC Program. FERC has *recognized* states' authority over similar programs. Moreover, Plaintiffs have asked FERC for rule changes that, they say, would resolve the Program's allegedly adverse market impact. The ZEC Program cannot be an "obstacle" to FERC's policy when, Plaintiffs admit, FERC has the tools to achieve its goals while respecting Illinois' authority over generation.

The Court should see this case for what it is: an effort to persuade this Court to adopt, as a rule of preemption, an oversimplified view of wholesale markets that would gravely undermine state authority and that FERC itself has rejected. In effect, Plaintiffs' claims would preempt not only the states, but also FERC's ability to decide how best to marry its wholesale markets with

---

[1] Unless otherwise specified, "Opp." refers to the Opposition of the Fossil Fuel Plaintiffs. References to "ECF No." refer to docket entries in Case No. 1:17-cv-01164. "Mem." refers to Exelon's Memorandum.

state policies. This attempt is not only meritless, but also is not properly before the Court. Congress wanted FERC, not courts, to address any perceived tension—and hence, Congress created no private right of action that would allow Plaintiffs to bypass the agency.

Plaintiffs' Commerce Clause argument also fails, and Plaintiffs lack standing in any event.

## ARGUMENT

### I.  Plaintiffs Are Not Entitled To Pursue Their Arguments In Court.

#### A.  Plaintiffs Lack A Preemption Cause Of Action.

Plaintiffs lack a cause of action under *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). Plaintiffs contend that 16 U.S.C. § 825p, which provides "District Courts … jurisdiction [over] *all suits in equity* and actions at law," shows Congress contemplated private equitable suits. But the Supreme Court has explained (in an FPA case) that "vesting jurisdiction" "does not create causes of action, but only confers jurisdiction to adjudicate those [claims] arising from other sources." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951). Here, § 825p simply confers jurisdiction to hear the suits *FERC* is authorized to bring under the cause of action that Congress *did* provide. *See* 16 U.S.C. § 825m(a); *City of Gainesville v. Fla. Power & Light Co.*, 488 F. Supp. 1258, 1273 (S.D. Fla. 1980) ("the reference to 'suits in equity' in [16 U.S.C. § 825m(a)] … complements the [FERC] equitable cause of action."). Plaintiffs invoke *Ex Parte Young*, but when Congress expressly empowers an agency "to sue a State to compel compliance with federal rules," that is reason to read the statute as precluding private suits. *Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring).[2] Plaintiffs also ignore the Public Utility

---

[2] Moreover, even if Congress intended to preserve *Ex Parte Young*-style actions in cases where a plaintiff invokes preemption as an anticipatory defense to being "subject[ed] … to local laws," that would not apply here. Plaintiffs are bystanders who seek "to enforce federal law themselves." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 146 (2d Cir. 2016).

Regulatory Policies Act ("PURPA"), which in limited circumstances expressly authorizes private actions. Mem. 27-28. Congress's decision to create an express private cause of action in one corner of the FPA indicates that it did not otherwise intend to allow such suits.[3]

This case shows the damage that private suits wreak on Congress's desire to achieve the "expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking." *Armstrong*, 135 S. Ct at 1385. Certain Plaintiffs recently asked FERC to require changes to PJM's tariff, urging that they would "address" the "threat to the … market" posed by the ZEC Program, *without* need to find it preempted.[4] Meanwhile, FERC held a technical conference addressing how best to "reconcile [its] market framework with the increasing interest by states to support particular … resource attributes" in light of FERC's desire to "respect state policies." Notice at 2, No. AD17-11-000 (Mar. 3, 2017). In response, FERC can weigh what action to take. It could: (1) maintain the status quo; (2) order Plaintiffs' rule changes; (3) order some other change while leaving the ZEC Program undisturbed; or (4) initiate suit under §825m(a). This suit would short-circuit that process and eliminate FERC's policy discretion.[5]

Plaintiffs' opposition confirms that their claims turn on "judicially unadministrable" standards. *Armstrong*, 135 S. Ct. at 1385. They insist that they do not ask the Court to determine whether rates are "reasonable" but only to "ensure that … FERC-mandated auctions are not impacted by … subsidies." Opp. 32-33. But Plaintiffs do not *really* advocate that clear line. They

---

[3] Plaintiffs say that because *FERC* has "authority to file compliance actions," administrative proceedings are not the "sole remedy." Opp. 32. This is a non sequitur. If anything, the fact that Congress expressly authorized only FERC to sue suggests that Congress wished to foreclose other parties from doing so.

[4] Mot. to Amend at 3, *Calpine Corp. v. PJM Interconnection, L.L.C.*, No. EL16-49-000 (F.E.R.C. Jan. 9, 2017) ("Mot. to Amend"), http://bit.ly/2oWAtf9; Mot. for Leave to Answer and Answer at 4, *Calpine*, No. EL16-49-000 (Feb. 14, 2017), http://bit.ly/2oMdXoO.

[5] The dueling positions of the two independent system operators, *compare* ECF No. 88 at 9 (PJM), *with* ECF No. 85-1 at 6 (MISO), underscore that this case is really a policy dispute that belongs at FERC, rather than a viable preemption claim that would take away FERC's discretion to balance state and federal goals.

3

concede that FERC plainly allows *some* "impact[s]" from "subsidies." *Infra* at 9-10. To be sure, Plaintiffs argue that the ZEC Program's "market distortion" will be more "severe." Opp. 25, 28; *see also* Opp. 2, 17 n.13. But if *some* impacts still lead to "reasonable rates," Opp. 32, then Plaintiffs' arguments become an exercise in line-drawing: If a $2/MWh impact is reasonable, what about $4/ MWh? $6/ MWh? Answering that question *is* deciding which rates are "reasonable." But only FERC can "reduce the abstract concept of reasonableness to concrete expression in dollars and cents." *Montana-Dakota Utils. Co.*, 341 U.S. at 251.

Plaintiffs argue that the Court should refrain from dismissing because *Hughes*, and other cases, addressed FPA preemption issues. Opp. 32-33. But *Hughes* expressly reserved the *Armstrong* question because no party raised it. 136 S. Ct. at 1296 n.6. It is "high time for courts to consider … the FPA's private enforceability" in light of *Armstrong*. Matthew R. Christiansen, *The FPA and the Private Right to Preempt*, 84 Geo. Wash. L. Rev. Arguendo 130, 133 (2016).

## B. Retail Plaintiffs Lack Prudential Standing To Invoke Preemption.

Retail Plaintiffs lack prudential standing because their injury is having to pay the ZEC surcharge—a retail charge squarely within states' authority. Mem. 30. Retail Plaintiffs argue that, so long as "the statute is indeed preempted," the surcharge's validity is irrelevant. Retail Opp. 10. That is non-responsive: the point is that the FPA's zone of interests encompasses the "consumer interest in being charged non-exploitative rates" at *wholesale*, *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000) (quotation marks omitted), and Retail Plaintiffs do not complain they are being overcharged for wholesale electricity. Instead, they complain about a retail charge used to purchase ZECs. Nor can they now complain they will lose money due to the ZEC Program's "effect on competition in the … electricity markets." Retail Opp. 9. They pled no such harm in their Complaint, perhaps because Fossil Fuel Plaintiffs premise *their* injury

on "*lower* prices" for wholesale electricity that will result.  EPSA Compl. ¶ 66 (emphasis added).

    **C.**    **Plaintiffs Lack Standing To Challenge The ZEC Price Adjustment.**

As discussed below, Plaintiffs claim the ZEC Program is preempted because the price "is subject to an … adjustment" that "refer[s] to wholesale prices."  Opp. 14; *infra* at 18-19.  To the extent their preemption claim turns on that aspect of the ZEC Program, Plaintiffs lack standing, because the adjustment only *reduces* their alleged injury.  Mem. 14 (citing *Johnson v. U.S. Office of Personnel Mgmt.*, 783 F.3d 655 (7th Cir. 2015)).  They respond that their challenge "targets a single regulatory measure"—the ZEC Program.  Opp. 15.  But *Johnson* rejected that argument.  There, too, the plaintiffs said the rule was "indivisible" and so they had "standing to challenge the Rule as a whole."  783 F.3d at 662-63.  But *Johnson* held that a plaintiff must show how "the inclusion of [the] specific aspects of [the] Act" that were "challenged" had "caused him injury."  *Id.* at 662.  Plaintiffs cannot make that showing about the price adjustment.  Moreover, *Johnson* makes clear that Plaintiffs lack standing even if invalidating the *entire* ZEC Program were "the only possible remedy."  *Id.*  Here, Plaintiffs' standing is even weaker because, as Retail Plaintiffs admit, the Court could sever the price adjustment.  *See* Retail Compl. ¶ 1 n.1.[6]

    **D.**    **Plaintiffs Lack Standing To Bring A Dormant Commerce Clause Claim.**

As to the discrimination claims under the Commerce Clause, Plaintiffs lack Article III standing because their "injury would continue to exist even if the [legislation] were cured" of the alleged discrimination.  *Johnson*, 783 F.3d at 662; Mem. 31-33.  Whether the plants "artificially retained" in the market are in Illinois or not, Fossil Fuel Plaintiffs' alleged injury from lower wholesale prices is the same.  And wherever ZECs originate, Retail Plaintiffs will pay a surcharge.

---

[6] Plaintiffs invoke (at 15) *West Lynn Creamery, Inc. v. Healy*'s refusal to "divorce" for separate analysis "two parts of an integrated regulation."  512 U.S. 186, 201 (1994).  But that statement did not concern standing.  In *West Lynn*, each part of the two-part program harmed the plaintiffs.  Here, by contrast, Plaintiffs cannot show that the ZEC price adjustment harms them.

Fossil Fuel Plaintiffs respond by misstating the law, claiming that "a party suffering competitive injury … has standing to challenge discriminatory state subsidy programs." Opp. 33. But in every case they cite, the plaintiffs' products were treated differently *because of* their out-of-state origin. If the discrimination were removed, so that the law were indifferent to geography, those plaintiffs would not have been injured.[7] Fossil Fuel Plaintiffs cite no case granting standing to a party like them: out-of-state competitors allegedly injured by a program irrespective of its alleged discrimination. Plaintiffs also ignore the many cases holding that competitors lack *prudential* standing if they are not injured by alleged discrimination. Mem. 31-33.[8]

Fossil Fuel Plaintiffs next claim that one of EPSA's members "owns a nuclear facility in Pennsylvania that is precluded from participating in the Illinois ZEC program." Opp. 34. But associations must provide "specific allegations establishing that at least one identified member … would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "[I]t is not enough to aver that unidentified members have been injured." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Plaintiffs must instead both "nam[e] an individual member" *and* "illustrat[e] why such individual has standing." *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 267 (D.D.C. 2016); *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194-95 (9th Cir. 2013) (same). Here, Plaintiffs certainly have not "illustrat[ed] why" this unnamed member "has standing," *Int'l Acad.*, 195 F. Supp. 3d at 267, when they do not allege that the unnamed member would apply for the ZEC Program if the

---

[7] *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (out-of-state coal sellers harmed by discrimination favoring Illinois coal); *Bacchus Imports Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (sellers subject to tax on out-of-state products they sold); *West Lynn Creamery*, 512 U.S. at 188-89 (same); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 272 (1988) (producer of out-of-state product subject to tax).
[8] Plaintiffs try to muddy the water by claiming that the ZEC Program discriminates against "both nuclear and non-nuclear" out-of-state plants. Opp. 33-34. Not so. The statute clearly treats all *non*-nuclear plants equally: they are ineligible for ZECs. The only alleged discrimination is against out-of-state nuclear plants.

alleged discrimination were removed, or even that the member believes itself to be harmed.

Retail Plaintiffs, meanwhile, claim standing because they purchase electricity from out-of-state generating plants. Retail Opp. 13. But they never alleged that theory in their Complaint, and "parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Anyway, Plaintiffs' consumption of energy does not give them prudential standing to litigate the rights of out-of-state plants to be free of discrimination. This case is nothing like *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) (cited at Retail Opp. 12-13). *Tracy* "do[es] not stand for the proposition that consumers paying the end-line cost of an economic regulation have standing." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1381 (8th Cir. 1997). *Tracy* confers standing only on plaintiffs "directly subject to discrimination," who "were liable for taxes based on where they purchased goods," and thus paid more when they bought goods from out-of-state. *Id.* Retail Plaintiffs do not fit that description—they are not liable for the ZEC surcharge based on where "they purchased" electricity; they must pay it *regardless*. Retail Compl. ¶ 15. Numerous cases hold that consumers lack standing to challenge passed-on costs. Mem. 31-32.[9]

## II. Plaintiffs' Field Preemption Claim Fails As A Matter Of Law.

The ZEC Program is valid because it provides for the sale and purchase of credits memorializing how energy was produced. Such transactions are within states' authority over generation, and outside FERC's jurisdiction over wholesale sales. FERC so held in *WSPP*. This accords with *EPSA* and *Hughes*, which establish that subsidies do not invade FERC's jurisdiction so long as they do not change the "amount of money" received "in exchange for" electricity at

---

[9] Retail Plaintiffs cannot distinguish Illinois utilities from the entities in *Ben Oehrleins* and *Individuals for Responsible Gov't, Inc. v. Bd. of Cty. Comm'rs ex rel. Washoe Cty.*, 110 F.3d 699 (9th Cir. 1997), all of which passed their costs on to consumers, who, in turn, lacked standing.

wholesale, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 777 (2016) ("*EPSA*"), by conditioning payment on participating in and clearing FERC auctions. *Hughes*, 136 S. Ct. at 1299.

Plaintiffs respond with two arguments. First, they contend the ZEC Program is preempted because of its "intended," or "direct," effects on wholesale auctions. Opp. 1. Second, Plaintiffs rewrite *Hughes*' narrow holding to try to cast Illinois as setting wholesale rates. Opp. 13-19. But Plaintiffs' "effects" theories are not the law, and *Hughes* does not support Plaintiffs' arguments.

### A.    Plaintiffs' Effects-Based Arguments Fail.

#### 1.    The FPA Does Not Preempt State Programs Just Because They Are Intended To Affect Generators' Decisions.

Plaintiffs' core theory is that the ZEC Program is preempted because it is intended to allow "plants to continue operating when the auction market would otherwise dictate they close," thus "altering [auction] outcome[s]." Opp. 1. Such programs, Plaintiffs say, are preempted because they are "aimed directly" at wholesale markets. Opp. 12 (quoting *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1600 (2015)); *see also* Opp. 1. This theory is unsupported by precedent. *Northwest Central* upheld a state regulation even though it was "[d]esigned as a counterweight to … forces" set in motion by FERC policies. *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 497 (1989). The "expected" effect was that wholesale market participants would alter "purchasing decisions," with follow-on effects "on interstate rates"—yet still, it was not preempted. *Id.* at 512. Any other conclusion, the Supreme Court stressed, would be an "extravagant interpretation" inconsistent with states' reserved authority over production. *Id.*

Plaintiffs' theory is also "based on an idealized vision of markets free from the influence of public policies," but "such a world does not exist." *N.Y. State Pub. Serv. Comm'n*, 158 FERC ¶ 61,137, 2017 WL 496267, at *11 (2017) (Bay, concurring). While FERC's markets set wholesale prices, they have always done so against the backdrop of states' reserved authority over

generation and state policies that shape—and are intended to shape—generators' decisions. FERC has thus explained that states may "grant loans, subsidies or tax credits to particular facilities on environmental or policy grounds," *Cal. Pub. Utils.*, 133 FERC ¶ 61,059, at P 31 n.62 (2010), including when that "allow[s] states to affect the [wholesale] price" or makes clean generation "more competitive in a cost comparison with fossil-fueled generation," *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, 62,080 (1995). FERC last year confirmed that states are "free" to encourage clean generation "even if the price signals in the … capacity market indicate that [they] are [not] needed." Amicus Br. of United States at 33, *Hughes*, 136 S. Ct. 1288, 2016 WL 344494; *see* Mem. 23. And the D.C. Circuit has explained that states may "require retirement of existing generators, [require construction of] expensive, environmentally-friendly units, or … take any other action in their role as regulators of generation facilities," even though that "affects the market clearing price." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009).

Plaintiffs characterize one FERC decision as "dicta," Opp. 23 n.19, but ignore FERC's other statements reaffirming the same principle. As to *Connecticut Department*, they note that it held that FERC may establish rules for its *own* capacity markets—in particular, "installed capacity requirements"—in response to state programs affecting rates. Opp. 21 n.16. But the case *also* affirmed the principle fatal to Plaintiffs' theory: states can influence who serves FERC's markets by regulating generators, even though that affects market outcomes. 569 F.3d at 481.[10]

Plaintiffs' concessions confirm that their theory is untenable. They do not dispute that REC programs, tax incentives, and carbon taxes are within state jurisdiction. Opp. 16 n.12, 21-22. Yet as PJM explains, programs like "tax subsidies," "tax rebates," "renewable energy credits,"

---

[10] *Connecticut Department* also disposes of PJM's misguided notion (ECF No. 88, at 5) that, by choosing to rely on PJM's markets to ensure resource adequacy, Illinois has forfeited its statutory powers to promote environmentally friendly generation. The states in *Connecticut Department* had done the same thing.

and other "State programs … to … promote … carbon-free … generation" likewise "distort … market outcomes" and so "cause a similar type of harm … as the … ZEC program." ECF No. 88, at 9. If Illinois "price[d] the negative externality [of] carbon" via a tax, as PJM and Plaintiffs advocate, *id.* at 14, that too would obviously affect generators' decisions to enter or exit wholesale markets. Plaintiffs argue that the "impact" of these programs is "incidental," while the ZEC Program's is "intended," Opp. 12—*i.e.*, *foreseeable* effects are fine, but *intended* effects are not. But that is no distinction at all. Altering a state's portfolio of generators is the point of these programs. When a state creates a REC program, or a tax incentive, it aims to encourage *more* renewable generators to start production. When a state imposes a carbon tax, reducing fossil fuel generation and increasing clean generation is not just foreseeable; it is the point.

Plaintiffs' case for their theory, *Oneok*, does not create a roving license for courts to strike down such programs based on an inquiry into the state's subjective "aim." Opp. 12. *Oneok* safeguards state authority by establishing a purpose-based *defense* for generally applicable laws. It concerned a generally applicable antitrust law that a state applied to regulate wholesale gas prices. *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015). FERC has exclusive jurisdiction over such prices. Even so, the Court upheld the law's application because its purpose—what it "aimed directly at"—was to combat antitrust violations, not regulate wholesale prices. *Id.* at 1599-60. *Oneok* never intimates that when a state regulates generation, and so does not apply *any* law to wholesale transactions or prices, its action is invalid if the state understood it would impact wholesale markets. *Oneok* cannot be read that way in light of *Northwest Central*, which *Oneok* repeatedly cites, 135 S. Ct. at 1600-01, nor in light of the REC programs and other policies whose legality Plaintiffs concede.

### 2. Plaintiffs Cannot Rely On FERC's "Directly Affecting" Jurisdiction.

Plaintiffs fall back on an even broader effects-based theory. FERC has authority to ensure

that practices that "directly affect" wholesale rates are "just and reasonable." *EPSA*, 136 S. Ct at 774; 16 U.S.C. § 824d(a). Plaintiffs claim that if a court finds that the ZEC Program's effects cross a vague line between "indirect" and "direct," the Program intrudes on FERC's exclusive jurisdiction and is preempted. Opp. 11. That claim is wrong for three reasons.

First, Plaintiffs misunderstand FERC's jurisdiction over practices "directly affecting" wholesale rates. The FPA *empowers* FERC to regulate such practices, but if FERC does not, states are not preempted from doing so. That is clear from *Connecticut Department*, which held that because state policies regarding generation "affect[ed] the market clearing price," FERC could modify its markets to address them—but which also recognized that states could maintain those policies even though they "affect[ed]" wholesale rates. 569 F.3d at 481-82. It is also clear from *New York v. FERC*, 535 U.S. 1 (2002), which held FERC could decline to regulate in an area where it might have jurisdiction—"bundled retail transmission"—and allow states to regulate instead. *Id.* at 25-28. Likewise, *EPSA* approved FERC's decision to allow states to determine who could participate in demand-response, even though that choice "directly affects" wholesale rates. Mem. 17-18; *see Sprietsma v. Mercury Marine*, 537 U.S. 51, 65-66 (2002) (agency's "decision not to regulate" is "consistent with an intent to preserve state regulatory authority"). Plaintiffs cite no case holding a state program preempted because it "directly affects" wholesale rates when FERC has not taken any action; their cases say the opposite. *See* Opp. 11 (citing *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988), holding that "States may not regulate in areas where FERC has properly *exercised its jurisdiction*." 487 U.S. at 374 (emphasis added)).

Second, FERC has not merely declined to regulate production credit programs like the ZEC Program—it has held they fall *outside* its "directly affecting" jurisdiction. As explained, FERC has approved state authority to enact REC programs, tax incentives, and pollution controls, even

though doing so "allow[s] states to affect the [wholesale] price." *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, 62,080; *supra* at 8-9. These programs affect auction markets in the same way Plaintiffs allege the ZEC Program does: They alter generators' costs or revenues, which in turn alter decisions on whether and how to participate in auctions, which in turn affect prices. In *WSPP*, FERC held that unbundled credit payments do not "affect wholesale electricity rates" directly enough to bring them "within [FERC's] jurisdiction," even though they are intended to, and do, affect which generators are in the market. *WSPP, Inc.*, 139 FERC ¶ 61,061, PP 22, 24 (2012). Plaintiffs do not dispute that holding receives *Chevron* deference, *see* Mem. 10-11, and it is fatal to their arguments. ZECs plainly are not more *direct* than RECs in how they affect markets.[11]

Third, even if FERC had not held that programs like the ZEC Program are outside its jurisdiction, Plaintiffs would *still* be unable to show that the ZEC Program "directly affects" wholesale rates, as FERC and courts have used that phrase. *EPSA* explained that FERC's "directly affects" jurisdiction cannot "transgress" states' authority over generation—"no matter how direct, or dramatic," the program's "impact on wholesale rates." 136 S. Ct. 775, 780 n.10; Mem. 17. Hence, a bevy of FERC and federal precedent squarely holds that states may do things like order the construction of "expensive, environmentally-friendly units," even though that "affects the market clearing price." *Conn. Dep't*, 569 F.3d at 481; *supra* at 8-9. The ZEC Program is no different: ZECs—a payment to generators for the *production* of electricity—fall within states' authority over generation facilities and outside FERC's "directly affecting" jurisdiction.

### 3. Plaintiffs Cannot Dodge *WSPP*'s Clear Holding.

Plaintiffs try to dodge *WSPP* via semantic tricks. They point to its preliminary observation

---

[11] Plaintiffs are thus wrong that dismissing their preemption claim puts the ZEC Program "outside the area in which FERC can regulate." Opp. 11. The Court need only note that, under *WSPP*, FERC currently interprets its "directly affecting" jurisdiction not to reach that area. Mem. 18.

that a REC transaction could fall within "federal jurisdiction if it 'affects' … 'jurisdictional rates.'" Opp. 22 (quoting *WSPP*, 139 FERC ¶ 61,061, at P 22), and say *WSPP* endorsed a case-by-case test for invalidating REC programs that affect wholesale rates. That is not what *WSPP* held. Plaintiffs selectively quote the first half of a passage, but omit the punchline: "when an unbundled REC transaction is independent of a wholesale electric energy transaction," the transaction "*does not affect wholesale electricity rates*" under the "directly affecting" test. 139 FERC ¶ 61,061, at P 24 (emphasis added). The holding was not case-specific or hedged, Opp. 24, but general: "[W]e conclude that unbundled REC transactions fall outside [FERC's] jurisdiction." *WSPP*, 139 FERC ¶ 61,061, at P 18. If Plaintiffs were right, many REC programs would be invalid, as they concededly cause a similar type of effect to what Plaintiffs allege. ECF No. 88, at 9.[12]

Next, Plaintiffs offer a laundry list of factual distinctions between ZECs and RECs, suggesting "fact issue[s]" preclude dismissal. Opp. 24; *see* ECF No. 88, at 10 (PJM). No factual development is required. *WSPP* set forth a clear rationale: RECs recognize the value attributed by the state to the *production* of electricity meeting "certain requirements and standards." 139 FERC ¶ 61,061 at P 21. As such, a REC payment is "not a charge in connection with a wholesale sale," and "does not fall within [FERC's] jurisdiction." *Id.* at P 24. ZECs have those same features, and thus *WSPP* is controlling. Plaintiffs' purported distinctions have no connection to that rationale.

---

[12] Plaintiffs claim ZECs "are not 'independent' from wholesale" sales because "utilities are forced to buy ZECs" in "proportion[] to their … wholesale electricity purchases." Opp. 23. This is wrong. First, *WSPP* uses "independent[]" as a synonym for "unbundled," in juxtaposition with "bundled." 139 FERC ¶ 61,061, at PP 1, 24. For an attribute credit transaction to be "independent," *WSPP* requires only that "a wholesale energy sale and a REC sale [not] take place as part of the same transaction." *Id.* at P 24; *Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008) ("unbundled" means "sold separately" "from the energy"). The ZEC Program satisfies that test. Mem. 10 & n.6. Plaintiffs are also wrong that utilities buy ZECs in proportion to their wholesale purchases. A utility must buy ZECs in proportion to the amount of electricity it *delivers* on its wires to its retail customers. 20 ILCS 3855/1-75(d-5)(1). Much of the electricity a utility delivers is generated or purchased at wholesale by competitive retail suppliers. Mem. 10 & n.6. Thus, ZEC purchases do not correspond to a utility's wholesale purchases.

They are irrelevant to FERC's reason for disclaiming jurisdiction over RECs.

Plaintiffs also mischaracterize REC laws. They claim RECs are "available to anyone who produces renewable energy, without regard to economic need." Opp. 21. But REC programs' *whole purpose* is to support generation in "economic need," aiming to make profitable generators that otherwise would not enter the market.[13] Many include only generators of a certain size, because smaller plants are in greater need;[14] others have technology-specific RECs (*e.g.*, "SRECs" for solar power,[15] or "ORECs" for off-shore wind[16]) or multipliers,[17] to increase prices for technologies needing more support.[18]

Plaintiffs are also wrong that REC prices are necessarily "determined by a competitive market," not "state dictate." Opp. 22. Illinois and many states set some prices directly.[19] Nearly all states set an "alternative compliance payment" utilities can pay in lieu of buying RECs, which caps the price for RECs.[20] And contra Plaintiffs, the ZEC Program is not alone in assessing REC prices against wholesale prices: the IPA likewise may measure REC prices against "price

---

[13] 20 ILCS 3855/1-75(c)(1)(J) (IPA cannot purchase RECs from generators that are "recover[ing]" their "costs" elsewhere, because that does not "promote the competitive development of renewable energy"); *see* Ivan Gold & Nidhi Thakar, *A Survey of State Renewable Portfolio Standards: Square Pegs for Round Climate Change Holes?*, 35 Wm. & Mary Envtl. L. & Pol'y Rev. 183, 189 (2010) ("programs generally relied on legislative findings that [they] were needed to subsidize renewable energy resources….").

[14] *See, e.g.*, N.C. Gen. Stat. § 62-133.8(a)(7) (limiting eligible hydropower to "10 megawatts or less"); Conn. Gen. Stat. § 16-1(20) (limiting eligible hydropower to "not more than thirty megawatts").

[15] *See, e.g.*, 26 Del. Code Ann. §§ 352(25), 354(a) (SREC); Minn. Stat. § 216B.1691 Subd. 2f (solar projects of 20 kilowatts or less); 52 Pa. Code § 75.1 ( "solar photovoltaic" sources).

[16] N.J. Stat. Ann. § 48:3-87.1; Md. Code Ann. Pub. Utils. § 7-704.1. These programs select participating facilities administratively, with applicants submitting generator-specific cost data.

[17] *See, e.g.*, Colo. Rev. Stat. § 40-2-124(1)(c)(VII)(A), (IX) (triple credit for solar); 26 Del. Code Ann. § 356 ( "300% credit" for solar; "150% credit" for wind; "350% credit" for off-shore wind).

[18] *See, e.g.*, Order Adopting a Clean Energy Standard at 115, No. 15-E-0302 (N.Y. P.S.C. Aug. 1, 2016) (separate tier to maintain generators that "might fail financially and retire for the lack of sufficient overall revenues"); Steven Ferrey, 2 L. of Indep. Power § 10:115 (2017) ("Some states designate tiers [of RECs] by type of technology of renewable resource so as to be able to promote a certain technology ....").

[19] *See, e.g.*, 20 ILCS 3855/1-56(b)(3)-(4) (IPA "shall" determine "the prices to be paid for [RECs]"); *see id.* § 1-75(c)(1)(K) (portion of REC program would use "a transparent schedule of prices" set by the state).

[20] Gold & Thakar, *supra*, at 195 & n.92.

14

benchmarks" based on "expected current and future regional energy prices."  20 ILCS 3855/1-75(c)(1)(D).[21]  Indeed, Plaintiffs' whole notion of REC markets as real markets is wrong:  The "market" exists only because the state created RECs and gave them to certain generators (setting supply), and then required utilities to buy certain quantities of them (setting demand).

Last, Plaintiffs assert that REC programs concern "a few percentage points" of capacity, which is "small … compared to nuclear."  Opp. 22.  To begin, Plaintiffs have not pled this claim.  And regardless, even Plaintiffs cannot *really* believe the size of the effect is controlling.  Plaintiffs concede that REC programs are legal, yet several Plaintiffs told FERC that state REC programs in New England "suppress capacity revenues by up to $1 billion in a single year."  *ISO New England, Inc.*, 147 FERC ¶ 61,173, P 67 (2014).  FERC has disclaimed jurisdiction over REC programs despite these effects, and only FERC, not courts, can determine whether the ZEC Program's effects are meaningfully different—if they are larger at all.  *Supra* at 3-4.

**B.    *Hughes*'s Careful Holding Preserves The ZEC Program.**

Plaintiffs fall back on *Hughes*'s holding that a Maryland program was preempted because it was "[]tethered to [the] generator's wholesale market participation."  136 S. Ct. at 1299; *see* Opp. 13-17.  The "tether" in *Hughes* was that Maryland "condition[ed] payment … on capacity clearing the auction," thus requiring "'wholesale market participation'" in exchange for payment.  *Hughes*, 136 S. Ct. at 1299.  Plaintiffs do not genuinely dispute that the ZEC Program lacks this type of "tether": A generator receives ZECs for producing electricity, regardless of whether it participates in the wholesale markets by bidding into, or clearing, the auction.  Mem. 12-13.  Even so, Plaintiffs ask the Court to invalidate the Program by expanding, in one way or another, the narrow "tether" *Hughes* found impermissible.  But *Hughes* itself forecloses that request.  It states:

---

[21] Below (at 18-19), Exelon addresses why the ZEC pricing mechanism does not render the Program unlawful.

"Nothing in this opinion should be read to foreclose … States from encouraging … clean generation … [s]o long as a State does not condition payment of funds on … clearing the auction." 136 S. Ct. at 1299. Plaintiffs insist that this merely left the "other types of programs" for "future decision." Opp. 14. Not so. The Court stated that *Hughes* ("this opinion") does not invalidate "other types of programs," absent the specific "tether" it condemned. 136 S. Ct. at 1299. That is also how FERC interprets *Hughes*. *ISO New England Inc.*, 158 FERC ¶ 61,138, P 8 n.19 (2017).

*Hughes*'s careful limit followed from the Court's understanding of the scope of FERC's field: FERC's exclusive jurisdiction to set "wholesale rates." When a state declares it will pay only if a generator completes a wholesale sale, that changes the "amount of money" the seller receives for the sale—setting the "rate." *EPSA*, 136 S. Ct. at 777. That is why Maryland was deemed to have "set[] an interstate wholesale rate" in *Hughes*: by conditioning payment on bidding and clearing in the auction, it changed the amount of money the seller received *for the sale*. 136 S. Ct. at 1297.[22] *Hughes* also recognized that a *broader* definition would damage states' "various other measures" to "encourage … clean generation, including tax incentives, land grants, direct subsidies," and the like. *Id.* at 1299. The Court should not abrogate *Hughes*'s careful limits.

Plaintiffs nevertheless try to distend *Hughes*'s holding in three ways. First, Plaintiffs claim the ZEC Program is "tethered" because ZECs are a "causal agent of … generators continuing to sell." Opp. 15. That is just a rerun of the argument that states may not act to affect the mix of generation facilities—which, if adopted, would invalidate the programs *Hughes* tried to preserve.

Second, Plaintiffs claim that even though Illinois has not conditioned payment on clearing the auction, generators have no *practical* "alternative to selling their output in the MISO and PJM

---

[22] Plaintiffs have no real response to *EPSA*'s narrow definition of what it means to set a "rate." They do not dispute it. Instead, they claim only that *EPSA*'s definition does not matter because, in addition to its jurisdiction over wholesale rates, FERC has jurisdiction over practices directly affecting those rates. Opp. 18. Plaintiffs' "directly affecting" arguments fail for reasons explained above. *See supra* at 10-12.

energy auctions," and PJM's rules require "Quad Cities to participate" in capacity auctions.  Opp. 13 (quoting Compl. ¶ 36).  This assertion is irrelevant because it does not reflect any requirement *Illinois* has imposed.  Field preemption turns on whether "*state* regulation" has "invade[d] the federal agency's exclusive domain," *Oneok,* 135 S. Ct. at 1600 (emphasis added), not on how private parties arrange their affairs or on PJM's choices.  *See Hughes*, 136 S. Ct. at 1299 (asking whether "*a State* [has] condition[ed] payment" (emphasis added)); *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 229 (1993) ("the Supremacy Clause does not require pre-emption of private conduct").[23]  Plaintiffs' assertion is also obviously overbroad, as it would doom any state support of generation facilities, including RECs, "tax incentives, land grants, and direct subsidies," *Hughes*, 136 S. Ct. at 1299, so long as PJM market rules require wholesale market participation.  But Congress *reserved* state authority over generation facilities, even as it empowered FERC to regulate wholesale sales.  16 U.S.C. § 824(b).

Moreover, the premise of Plaintiffs' argument is that *every* ZEC-eligible facility must "dispose" of its electricity "by selling it in the auctions."  Opp. 13.  That is false.  Because the ZEC Program itself does not require such auction participation, facilities in PJM can receive ZECs even if PJM eliminates its participation requirement, which it is "exploring" doing.  ECF No. 88, at 11 n.6.  So too, those facilities can get ZECs even if they fail to clear the capacity market—like Quad Cities recently did—and thus have no duty under PJM's rules to sell in energy markets.  Compl. ¶ 55.[24]  Facilities in MISO can get ZECs even though MISO does *not* require participation in

---

[23] That distinguishes Plaintiffs' cases, which all concern situations in which *the state*, not someone else, effectively prohibited conduct that federal law authorized.  *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192–93 (4th Cir. 2007) ("state law … effectively mandates" inclusion of provisions in ERISA plans); *S. Dakota Min. Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998) ("ordinance[ enacted a] de facto ban on mining"); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers*, 27 F.3d 1499, 1507 (10th Cir. 1994) ("San Diego's … scheme … impose[d] a de facto ban").

[24] Plaintiffs also (at 6) allege that Clinton is an Exempt Wholesale Generator ("EWG") that can only sell at

wholesale auctions. Opp. 13.[25] And facilities in PJM and MISO (including part of Quad Cities) owned by vertically integrated utilities can receive ZECs for power they sell to *retail* customers. Thus, ZEC-eligible generators are not required—by Illinois or otherwise—to sell in the auctions.

Third, Plaintiffs claim the ZEC Program is "tethered" because it includes a price adjustment that "refer[s] to wholesale prices." Opp. 14. But *Hughes* was express that its concern was tethering payments to "wholesale market participation"—wholesale *sales*, not wholesale *prices*. 136 S. Ct. at 1299; Mem. 12, 14-15. So, it does not matter whether, as Plaintiffs assert, the Program creates a "'price collar' [that] operates similarly to the contract-for-differences … in *Hughes*." Opp. 14-15. In the Supreme Court, FERC's attorney affirmed: A "contract for differences is not preempted here. It's just when there's a bidding-and-clearing requirement."[26]

Reinforcing the point is *Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99 (2d Cir. 1985). It holds that "there is a distinction between … regulating [wholesale] sales," and doing what the ZEC Program (allegedly) does here: change a price within the state's jurisdiction (the ZEC price) based on "the profits from a reasonable estimate of those sales." *Id.* at 105. The former is preempted, and the latter is not. Plaintiffs say *Rochester* assumed that the state's accounting for wholesale revenues "would not affect … wholesale-market decisions," and reserved judgment on a situation where such effects were present. Opp. 18-19. That is incorrect. *Rochester* deferred judgment on a "situation where a state commission has ordered a utility to begin making [wholesale] sales" or tried to "force the utility" to make more wholesale sales against its will. 754 F.2d at 102.

---

wholesale. *See also* Retail Opp. 5. But that is a voluntary choice. The ZEC Program does not require eligible facilities to be EWGs, and a ZEC-eligible facility could simply tell FERC it "no longer seeks to maintain its [EWG] ... status" and then seek the ICC's approval to sell at retail. 18 C.F.R. § 366.7(c)(3).

[25] As MISO has explained, "the vast majority of utilities in MISO's footprint arrange for supply resources to serve their demand well in advance of MISO's residual capacity auction." ECF No. 85-1, at 7.

[26] Tr. of Oral Arg. at 57, *Hughes*, 136 S. Ct. 1288 (2016) (Nos. 14-614, 14-623), http://bit.ly/2q6rjeq.

In any event, Plaintiffs ignore all the ways that the ZEC Program differs from *Hughes*'s contract-for differences. Mem. 16-17. For example, the price might never deviate from the social cost of carbon. *Id.* at 16. And because it cannot go higher, it does not protect generators from the risk of falling prices. *Id.* It thus does not "guarantee" that facilities receive "sufficient revenues." Opp. 15. The price adjustment is also based on forecasts and an amalgam of capacity prices that no generator will ever receive—not actual wholesale prices received by the generator. Mem. 16.

### C. Plaintiffs' Other Miscellaneous Cases Are Off Point.

Plaintiffs also try to manufacture a preemption claim via out-of-context quotations from a smorgasbord of cases dating from the 1980s and 1960s. But these cases are inapposite.

In *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988), a state law prohibiting interstate pipelines from issuing new securities was "aimed directly" at wholesale markets because it directly altered *actual* "wholesale rates" and attempted to make them "lower." *Oneok*, 135 S. Ct. at 1600 (emphasis omitted). One element of FERC's cost-based rates was the pipeline's capital structure (ratio of equity to debt), and the law "control[led]" this element by preventing the utility from issuing stock, overriding FERC's determination of a just and reasonable capital structure. *Schneidewind*, 485 U.S. at 301-03, 08. *Schneidewind* thus accords with *EPSA* and *Hughes*'s narrow definition of ratesetting. Indeed, *Oneok* rejects a broad reading of *Schneidewind* to preempt any regulation "which [could] raise," or lower, "wholesale … costs." 135 S. Ct. at 1600-01.

Farther afield is *Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963). It struck down a Kansas regulation that instructed interstate gas pipelines where to purchase gas at wholesale, even though such sales fall within FERC jurisdiction. 372 U.S. at 88-89, 92; *see Oneok*, 135 S. Ct. at 1600. This case would be *Northern Natural* if Illinois instructed PJM or MISO how

to run auctions, or ZEC facilities how to bid or where to sell.[27]

**D.    Exelon's Arguments Do Not Turn On The Label "Environmental," And Plaintiffs Also Have Not Properly Pled Anything To The Contrary.**

Plaintiffs say that "Defendants premise their arguments on the notion that the … ZEC program" is an environmental program, which Plaintiffs claim to dispute.  Opp. 8.  First, Plaintiffs' characterization of Exelon's argument is inaccurate.  What matters is that ZECs are production-based credits sold unbundled from any wholesale sale.  That places the Program squarely within what FERC approved in *WSPP* and the Supreme Court left undisturbed in *Hughes*.  Second, while Plaintiffs have asserted that the ZEC Program "is not environmental legislation" and is aimed at preserving jobs, EPSA Compl. ¶¶ 58-59; Opp. 8-9, they have not properly pled that the Program has *no* environmental purpose.  The ZEC Program maintains the environmental benefits of non-emitting plants that might otherwise retire, as the legislative findings make clear.  The General Assembly stressed how "premature closure of existing nuclear power plants" could impose "societal cost[s]" via "increased greenhouse gas emissions," incorporating a report showing that, between 2020 and 2029, 80% of replacement power would come from coal plants—costing up to $18.6 billion in increased emissions.  SB 2814 §1.5(5); *see* Ill. Commerce Comm'n, Potential Nuclear Power Plant Closings in Illinois 118-22 (Jan. 5, 2015), http://bit.ly/2qg5hWA.  Plaintiffs have pleaded no facts supporting an inference that the ZEC Program lacks *any* environmental

---

[27] Plaintiffs also cite *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988), and *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986).  Opp. 20.  But those cases involved the clearest possible "conflict pre-emption," *Oneok*, 135 S. Ct. at 1601, in which "state law penalize[d] what federal law require[d]."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000).  FERC found allocations of power to utilities were just and reasonable (requiring utilities to pay the resulting wholesale rates), yet state commissions "penalize[d]," *id.*, the utilities by finding the allocations were not reasonable (barring them from recovering costs from ratepayers).  *Oneok*, 135 S. Ct. at 1601-02; *see also Mississippi*, 487 U.S. at 371-73; *Nantahala*, 476 U.S. at 966-67.  Illinois has not done anything similar.  Indeed, *Hughes* interpreted *Mississippi Power* and *Nantahala* in the context of subsidy payments to wholesale generators, and concluded they are preempted only when conditioned on auction clearance.  136 S. Ct. at 1298-99.

purpose *at all*. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.    Plaintiffs' Conflict Preemption Claim Fails As A Matter Of Law.

Plaintiffs recognize their heavy burden: to plausibly plead that the ZEC Program "would cause 'clear damage' to FERC's goals." Opp. 25 (quoting *Nw. Cent.*, 489 U.S. at 522). The burden is so heavy because "conflict pre-emption analysis must be applied sensitively … so as to prevent the diminution of the role Congress reserved to the States." 489 U.S. at 515. Plaintiffs cannot carry that burden when FERC's most on-point precedent *acknowledges* state authority to enact credit programs like the ZEC Program. Mem. 22-24. *WSPP* remains FERC's policy, even though RECs cause an effect "similar" to the effect Plaintiffs allege will result from ZECs. *Supra* at 10. Plaintiffs argue, without citing any FERC statement, that FERC's policy is that "just and reasonable rates … must be established by the auction process" free from influence of *any* state policy that "keeps … generating units in the wholesale markets" when they otherwise would retire. Opp. 24, 28. But as explained, FERC has no such policy. *Supra* at 8-9; Mem 22-24. FERC last year recognized the opposite: States are "free" to encourage clean generation "even if the price signals in the … capacity market indicate that [those] resources are [not] needed." Amicus Br. of United States at 33, *Hughes*, 136 S. Ct. 1288, 2016 WL 344494.[28] When the agency "has never taken the position" that similar programs pose a conflict, a plaintiff's invocation of broad statutory "goals" is not enough—the plaintiff's conflict claim fails. *Sprietsma*, 537 U.S. at 65, 70.

Even if FERC *were* troubled, it is fatal that certain Plaintiffs have conceded that a lesser remedy—the market rule changes they have sought—would "address" the "threat to the" market and "ensure that [the legislation] do[es] not artificially suppress prices." Mot. to Amend, *supra*

---

[28] Plaintiffs spill much ink quoting five-year-old statements from Exelon executives. Opp. 27-28. Those statements obviously shed no light on FERC's views, and they did not concern an environmental credit program, but instead a New Jersey program that (as in *Hughes*) conditioned payments on wholesale sales.

n.4, at 3, 13. The ZEC Program cannot be an "obstacle" to FERC's goals, *Oneok*, 135 S. Ct. at 1595, when Plaintiffs concede that FERC can achieve its goals with the ZEC Program intact.[29]

Plaintiffs imply that the ZEC Program is objectionable because of how "severe" its "alleged market distortion" will be. Opp. 25, 28. But states' authority over generation does not disappear based on size of effects, and FERC has found that rates resulting from auctions in PJM and MISO are just and reasonable despite the "similar" effect of REC programs and other subsidies. ECF No. 88 at 9; Mem. 24-25. If Plaintiffs believe a line should be drawn because the ZEC Program's rate impact is meaningfully different, that claim involves ratesetting: deciding whether rates are unjust and unreasonable. That inquiry is outside of courts' purview. *Supra* at 3-4.

Plaintiffs mischaracterize these issues as primary jurisdiction arguments. Opp. 28. They are not. The point is *not* that FERC must decide the preemption question *first*. Rather, Plaintiffs *lose their case* because FERC's stated policy acknowledges, rather than displaces, state authority to enact programs like the ZEC Program, and because Plaintiffs concede that FERC, if troubled, has ample tools to achieve its goals without resorting to preemption.

## IV. Plaintiffs' Dormant Commerce Clause Claims Should Be Dismissed.

### A. The ZEC Program Is Constitutional Under *Alexandria Scrap*.

Plaintiffs do not dispute that their Commerce Clause claim fails if this Court views the ZEC Program as similar to the programs upheld in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), and *Allco Finance Ltd. v. Klee*, No. 3:15-CV-608 (CSH), 2016 WL 4414774 (D. Conn.

---

[29] This argument is not "similar to the one that was rejected in *Hughes*." Opp. 30 n.25. *Hughes* held that if a state regulation is *field preempted* because it sets wholesale rates, it is irrelevant that FERC could "accommodate[] the program by" changing its market rules. 136 S. Ct. at 1298 n.11. That makes sense, given that a state may never enter FERC's field. But in a conflict preemption case, each sovereign is acting in its own sphere. "[C]ourts must be careful not to confuse the 'congressionally designed interplay between state and federal regulation[]' … for impermissible tension that requires pre-emption under the Supremacy Clause." *Hughes*, 136 S. Ct. at 1300 (Sotomayor, J., concurring) (quoting *Nw. Cent.*, 489 U.S. at 518).

Aug. 18, 2016). But Plaintiffs contend this case is different because Illinois "has not … created a new market" and "is not acting to facilitate commerce," and so must be acting as a "regulator." Opp. 39. *Allco* belies that contention. The Connecticut statute, like the ZEC Program, required utilities to purchase RECs *through regulation*. 2016 WL 4414774, at *20. Connecticut did not purchase RECs itself. *Id.* Still, the Court held that because "Connecticut created the commerce in RECs," the statute did not violate the Commerce Clause. *Id.* Here too, Illinois "created a new market" and has "facilitate[d] commerce" in ZECs, which are creatures of Illinois law. Opp. 39. Under Plaintiffs' own test, such programs are valid under *Allco* and *Alexandria Scrap*.[30]

Indeed, *Alexandria Scrap* itself involved state regulation. The state implemented its bounty program with classic regulation—penalties imposed on scrapyards that kept old automobile hulks, documentation requirements, and grants of immunity. 426 U.S. at 796-97. Those are not things "any other participant in that market" could have imposed. Opp. 39. Thus, as the plurality explained in the *very case* on which Plaintiffs rely, "Maryland employed the tools of regulation to invigorate its participation in the market for automobile hulks," and "[s]uperficially, the scheme was regulatory in nature." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 346 (2008) (plurality op.) (cited at Opp. 39). But "in *practical terms*," the bounty "bid up [the] price" paid to remove car hulks, just as Illinois's ZEC payments will "bid up" the price for non-emitting generation. *Id.*

### B. Plaintiffs' Discrimination-Based Claims Fail On The Merits.

Plaintiffs assert that they have adequately pled three discrimination claims. Opp. 35-38. Not so. *First*, Plaintiffs claim the statute discriminates "on its face." Opp. 35. But Plaintiffs concede that "the IPA and ICC" will *not* "flout their statutory duties," Opp. 36 n.34, so Plaintiffs

---

[30] It is odd that Plaintiffs claim that *Allco* supports their government-as-regulator argument. Opp. 39-40. *Allco* did ask "whether a state or local government is regulating," 2016 WL 4414774, at *23 (quotation marks omitted), but then *decided* that issue *against* Plaintiffs' position, holding that when a statute requires in-state utilities to purchase RECs, that is *not* regulation subject to the Commerce Clause. *Id.* at *23-25.

must point to *actual* "statutory duties" favoring in-state plants. They cannot. Plaintiffs cite one provision directing the IPA to consider a report concerning Illinois nuclear plant closures, but do not dispute that the same provision tells the IPA to consider reports (including several by PJM) concerning closures in *other* states.[31] Considering reports on plants in- and out-of-state does not facially favor in-state plants. Mem. 33-34.[32] Plaintiffs also claim that the word "Jobs" is facially discriminatory. Opp. 37. But that word's appearance in the Act's title is unsurprising. Major parts of the Act are jobs programs: A "Utility job training program," 220 ILCS 5/16-108.12, a solar program that "must include job training opportunities" and "hiring," 20 ILCS 3855/1-56(b)(2), and REC "procurements, Adjustable Block solar program, and community renewable generation programs" required to "provide employment opportunities." *Id.* § 1-75(c)(7).

Plaintiffs next claim the law is invalid because it will, in "effect," favor "in-state economic interests." Opp. 37. But the Supreme Court has repeatedly upheld statutes that benefitted in-state interests far more than out-of-state interests.[33] Courts have therefore concluded that "the 'discriminatory effect' cases are best regarded as cases of purposeful discrimination." *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 400 (3d Cir. 1987).[34] Further, because Plaintiffs brought a facial challenge before the ICC's procurement, they do not get to enjoin a state law based on hypothesized discriminatory effects. Mem. 35-37. The ICC could select an out-of-state facility,

---

[31] *See* 20 ILCS 3855/1-75(d-5)(1)(C); PJM, *PJM Economic Analysis of EPA's Proposed Clean Power Plan* (Mar. 2, 2015), http://bit.ly/2pdKToc (analyzing "nuclear retirement" scenarios in every PJM state).

[32] Plaintiffs also do not dispute that the ICC, *not* the IPA, will select the facilities based on neutral environmental criteria, Mem. 34, so any direction given to the IPA is irrelevant.

[33] *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981) (upholding law despite "granting that the out-of-state plastics industry is burdened relatively more heavily than the [in-state] pulpwood industry"); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125-26 (1978) (upholding law even though *entire* impact was felt by out-of-state producers or refiners).

[34] The Supreme Court has found a "discriminatory effect" when the legislature's *express* purpose was protectionist or the state statute did not advance the legislature's non-protectionist purpose. *See Bacchus*, 468 U.S. at 270 (express purpose protectionist); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) (non-protectionist purpose not advanced by legislation).

or in-state facilities that better serve the statute's neutral environmental criteria. *Id.* Both would be constitutional. *Id.* Absent facial discrimination, a "state's choice between … alternative environmental protection policies does not implicate the Commerce Clause simply because the alternative chosen may be in the best economic interests of the state." *Norfolk S.*, 822 F.3d at 402.

Plaintiffs claim that the ZEC Program "was intended to be protectionist regulation." Opp. 37. But courts must "assume that the objectives articulated by the [state] are [the] actual purposes" unless "circumstances force[] [the Court] to conclude that they 'could not have been a goal.'" *Clover Leaf*, 449 U.S. at 463 n.7 (citation omitted). Here, Plaintiffs do not attempt to argue that reducing air pollution "*could not* have been" at least "*a* goal." *Id.* (quotation marks omitted). Their sole response is to quote the *dissent* in *Clover Leaf* and assert that "Commerce Clause analysis" of purpose "differs from analysis under the 'rational basis' test." Opp. 38. That is wrong. In addressing the statute's purpose *under the Commerce Clause*, the Court relied on the same analysis as "in the equal protection context." 449 U.S. at 471 n.15. Thus, in *Clover Leaf* "the Court indicated that the declared legislative purpose should be given the same deference … as … in equal protection analysis." *Norfolk S.*, 822 F.2d at 403 n.21. Plaintiffs' claim fails under that standard.[35]

## CONCLUSION

For the foregoing reasons, the Complaints should be dismissed with prejudice.

---

[35] Plaintiffs also fail to state a claim under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). First, even *Pike* requires "at least 'mild' discrimination against interstate commerce." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555-56 (7th Cir. 2007) (citing *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir.1995)). But Plaintiffs allege effects on the interstate *market*—in- and out-of-state plants alike. Compl. ¶ 91. Indeed, they could *never* make the required allegations in this facial challenge, when plants have not been selected. Mem. 36. Second, *Pike* requires a "burden" on commerce that makes it more difficult. *Pike*, 397 U.S. at 142 (ban on shipment of cantaloupes unless packed in certain manner). But Plaintiffs do not allege that ZECs place any *burden* on commerce; they only allege *effects* on competitors.

On equal protection, Retail Plaintiffs admit that it requires Illinois only to treat persons "within its jurisdiction" equally, not treat residents the same as others in PJM or MISO. Opp. 14. That distinguishes Plaintiffs' cases about states treating their *own* residents differently. *Id.* at 15-16. Their claims regarding the law's "real purpose" are "irrelevant," as long as "some rational basis" "could" justify it. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). The rational basis is evident. SB 2814 § 1.5.

May 10, 2017

Gabriel A. Fuentes
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
gfuentes@jenner.com

*Admitted *pro hac vice*

Respectfully submitted,

/s/ Matthew E. Price
Matthew E. Price*
David W. DeBruin*
Zachary C. Schauf*
William K. Dreher*
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com

*Counsel for Intervenor Exelon Generation Company, LLC*

26

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on May 10, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished via the CM/ECF system.

Dated: May 10, 2017                           By:  /s/ Matthew E. Price