**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASS'N, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  17-cv-01164 |
| | ) | |
| v. | ) | |
| | ) | Judge Manish Shah |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, *et al.*, | ) | |
| | ) | Magistrate Judge Susan Cox |
| Defendants. | ) | |
| VILLAGE OF OLD MILL CREEK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  17-cv-01163 |
| | ) | |
| v. | ) | |
| | ) | Judge Manish Shah |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, | ) | |
| | ) | Magistrate Judge Susan Cox |
| Defendant. | ) | |

**STATE DEFENDANTS' REPLY
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Thomas Ioppolo
*tioppolo@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 11th Floor
Chicago, IL 60601
(312) 814-7198

Richard S. Huszagh
*rhuszagh@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 12th Floor
Chicago, IL 60601
(312) 814-2587

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.     Introduction and Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Plaintiffs Have Not Alleged a Valid Claim that Illinois'
ZEC Program Is Preempted by the FPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.    Illinois' ZEC Program Is Not Field-Preempted. . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.    Illinois' ZEC Program is Not Invalid Under Conflict-Preemption Principles. . . . . 12

       C.    Plaintiffs Do Not Have a Cause of Action in Equity to Enjoin
Implementation of the ZEC Program on Preemption Grounds.. . . . . . . . . . . . . . . 13

III.   Plaintiffs Fail to State a Plausible Claim for Relief
Under the Dormant Commerce Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

*Cases*                                                                      Page(s)

*Arizona v. California*, 283 U.S. 423 (1931).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). . . . . . . . . . . . . . . . 13, 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383 (1994).. . . . . . . . . . . . . . . 19

*Cal. Pub. Utilities Comm'n*, 133 FERC ¶ 61,059 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Las Vegas v. Foley*, 747 F.2d 1294 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Doran v. Mass. Turnpike Auth.*, 348 F.3d 315 (1st Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 20

*FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016).. . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
     841 F.3d 133 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366 (1976).. . . . . . . . . . . . . . . . . . . . 18

*H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016). . . . . . . . . . . . . . . . . . . . 2, 4-9

*L C & S, Inc. v. Warren Area County Plan Comm'n*, 244 F.3d 601 (7th Cir. 2001). . . . . . . . . . . 17

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981). . . . . . . . . . . . . . . . . . . . . . . . 16

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988). . . . . . . . . . . 4

*Missouri Pet Breeders Ass'n v. Cook County*, 106 F. Supp. 3d 908 (N.D. Ill. 2015). . . . . . . . . 20

*MPHJ Tech. Inv. v. Sorrell*, 108 F. Supp. 3d 231 (D. Vt. 2015). . . . . . . . . . . . . . . . . . . . . . . 20

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986). . . . . . . . . . . . . . . . . . . . . 4

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493 (1989). . . . . . . . . . . 5

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 9, 10, 12

*Personal-assistant cases. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . 6

*Public Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456 (1943). . . . . . . . . . . . . . . 4

*S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253 (2nd Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . 20

*Soon Hing v. Crowley*, 113 U.S. 703 (1885). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. O'Brien*, 391 U.S. 367 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Vizio v. Klee*, 2016 WL 1305116 (D. Conn. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*WSPP Inc.*, 139 FERC ¶ 61,061 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

### Statutes and Court Rules

16 U.S.C. § 824d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

16 U.S.C. § 824e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 825m. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

16 U.S.C. § 825p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20 ILCS 3855/1–75(d–5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ill. Public Act 99–906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## I.     Introduction and Summary of Argument

Plaintiffs, PJM Interconnection, L.L.C. ("PJM"), and Monitoring Analytics, LLC ("MA"), paint a regulatory landscape occupied by free-market principles that favor economic efficiency and leave no room for other policies, including policies to promote power-generation sources with greater environmental benefits than fossil-fuel power plants.  But the law does not adopt such a one-sided, externality-blind approach.  Instead, the Federal Power Act (the "FPA") establishes an allocation of federal and state authority in which States may regulate the generation and retail sale of electric power and, in the exercise of their independent authority, may pursue policies other than economic efficiency.  Illinois' ZEC program falls well within the scope of that state authority and is not invalid under either field preemption or conflict preemption principles.

For their field-preemption claim, Plaintiffs incorrectly describe the scope of FERC's *exclusive jurisdiction* as much greater than it actually is, so that it extends far beyond regulating rates for interstate sales of wholesale power and reaches any state law or policy that "affects" those rates. That description:  (1) is inconsistent with Supreme Court precedent defining FERC's jurisdiction and the State's independent jurisdiction; (2) has been rejected by FERC itself; (3) is inconsistent with Plaintiffs' admission that REC programs, which also affect wholesale rates, are not preempted under the FPA; and (4) if accepted, would eliminate a vast category of state regulation, including regulation the FPA specifically reserves to the States.  With respect to Plaintiffs' conflict preemption claim, relating to the area in which FERC and States have *concurrent jurisdiction*, Plaintiffs disregard the requirement of an "actual conflict" with federal law and take the position that whenever FERC *could* adopt a federal-law policy that conflicts with state law on a matter that directly affects interstate sales of wholesale power, the state law is preempted, regardless whether FERC *has* adopted such a policy. That position is likewise inconsistent with established law and FERC's own understanding of its

authority.  Plaintiffs' preemption claims also lack merit because they do not satisfy the elements necessary for an equitable cause of action to enjoin the ZEC program under the Supremacy Clause.

Plaintiffs also have not alleged a valid claim that the ZEC program violates the dormant Commerce Clause.  That Clause prohibits States from enacting protectionist legislation that privileges in-state businesses over out-of-state businesses. But it does not prevent States from legislating evenhandedly in furtherance of its traditional police powers — here, environmental protection and public health.  Public Act 99-906 (the "Act"), which provides zero emission credits ("ZECs") to qualifying nuclear power plants, does not discriminate between in-state and out-of-state facilities.  It also treats fossil fuel generators the same; whether in-state or out-of-state, they are by definition excluded from having the credits.  In the absence of sufficient factual allegations that the Act discriminates on its face or that, in this pre-enforcement challenge, the state agencies responsible for its implementation will intentionally discriminate against out-of-state power generators, Plaintiffs' dormant Commerce Clause claim should be dismissed.

## II.     Plaintiffs Have Not Alleged a Valid Claim that Illinois' ZEC Program Is Preempted by the FPA.

Based on a misreading of governing precedent, including *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), Plaintiffs contend that FERC has "exclusive jurisdiction" over any state law that "affects" the rates for interstate sales of wholesale electricity in RTO auctions, and that the FPA consequently preempts such state laws.  (See, e.g., Pl. Mem. at 3, 11.)  They are mistaken. The FPA does give FERC *exclusive* authority to set rates for interstate sales of wholesale power, but that authority is not nearly as broad as Plaintiffs claim.  The FPA also gives FERC authority to regulate state rules and practices that "directly affect" such interstate sales.  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 774 (2016) ("*EPSA*").  But that authority — pursuant to which FERC may determine whether such rules or practices are "unjust" or "unreasonable" and, if it makes such

2

a finding, establish a "just and reasonable" rule or practice, 16 U.S.C. § 824d — is *non-exclusive*. And, to the extent it extends to matters that States may also regulate (including the generation and retail sale of electricity, and the pursuit of general health-and-welfare policies), it preempts state law only when FERC *exercises* that authority in a way that *actually conflicts* with a challenged state law. Neither situation is present here.

### A.     Illinois' ZEC Program Is Not Field-Preempted.

Plaintiffs, echoed by PJM and MA, first maintain that the Illinois ZEC program is invalid under field-preemption principles because FERC has "*exclusive* regulatory jurisdiction" over anything "affecting" rates for interstate sales of wholesale power. (Pl. Mem. at 3, emphasis added; see also PJM Mem. at 8; MA Mem. at 9.) As explained in the State Defendants' opening memorandum (at 9-12), however, FERC's exclusive jurisdiction, which does trigger field preemption principles, is significantly narrower than Plaintiffs assert. It applies to the regulation of wholesale rates as such, not everything that may affect such rates. Plaintiffs repeatedly blur the distinction between FERC's exclusive jurisdiction and its broader jurisdiction — which is not exclusive, but instead is to a great extent concurrent with the State's independent authority and implicates conflict preemption, not field preemption — over matters that directly affect wholesale rates.[1] The Court should not similarly confuse these distinct categories of FERC authority.

The State Defendants agree that because only FERC has authority under the FPA to

---

[1]     See also Pl. Mem. at 11 (asserting that FERC's "*exclusive* authority extends to . . . the enacting of any 'rules and regulations *affecting* or pertaining to such [wholesale] rates or charges.'") (quoting 16 U.S.C. §§ 824d(a), 824e(a)) (emphasis added); *id.* ("for the Court to hold that the ZEC program is not preempted would mean that it is outside the area in which FERC can regulate"); *id.* ("The ZEC program is field preempted by FERC's *exclusive* regulatory authority because . . . the program 'affects' . . . wholesale electricity rates") (emphasis added); *id.* at 18 ("states are expressly prohibited . . . from taking actions that 'affect,' 'pertain to,' or are 'connected with' wholesale rates") (quoting 16 U.S.C. §§ 824d(a), 824e(a)); *id.* at 23 ("ZECs plainly '*affect*' the [wholesale] market and are thus subject to FERC's *exclusive* jurisdiction") (emphasis added).

determine whether rates for wholesale sales of power in interstate commerce are just and reasonable, States may not set different rates for such sales, see *Hughes*, 136 S. Ct. at 1297; see also *Public Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469-70 (1943) (applying Natural Gas Act), or nullify such rates "by substituting their own determinations of what would be just and fair" and denying utilities the ability to include them in their rate base for retail sales, *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 365, 370-73 (1988); accord *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 959-61, 970 (1986); see also *Hughes*, 136 S. Ct. at 1298 (noting that in both *Mississippi Power & Light* and *Nantahala Power & Light*, "a State determined that FERC had failed to ensure the reasonableness of a wholesale rate, and the State therefore prevented a utility from recovering — through retail rates — the full cost of wholesale purchases"). It does not follow, however, that FERC alone may establish rules or regulate practices that *affect* such rates.

Indeed, in *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1600 (2015), the Supreme Court expressly rejected the proposition "that FERC's regulation of . . . wholesale rates forecloses every other form of state regulation that *affects* those rates." 135 S. Ct. at 1600 (emphasis added); see also *id.* ("no one could claim that FERC's regulation of this physical activity [reporting a price to a specialized journal] for purposes of wholesale rates forecloses every other form of state regulation that *affects* those rates") (emphasis added). In dissent, Justice Scalia espoused the very position Plaintiffs advocate here: "If the Federal Government may regulate a subject, the States may not." 135 S. Ct. at 1603 (Scalia, J., dissenting). But the Court refused to adopt that position, instead holding that areas in which FERC may regulate because they involve matters that affect wholesale rates are not within its exclusive jurisdiction. The Court explained:

> Petitioners and the dissent argue that there is, or should be, a clear division between areas of state and federal authority in natural-gas regulation. . . . But that Platonic ideal does not describe the natural gas regulatory world.

4

*Id.* at 1601. Elaborating, the Court stated:

> Suppose FERC, when setting wholesale rates in the former cost-of-service rate-making days, had denied cost recovery for pipelines' failure to recycle. Would that fact deny States the power to enact and apply recycling laws? These state laws might well raise pipelines' operating costs, and thus the costs of wholesale natural gas transportation. But in *Northwest Central* [*Pipeline Corp. v. State Corp. Commission of Kansas*, 489 U.S. 493, 514 (1989),] we said that "[t]o find field pre-emption of [state] regulation merely because purchasers' costs and hence rates might be *affected* would be largely to nullify . . . § 1(b)."

*Id.* (emphasis added).[2]

*Hughes* is fully consistent with this distinction, specifically declaring that "States may regulate within their assigned domain even when their laws incidentally *affect* areas within FERC's domain." 136 S. Ct. at 1290 (emphasis added). Plaintiffs nonetheless attempt to equate Illinois' ZEC program with the Maryland program that *Hughes* held preempted by the FPA. That effort is unpersuasive. In *Hughes*, the challenged law promoted the creation of a new power-generating facility by guaranteeing that, for the facility's sales of electric capacity in RTO auctions, it received a state-mandated price, rather than the auction clearing price, through side-payments from the State's utilities pursuant to state-mandated "contracts for differences." 136 S Ct. at 1295. The Court held that this program was preempted by FERC's authority to regulate wholesale rates because it "disregards" a rate for wholesale capacity sales prescribed by FERC-approved auctions, *id.* at 1299, and "invades FERC's regulatory turf" by "*adjusting* an interstate wholesale rate," *id.* at 1297

---

[2]     Unwilling to let go of the now-abandoned "binary" theory of exclusive jurisdiction, Plaintiffs assert that "[i]n *EPSA*, the Court made clear that FERC's authority preempts state 'rules or practices that *directly* affect the [wholesale] rate.' 136 S. Ct. at 774 (emphasis in original) (internal quotation marks omitted)." (Pl. Mem. at 12.) In fact, *EPSA* merely held that FERC's authority under the FPA *extends* to matters that "directly affect" wholesale rates, not that the mere *existence* of that authority, even unexercised, preempts any state rule or practice that directly affects wholesale rates. (See also State Def. Mem. at 10.)

(emphasis added). The Court pointed out that the Maryland law conditioned receipt of the program's subsidies "on the new generator selling capacity into a FERC-regulated wholesale auction," *id.* at 1292, but then, for those wholesale sales, substituted the contract price for the auction price, *id.* at 1295 ("Maryland's program guarantees CPV the contract price rather than the auction clearing price").

In light of these aspects of the decision, *Hughes* is properly read as being grounded in FERC's exclusive jurisdiction to regulate wholesale rates, not its broader, concurrent jurisdiction over rules and practices that affect such rates. That reading is confirmed by the Court's recognition that "States may regulate within their assigned domain even when their laws incidentally *affect* areas within FERC's domain." *Id.* at 1298 (emphasis added). Notably, the Court limited the scope of its holding, stating that it did "not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, [or] direct subsidies," and that "[s]o long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Id.* at 1299 (emphasis added). Reiterating the point, the Court stated that "[n]othing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Id.* at 1299 (quoting respondents' brief.)[3]

In short, *Hughes*, contrary to Plaintiffs' reading of it, holds that a state program invades FERC's exclusive jurisdiction, and is subject to field preemption, when it regulates the rates for

---

[3]    MA asserts that in the case relating to New Jersey's similar program, *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), the program paid "contract-for-differences" subsidies without regard to whether the generator sold its capacity in PJM's wholesale auctions. (MA Mem. at 8-9.) That is incorrect. See 766 F.3d at 252 ("the Board guaranteed each generator a fixed price for its *cleared* capacity") (emphasis added).

wholesale sales of energy, not when it regulates some other transaction or aspect of the electric energy industry in a way that merely affects wholesale rates.[4]  And under the Act, Illinois' ZEC program does not set prices or otherwise regulate the terms for sales of electric capacity or energy. Instead, it creates separate state-law property interests in the environmental benefits associated with the operation of nuclear power plants and then establishes a separate market for the sale of those interests.  It does not "adjust" or "disregard" the FERC-market rate for sales of electric capacity or energy by substituting a different price for such sales, as did the Maryland program in *Hughes*.  That ZEC revenues to certain nuclear power plants may affect those plants' bids in wholesale markets does not change this conclusion.

Plaintiffs and PJM nonetheless maintain that Illinois' ZEC program is similar in many respects to the Maryland program invalidated in *Hughes* and so must meet the same fate.  They assert, in particular, that in Illinois' program, as in Maryland's:

- Nuclear power plants receive ZEC revenues "only if they produce electricity," which "they can dispose of . . . only by selling it in the auctions" created by FERC, (Pl. Mem. at 13.)

- "ZECs are 'tethered' to the favored generators' wholesale market participation," (*id.* at 14);

- "Illinois was 'aiming at' changing wholesale market outcomes," (*id.* at 15).

This attempt to equate Illinois' ZEC program with the program declared invalid in *Hughes* fails.

Unlike the statutory program in *Hughes*, which conditioned the generator's receipt of contract-for-differences payments on its capacity bids "clearing the auction," 136 S. Ct. at 1299,

---

[4]     *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988), on which Plaintiffs rely, is not to the contrary.  That case involved a Michigan law giving a state regulator the power to decide whether the issuance of securities by a company transporting natural gas in interstate commerce, which would affect is return-on-capital position, was consistent with reasonable wholesale rates.  The Court held that the law was preempted because it was "directed at . . . the control of rates and facilities of natural gas companies," which were "precisely the things over which FERC has comprehensive authority."  485 U.S. at 308.  See also *Oneok, Inc.*, 135 S. Ct. at 1600 (describing *Schneidewind*).

Illinois' ZEC program only requires eligible nuclear power plants (which are connected to the PJM or MISO grid) to generate power. 20 ILCS 3855/1–75(d–5). That generation requirement, which does not depend on a bid clearing an RTO auction, serves to ensure that the environmental benefits of the program (the absence of carbon and other airborne emissions) are achieved. It is of course likely that these plants will seek to sell the power they generate to earn these ZEC revenues (e.g., with low or zero-dollar bids in the day-ahead or same-day energy markets). But their ZEC revenues are not conditioned on those bids clearing those auctions because, unlike the situation in *Hughes*, the subject matter of the relevant transaction, consistent with the ZEC program's goal, is the environmental benefit created by a certain type of power generation, not the wholesale sale of power or capacity.[5] Thus, the ZEC program, while possibly affecting wholesale rates to some extent, does not invade FERC's exclusive authority to regulate such rates.

That same requirement of generating power applies equally to RECs, which also establish environmental-benefit subsidies for the production of emission-free power. That these producers naturally also sell this power does not change the nature of the state-law property interest exchanged or the payment for it. Plaintiffs insist that RECs are different from ZECs because RECs "are independent from wholesale electricity sales." (Pl. Mem. at 6-7.) But that is also true for ZECs, which represent environmental benefits of emission-free power generated by nuclear power plants.[6]

---

[5]     Plaintiffs and PJM say this is a distinction without a difference because under PJM's rules, approved by FERC, all generators must offer their capacity into PJM's capacity auctions. (Pl. Mem. at 13; PJM Mem. at 10-11.) But this feature is not imposed by Illinois law. Nor does it require any capacity or energy that is *offered* into PJM's market to *clear*. In addition, eligible nuclear power plants can enter into bilateral contracts, in which event those contracts, not prices set in PJM capacity auctions, determine the financial consequences to them of making that capacity available.

[6]     Plaintiffs insist that ZECs are not "independent," in the sense recognized in *WSPP Inc.*, 139 FERC ¶ 61,061, pars. 23-24 (2012). (Pl. Mem. at 22-23.) But FERC uses that term in the sense of a transaction for an "unbundled" interest, such as a REC, separate from the sale of electric power or capacity — not a transaction that has no effect on such a sale. *Id.*

The price adjustment in the ZEC formula, under which ZEC prices (which never go up) go down as average prices for wholesale sales of power and capacity rise, likewise does not mean that ZEC subsidies are "tethered to a generator's wholesale market participation," as was the case in *Hughes*. See 136 S. Ct. at 1299. Again, the point in *Hughes* was that the Maryland program subsidized new generating capacity by replacing the prices for a new generator's capacity availability set in capacity-market auctions with prices determined by the statutory program, and it achieved that goal by adding the amounts provided in the statutorily mandated contracts-for-differences to the amounts received in the capacity auctions. Subjecting these additional payments to the condition that the generator's bid clear the capacity auction thus achieved this intended rate adjustment and confirmed that the subject matter of both transactions — in the auction and under the contract-for-differences — was the sale of the generator's capacity, a matter within FERC's exclusive jurisdiction. *Id.* at 1299 ("the contract for differences operates within the auction"). Here, by contrast, the subject of the ZEC payments is not the *sale* of electric power or capacity, but the *generation* of emission-free power. Thus, the price-adjustment — which furthers the perfectly sensible objective of reducing the costs borne by ratepayers to subsidize such emission-free power when higher energy- and capacity-market revenues reduce the amounts necessary to keep these nuclear power plants from closing — is not tethered to "market *participation*," *id.* at 1299 (emphasis added), but instead is modified by changes in prevailing market *prices*.

Finally, *Hughes*, *Oneok, Inc.*, and the other decisions on which Plaintiffs rely do not support their contention that Illinois' ZEC program is preempted because, despite its clear environmental benefits, "Illinois was 'aiming at' changing wholesale market outcomes," the ZEC program is "targeting" wholesale rates, and "the effect here on the wholesale market is the aim and purpose" of the program. (Pl. Mem. at 1, 12, 15, 21.) Two reasons defeat this contention.

First, while Plaintiffs' memorandum asserts "the pretextual nature of the purported 'environmental purpose' of the ZEC program" (Pl. Mem. at 9 n.7), their complaint never alleges that the "aim" or "purpose" of the ZEC program was to adjust, or disregard, *wholesale rates*. Instead, it alleges (in conclusory fashion) that "[a]lthough 'environmental protection' was the legislature's asserted goal, the clear and actual purpose of FEJA was to *save jobs and local tax revenues* associated with these plants," and that the Act "is just a mechanism to provide *out-of-market funding* to Clinton and Quad Cities." (EPSA Complaint, par. 58, emphasis added.) Thus, Plaintiffs' own claim, as alleged in their pleading, is that the Act was intended to provide economic subsidies to certain nuclear power plants to keep them operating, not to regulate wholesale rates for interstate sales of power or capacity, or to nullify or disregard FERC's regulation of those rates. And, as noted above, the Act's foreseeable *effect* on wholesale rates as a consequence of providing additional revenues to specific generators does not field-preempt the Act under the FPA.

Second, *Oneok, Inc.*'s focus on the "target" of a state law entails an objective examination of the functional operation and goals of the law, not an inquiry into a state legislature's subjective motivations for passing it. That is consistent with longstanding precedent holding that, subject to narrow exceptions, the validity of statutes does not depend on the motives of the legislators who enacted it. See *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *Arizona v. California*, 283 U.S. 423, 455 (1931) (Brandeis, J.);[7] *Soon Hing v. Crowley*, 113 U.S. 703, 710-11 (1885); see generally *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297-98 (9th Cir. 1984). It is also consistent with the nature of preemption analysis generally. For the activities regulated by FERC, none of the

---

[7]    In *Arizona*, the Court dismissed as insufficient a pleading alleging that a federal statute's recitals of its purpose were "a mere subterfuge and false pretense"; ruled that the Court could not inquire "[i]nto the motives which induced members of Congress to enact" the statute; and held that where Congress had the right to act under its authority over navigation, "the fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred." 283 U.S. at 454-56.

three types of preemption includes, as an element, the subjective purpose of a state law, much less the motivations of a state legislative body. Thus, if a state law is not expressly preempted by federal law, does not operate in an area exclusively subject to federal regulation, and does not actually conflict with federal law, it should not be condemned by allegations that its "true purpose" was to encroach on federal authority. See, e.g., *Personal-assistant cases. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 216 (1983). (See also below at 16-17.) And here, an objective analysis of the ZEC program, as prescribed in the Act, discloses that it does exactly what it purports to do: preserve zero-emission power generation that would be lost without giving it an economic value that recognizes its avoidance of negative environmental externalities. In any event, even if the Illinois legislature's subjective motivations were relevant to determining whether the Act is preempted by the FPA, Plaintiff's allegations, as noted above, are insufficient to support the conclusion that the Act's true purpose was to control wholesale power rates.

In addition, as noted in the State Defendants' opening memorandum, FERC itself has embraced this understanding of its jurisdiction, under which it has authority to regulate matters that affect wholesale rates, but its exclusive authority is limited to the actual regulation of such rates. See *WSPP Inc.*, 139 FERC ¶ 61,061, pars. 18-26 (2012).[8]

---

[8] See also *Cal. Pub. Utilities Comm'n*, 133 FERC ¶ 61,059, par. 31 & n.62 (2010) (stating that "a state may separately provide additional compensation for environmental externalities, outside the confines of, and, in addition to the [Public Utility Regulatory Policies Act of 1978] avoided cost rate, through the creation of renewable energy credits (RECs)"; that "RECs are separate commodities from the capacity and energy produced by [qualifying facilities]"; and that "[i]f a state chooses to create these separate commodities, they are not compensation for capacity and energy"); *S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995) ("States also may seek to encourage renewable or other types of resources through their tax structure, or by giving direct subsidies. Use of the tax structure may allow states to affect the price of renewables or other alternatives. By imposing a tax on fossil generators or by giving a tax incentive to alternative generation, states may allow the alternative generation to be more competitive in a cost comparison with fossil-fueled generation.")

Finally, Plaintiffs' challenge to the ZEC program is inconsistent with its admission that RECs are not preempted by the FPA. (Pl. Mem. at 21-22.) Plaintiffs attempt to identify various aspects of Illinois' REC program that distinguish it from the ZEC program. (*Id.* at 7.) But none of those aspects (e.g., the fact that the price of RECs is set in a competitive market, without regard to wholesale power rates) has any real significance under the preemption analysis that Plaintiffs advance, under which a subsidy program that has an effect on wholesale rates, and that provides payments to power generators who must sell that power in wholesale auctions, run afoul of FERC's exclusive jurisdiction.[9] In sum, Plaintiffs' field-preemption claim lacks merit as a matter of law and should be dismissed.

### B. Illinois' ZEC Program is Not Invalid Under Conflict-Preemption Principles.

Plaintiffs' conflict-preemption claim fares no better. In particular, although FERC has authority to take action *if* it determines that state rules and practices that directly affect wholesale rates are unjust and unreasonable, Plaintiffs do not allege that FERC *has* made such a determination. Thus, there can be no actual conflict with its exercise of that authority under the FPA. The notion that such a conflict exists simply because FERC *may* exercise its authority (but has not exercised that authority) over matters that affect wholesale rates is not only inconsistent with *Oneok, Inc.*, 135 S. Ct. at 1601, but logically absurd because it assumes that States may not take *any* action in an area that affects wholesale rates, even where FERC could decide the action *is* just and reasonable.[10]

---

[9]     The only material difference between RECs and ZECs under Plaintiffs' proposed preemption analysis is that ZECs are really a "sham" and a "pretext" for economic, not environmental, legislation. But that claimed difference, as noted elsewhere, is legally unfounded.

[10]     PJM asserts that although FERC has the authority to accommodate any price suppression effects of ZEC subsidies on wholesale rates and has been asked to do so, the ZEC program must be evaluated under the current state of affairs and should be found invalid because FERC has not adopted any rule to mitigate those effects. (PJM Mem. at 11 n.6.) This analysis is backward. That FERC may take action regarding ZECs in the future establishes both the absence of any actual conflict now and the possibility that, if it acts, there may not be any actual conflict.

Plaintiffs nonetheless contend that the ZEC program is invalid under conflict-preemption principles because "it frustrates the federal policy that just and reasonable rates" for wholesale sales of electricity be "established by the auction process." (Pl. Mem. at 24.) Once again, Plaintiffs mischaracterize the ZEC program as regulating wholesale rates when the Act, by its terms, creates a market for property interests that are uncoupled from electric power itself and are sold in transactions separate from any sale of electric power or capacity. In the end, Plaintiffs, PJM, and MA view all laws that affect the power industry through a competitive-market lens that eliminates consideration of any policies that promote other goals, including environmental protection. But even FERC recognizes that the FPA does not adopt such a one-dimensional view of the States' role. And unless FERC does take future action that actually conflicts with Illinois' ZEC program, the Illinois legislature cannot he held to have exceeded its authority by enacting that program.[11]

### C.    Plaintiffs Do Not Have a Cause of Action in Equity to Enjoin Implementation of the ZEC Program on Preemption Grounds.

Plaintiffs' preemption claim fails for the further reason that they do not have a cause of action for injunctive relief, under *Ex parte Young* principles, against implementation of the ZEC program. They maintain that such a cause of action is not limited to persons facing regulatory enforcement of the challenged law who assert preemption as an anticipatory defense. (Pl. Mem. at 30-31.) But without such a limitation, the Supremacy Clause would itself create such a cause of action — a position the Supreme Court specifically rejected in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1383-84 (2015). Moreover, in a case on which Plaintiffs themselves rely (Pl. Mem. at 32 n.28), the Second Circuit explained that where such a cause of action for an *Ex Parte Young*

---

[11]    PJM also maintains that Illinois, by deciding in the 1990s to restructure its energy sector, committed the State to greater competition and thus cannot now adopt policies that may diminish the effects of free-market forces. (PJM Mem. at 3-4.) But the legislature cannot deny itself the power to pass future laws, and PJM's view that Illinois may pursue only one set of objectives, to the exclusion of all others, is plainly wrong.

injunction does exist, "a plaintiff does not ask equity to create a remedy not authorized by the underlying law. Rather, it generally *invokes equity preemptively to assert a defense* that would be available to it in a state or local enforcement action." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (citations omitted). See also *Armstrong*, 135 S. Ct. at 1384 (citing *Ex Parte Young* and explaining that, "if an individual claims federal law *immunizes him* from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted") (emphasis added).

Plaintiffs also unconvincingly attempt to avoid *Armstrong*'s holding that there is no cause of action for injunctive relief against a state law that allegedly violates a federal statute where the statute, by including express remedies, implicitly excluded others, or where it contains "judicially unadministrable" criteria for deciding the preemption issue. 135 S. Ct. at 1385. Plaintiffs do not dispute that 16 U.S.C. § 825m (FPA § 213) gives FERC the express right to sue to enjoin violations of the FPA or to enforce compliance with it, thus undercutting their position that the FPA also recognizes the remedy of an equitable action for an injunction. They seek to minimize the significance of this provision by pointing to 16 U.S.C. § 825p (FPA § 317), which gives federal courts jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this Act." But that provision just recognizes federal court *jurisdiction*. It does not create any *cause of action*, including, in particular, a cause of action in equity for a private party (not FERC, to whom that right is given by Section 825m) to seek an injunction against violations of the Act.

In any event, the FPA criteria that Plaintiffs' preemption claim would require the Court to apply confirm the exclusion of a cause of action for the injunctive relief they seek. Plaintiffs respond that "this action seeks only to ensure that prices set by means of FERC-mandated auctions are not *impacted* by ZEC subsidies." (Pl. Mem. at 32-33, emphasis added.) That response misses the mark.

As noted above, neither FERC's exclusive jurisdiction over setting wholesale rates, to which field preemption applies, nor its non-exclusive jurisdiction over practices that directly affect such rates, subject to conflict preemption, exclude state regulation merely because it "affects" wholesale prices. And even in the latter category, when FERC actually exercises that broader authority, it may find a violation of the FPA only if it concludes that a state rule or practice is "unjust or unreasonable." 16 U.S.C. § 824d(a). That is a quintessential example of a judicially unadministrable standard.

### III. Plaintiffs Fail to State a Plausible Claim for Relief Under the Dormant Commerce Clause.

In response to the motions to dismiss, Plaintiffs argue that they have adequately pleaded that the Act discriminates against interstate commerce on its face; that it harbors a discriminatory purpose; and that it has the effect of favoring in-state economic interests over out-of-state interests. (Pl. Mem. at 35-36.) Beyond attacking the statute as drafted, Plaintiffs also attack how the statute will be implemented by the two state agencies — the Illinois Power Agency (the "IPA") and the Illinois Commerce Commission (the "ICC") — that are responsible for procuring ZECs and managing the process as it impacts local utilities and rate-payers. But Plaintiffs' two-pronged attack, on the legislature that passed the law, and on the agencies who have yet to implement it, rests on conclusory allegations that do not state a plausible claim.

Plaintiffs do not, and cannot, dispute that nuclear power generates no greenhouse gases or particulate airborne pollution; that the loss of presently operating nuclear power plants would create a corresponding loss of those environmental benefits; that the Act creates and gives economic value to state-law property interests (ZECs) to encourage the preservation of these benefits through a state-mediated process, in which the ultimate costs are borne by Illinois' electric ratepayers; that the Act excludes all fossil-fuel generators, including Illinois generators, from receiving the revenues of this process; and that the Act makes all nuclear power plants in the PJM and MISO areas eligible to

receive these ZEC revenues, provided they meet the relevant criteria. Despite all of this, Plaintiffs' Complaint alleges, in conclusory fashion, that the Act "is not environmental legislation; it is just a mechanism to provide out-of-market funding to" two Exelon nuclear plants in Illinois, and that the statutory procurement process "is a *sham*, as [these plants] have been *pre-determined* to be the 'winners of the ZEC contracts." (Complaint, pars. 58-59, emphasis added.) Indeed, Plaintiffs' response to the motions to dismiss makes clear that this is the foundational point of their dormant Commerce Clause claim. (See Pl. Mem. at 5, stating that the "well-pleaded allegations of pretext" justify denying the motions to dismiss.) But these allegations, while sensational, do not suffice to support that claim.

Under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), claims cannot rely on mere conclusions or allege what is merely conceivable, as opposed to what is factually plausible. *Iqbal*, 556 U.S. at 678. "Naked assertions devoid of further factual enhancement" are insufficient. *Id.* Unwarranted inferences will not suffice. And it is a function of judicial experience and common sense to determine whether allegations move a claim from the merely conceivable to the plausible. *Id.* at 679. Plaintiffs' allegations do not meet that standard.

As noted above, the actual environmental benefits of the Act, stated in the Act's recitals, are undeniable. Whatever other benefits the Act may bring, it is self-evidently designed to further environmental and health concerns for the people of Illinois. And absent sufficient factual allegations to the contrary, the legislative findings explaining the law's environmental and public health rationale cannot simply be cast aside. See *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7, 471 n.15 (1981). Carbon and particulate matter generated by fossil fuels cause illness and exacerbate climate change, and the statute is designed to address those problems with a system of zero emission credits (ZECs), similar to the renewable emission credits (RECs) used to promote wind and solar energy generation.

16

Plaintiffs' pleading that this is all a "sham" leading to a "pre-determined" outcome in favor of two Illinois nuclear power plants essentially relies on two facts — that the name of the bill contains the word "Jobs," and that the Governor praised the bill for its preservation of Illinois jobs. (Complaint, pars. 58, 61.) These alleged facts are legally insufficient to justify the extraordinary inference Plaintiffs claim. The ZEC portion of the act was just one part of a much larger bill addressing the subject of energy. Further, while it may be true that any number of legislators who voted for the bill, and the Governor who signed it into law, may celebrate the fact that the end result of the law may be to save Illinois jobs, that does not negate the fact that the ZEC program unquestionably serves an environmental purpose and advances public health interests that are clearly within the State's traditional police powers. And although the legislature was aware of Exelon's announcement that the Clinton and Quad City plants were slated for closure before the law's passage, consideration of such real-world facts is hardly unusual in the legislative process: "It is utterly commonplace for legislation to be incited by concern over one person or organization." *L C & S, Inc. v. Warren Area County Plan Comm'n*, 244 F.3d 601, 604 (7th Cir. 2001). Support for legislation by private parties likewise does not define the law's purpose.

As discussed in the State Defendants' opening brief, the challenged statute itself, the specific legislative findings, and the law's manifest environmental purpose negate any plausible inference that the legislature was simply perpetrating a fraud on the public at large when it enacted the law. There is no basis in fact, plausibly alleged in the Complaint, that the law's principal purpose was simply to discriminate in favor of an in-state business and preserve tax revenues from these facilities. In fact, Plaintiffs implicitly acknowledge that their "sham" accusation is misplaced when they admit that "the reduction of carbon emissions is important" (Complaint, par. 14), but argue that the State could employ other nondiscriminatory means to achieve that important goal (Pl. Mem. at 40). (Of course, the selection among different means to accomplish a policy objective is a matter for the

17

legislature, not the courts.)  Nor is there a plausible basis to conclude from the Complaint's allegations that the health benefits of the law are illusory — that it "is not environmental legislation." (Complaint, par. 58.)  It is.  And there is likewise no plausible basis to conclude the law should be judged by the strictest scrutiny as a "sham."  It is not.  If a State is truly committed to lessening its reliance on fossil fuels, then steps to preserve existing nuclear power generation, along with promoting wind and solar power, is eminently sensible.  Indeed, while reasonable people may debate the public policy aspects of this complex legislation, the conclusory assertion that it is nothing more than economic protectionism must be rejected.

Plaintiffs make a facial challenge to the statute, in effect arguing the law can have no valid applications.  But the Act itself, read fairly and objectively, refutes the idea that in the current posture of this case, before the statute has even been implemented, it cannot be valid in any set of circumstances.  Similarly, there is no support for the idea that the IPA will go about its procurement tasks — which have not even yet begun — in an unlawful manner, and that the ICC will fail to perform its oversight duties as required by the law.  Without further factual allegations supporting a plausible inference of such bad faith, or even malfeasance, by public officials, Plaintiffs' accusation that the procurement process is "pre-determined" cannot be assumed to be true.

Stripped of these implausible and conclusory allegations, Plaintiffs' dormant Commerce Clause claim does not stand up.  While the main concern under the dormant Commerce Clause is to prevent a state from discriminating against interstate commerce, the Supreme Court has held that "under our constitutional scheme the States retain broad power to legislate protection for their citizens in matters of local concern such as public health," and that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) (citation and internal quotation marks omitted); see also *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949)

(States may "impose even burdensome regulations in the interest of local health and safety"). The same pragmatic flexibility that characterizes the law of preemption in electric markets — which recognizes that there are no sharp barriers demarcating what is a matter for the federal regulatory agency and what is reserved to the States — applies to dormant Commerce Clause jurisprudence as well. While the ZEC program may have some impact on wholesale markets, just as any local regulatory measure may have, that is not enough to lead to its invalidation, especially in the absence of any protectionist discrimination. "The Court generally defers to health and safety regulations because 'their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations.'" *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 404 (1994) (O'Connor, J., concurring in the judgment). Thus, legislation intended to address "a typical and traditional concern of local government should not be rigorously scrutinized by the courts under the banner of the dormant Commerce Clause." *Vizio v. Klee*, 2016 WL 1305116, *8 (D. Conn. 2016) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007)). Those principles control here.

The Act does not discriminate in favor of in-state interests. *Any* nuclear power plant, whether one of Exelon's Illinois plants or a competitor's plant in another State, can apply to sell ZECs. Similarly, fossil fuel generators outside Illinois are not disadvantaged compared to fossil fuel generators in Illinois. Neither can receive ZEC revenues because their power generation produces greenhouse gases and associated pollutants. The fact that such in-state generators are potentially harmed by ZECs just as much as out-of-state generators may be harmed undercuts the notion that there is protectionist discrimination. See *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1174 (10th Cir.), *cert. denied*, 136 S. Ct. 595 (2015).

Plaintiffs further argue that even if the Act is not discriminatory on its face or in its purpose, they should be entitled to present evidence that its burden on interstate commerce "is clearly excessive in relation to its putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). As previously discussed, though, the Act does not discriminate based on locality between nuclear generators eligible for credits. Likewise, there is no discrimination between in-state and out-of-state fossil fuel generators. Accordingly, because there is no discriminatory burden on out-of-state commerce as Illinois attempts to advance its legitimate local and environmental interests, the *Pike* test does not apply. Conclusory allegations of discrimination under the Commerce Clause, which is all Plaintiffs offer here, do not survive a motion to dismiss, whether the claims are of purposeful discrimination or of mere effect. See *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 322 (1st Cir. 2003) (affirming Rule 12(b)(6) dismissal of Commerce Clause claim); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 261 n.8 (2nd Cir. 2013) (same); *Missouri Pet Breeders Ass'n v. Cook County*, 106 F. Supp. 3d 908, 923-24 (N.D. Ill. 2015) (same); *MPHJ Tech. Inv. v. Sorrell*, 108 F. Supp. 3d 231,244 (D. Vt. 2015) (same); *Vizio*, 2016 WL 1305116 at *8-9 (Commerce Clause allegations "cannot overcome the strong presumption of validity in the face of the non-illusory health and safety interests at issue in this case"). Accordingly, the Court should dismiss Plaintiffs' dormant Commerce Clause claim.[12]

## Conclusion

For the foregoing reasons and those set forth in the State Defendants' opening memorandum, Plaintiffs' complaints should be dismissed.

Respectfully submitted,

---

[12]     With respect to the Village of Old Mill Creek Plaintiffs' equal protection claim, those Plaintiffs' response to the motion to dismiss does not warrant any reply, and the State Defendants' stand on the arguments in their initial memorandum.

Thomas Ioppolo
*tioppolo@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 11th Floor
Chicago, IL 60601
(312) 814-719

May 17, 2017

  /s/ *Richard S. Huszagh*
Richard S. Huszagh
*rhuszagh@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 12th Floor
Chicago, IL 60601
(312) 814-2587