UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VILLAGE OF OLD MILL CREEK, *et al.*,

        Plaintiffs,

        v.

ANTHONY M. STAR , in his official
capacity as Director of the Illinois
Power Agency, *et al.*,

        Defendants.

and

ELECTRIC POWER SUPPLY ASSOCIATION,
*et al.*,

        Plaintiffs,

        v.

ANTHONY M. STAR , in his official
capacity as Director of the Illinois
Power Agency, *et al.*,

        Defendants.

No. 17 CV 1163 and
No. 17 CV 1164

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

The state of Illinois created a "zero emission credit" program to effectively subsidize nuclear power generation and corresponding sales of nuclear power in the wholesale market. The Future Energy Jobs Act[1] amended the Illinois Power Agency Act, 20 ILCS 3855/1-1 *et seq.*, and created a new commodity, the ZEC. The statute

---

[1] *See* SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016), available at http://www.ilga.gov/legislation/99/SB/PDF/09900SB2814enr.pdf.

grants ZECs to certain qualifying energy-generating facilities. Those facilities are likely to be two nuclear power plants owned by Exelon in Illinois. Utilities that sell electricity to consumers must purchase ZECs from the qualifying power plants, and those utilities will pass the costs of ZECs onto their customers. The result is money in the coffers of Exelon from the sale of ZECs that will give it a benefit when pricing its energy in the wholesale market relative to competing energy producers that do not receive ZEC payments.

Two sets of plaintiffs filed suit to challenge the statute. In one case, the plaintiffs, Village of Old Mill Creek, Ferrite International Company, Got It Maid, Inc., Nafisca Zotos, Robert Dillon, Richard Owens, and Robin Hawkins, are delivery services customers of Commonwealth Edison Company in Illinois. In the second suit, plaintiff Electric Power Supply Association is a national industry association for competitive electric power producers, and plaintiffs Calpine Corporation, Dynegy Inc., Eastern Generation, LLC, and NRG Energy, Inc. are independent power producers that operate generators nationwide and provide wholesale electricity to utilities. Both the consumer plaintiffs and the generator plaintiffs bring claims against Anthony Star in his official capacity as Director of the Illinois Power Agency and the Commissioners of the Illinois Commerce Commission in their official capacities, seeking to invalidate the statute. Exelon intervened in both actions to defend the ZEC program.

Defendants and Exelon each filed motions to dismiss the complaints. The motions are granted.

## I.    Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When analyzing a motion under Rule 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, but a court need not accept legal conclusions or conclusory allegations. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) *as amended* (Jan. 3, 2012) (citing *Iqbal*, 556 U.S. at 680–82). Rule 12(b)(6) limits a court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *see also* Fed. R. Evid. 201(b). A challenge to plaintiffs' standing to bring a claim is a challenge to the court's subject-matter jurisdiction, and as in a Rule 12(b)(6) motion, the facts of the complaint are accepted as true. *Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015).

## II.    Background

These two lawsuits are companion cases. The complaints are substantially similar, except that the consumer plaintiffs have an additional claim under the equal protection clause. In responding to defendants' and Exelon's motions to

dismiss, the consumer plaintiffs largely adopted the generator plaintiffs' arguments.[2]

## A. The Federal Power Act, FERC, and Wholesale Energy Markets

The Federal Power Act, 16 U.S.C. § 791a *et seq.*, allows both the Federal Energy Regulatory Commission and the states to regulate aspects of the electricity industry. Under the Federal Power Act, FERC has exclusive jurisdiction over wholesale sales of electric energy in the interstate market; it has the power to regulate wholesale electricity rates and any rule or practice that affects such rates.[3] 16 U.S.C. §§ 824(b), 824e(a). The states may regulate "any other sale" of electricity, which includes retail electric energy sales. *Id.* § 824(b).

FERC regulates wholesale rates of electric energy via interstate auctions. [1] ¶¶ 29–30. For most of Illinois, wholesale electricity is exchanged through auctions conducted by the Midcontinent Independent System Operator, Inc.[4] *Id.* ¶ 30. In Chicago and parts of northern Illinois, wholesale electricity is exchanged through auctions conducted by PJM Interconnection, L.L.C.[5] *Id.* Gaps between the supply and demand of electric energy can cause "uncontrolled widespread blackouts." *Id.* ¶ 32. To prevent such gaps, MISO and PJM continuously run two types of wholesale

---

[2] Bracketed numbers refer to entries on the district court docket, and unless otherwise noted, citations are to the 17-cv-1164 docket; referenced page numbers are from the CM/ECF header placed at the top of filings.

[3] A "wholesale" sale is the sale of electric energy to a buyer "for resale" to another buyer. 16 U.S.C. § 824(d).

[4] MISO is an independent system operator that serves fifteen states as well as one Canadian province. [1] ¶ 30.

[5] PJM is a regional transmission organization that serves thirteen states and the District of Columbia. [1] ¶ 30.

auctions, "energy" and "capacity," because electricity cannot be stored economically or in sufficient quantities. *Id.* ¶¶ 31–32.

Both MISO and PJM run day-ahead and real-time energy auctions. *Id.* ¶ 31. In the day-ahead energy auction, generators submit a bid for a price at which they are willing to generate a particular quantity of electricity to be delivered the next day. *Id.* ¶ 34. In the real-time energy auction, MISO and PJM each increase or decrease the prices of electric energy every five minutes to signal the need for generators to produce more or less electricity as conditions change in real time. *Id.* "In contrast to the energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to purchase electricity." *Id.* ¶ 38 (emphasis original). MISO and PJM calculate the generating capacity needed for the electric grid to run reliably each year and they establish the amount of capacity that retail electric suppliers, known as load serving entities, must purchase to meet customer demand in their territory each year.[6] *Id.* ¶ 37. To satisfy capacity obligations, load servicing entities may either enter into bilateral contracts with generators or they may participate in an auction market conducted by MISO or PJM. *Id.* "Each generator that sells capacity in the MISO and PJM capacity markets is required to participate in the day-ahead energy market, and to respond in real-time, if conditions warrant." *Id.* ¶ 38.

---

[6] FERC oversees this process and requires MISO to purchase annual capacity obligations one month before the relevant delivery period and PJM to purchase capacity obligations three years ahead of the relevant delivery period. [1] ¶ 39.

For both energy and capacity auctions, MISO and PJM use a process called "stacking" to accept generators' bids. *Id.* ¶¶ 41–42. The generators' bids are stacked from lowest to highest in price, and MISO and PJM accept bids in that order until the demand has been met. *Id.* ¶ 41. Each bid that is accepted is said to "clear the market." *Id.* The price of the highest-accepted bid is called the "market clearing price"; all generators receive that price for each bid they submitted that cleared the market, even if a generator submitted a bid at a lower price. *Id.* ¶¶ 35, 41. Since nuclear generators run continuously at maximum output and have no alternative to selling their output in MISO and PJM auctions, they submit conservative bids in the hopes of clearing the auction.[7] *Id.* ¶ 36. During times of oversupply, nuclear generators will even pay to offload their energy output onto the grid, by submitting a bid for a negative price, so that they have room to generate more energy in the future. *Id.* This bidding strategy results in lower market clearing prices. *Id.*

## B. Illinois's Future Energy Jobs Act and the ZEC Program

Exelon Corporation announced that it would shut down two of its nuclear generator facilities, Clinton and Quad Cities, unless the Illinois General Assembly passed "adequate legislation." [38-4] at 2–3. The two plants had lost more than $800 million over the last six years; but closing the plants would result in the estimated loss of 4,200 direct and secondary jobs, as well as approximately $1.2 billion in economic activity within four years. Succumbing to that pressure, the Illinois

---

[7] Generators' sources of compensation are predominantly their energy market and capacity market revenues; to a much lesser extent they also receive compensation from their ancillary services. [1] ¶ 43.

General Assembly created the zero emission credit program in the Future Energy Jobs Act.[8] The statute amends the Illinois Power Agency Act. *See* 20 ILCS 3855/1-1 *et seq*. When the governor signed the legislation into law, Exelon confirmed that Clinton and Quad Cities would operate for another ten years due to the new legislation. [38-11] at 2–3.

According to plaintiffs, the legislature's asserted goal for the statute, "environmental protection," was mere pretext for a bailout for Exelon's Clinton and Quad Cities plants. [1] ¶ 58. The actual purpose of the statute—to save jobs and local tax revenues—was clear from its title, "Future Energy Jobs Act." *Id*. Plaintiffs also noted that when the governor signed the bill into law, he said, "The Future Energy Jobs bill protects taxpayers, ratepayers, and the good-paying jobs at the Clinton and Quad Cities' plants." *Id*. ¶ 61.

The statute created a new commodity called a zero emission credit. A ZEC is a tradeable credit that represents the environmental attributes of one megawatt hour of energy produced from a zero emission facility (a nuclear power plant interconnected with MISO or PJM). 20 ILCS 3855/1-10. The Illinois Power Agency confers ZECs on those facilities that are "reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16%[9] of the

---

[8] *Illinois governor signs energy bill to help Exelon nuclear plants*, S&P GLOBAL PLATTS, (Dec. 7, 2016), available at http://www.platts.com/latest-news/electric-power/washington/illinois-governor-signs-energy-bill-to-help-exelon-21280324.

[9] Plaintiffs are suspicious of the 16% figure since it perfectly aligns with the amount of electricity that Clinton and Quad Cities provide. [100] at 24:2–8. They believe that the fact that the legislature used the 16% figure instead of calculating a competitive environmental amount that is universally beneficial is further proof that this is not an "open-ended

actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014."[10] 20 ILCS 3855/1-75(d-5)(1). Utilities are required to enter into contracts to purchase the ZECs from the winning zero emission facilities. *Id.* § 1-75(d-5)(1)(C-5). The contracts will have a term of ten years, ending May 31, 2027. *Id.* § 1-75(d-5)(1).

The retail suppliers must purchase all of the ZECs conferred on the selected zero emission facilities in each delivery year. *Id.* The price for each ZEC is the Social Cost of Carbon[11]; but, it may be reduced according to a "Price Adjustment," which is "the amount [. . .] by which the market price index[12] for the applicable delivery year

---

program" in which other plants can compete, but it is a subsidy for Clinton and Quad Cities. *Id.* at 24:2–8, 30:11–17.

[10] The Illinois statute modeled the ZEC program on Renewable Energy Credit programs, which many states, including Illinois, have enacted. [38-3] ¶ 46; [1] ¶ 51; *see also* 20 ILCS 3855/1-75(c). Generally, under such programs, "qualified renewable generators (such as solar, wind, and biomass) earn RECs for each MWh of electricity they generate," and retail suppliers "are required to acquire a certain number of RECs each year or make an Alternative Compliance Payment." [1] ¶ 51. All qualified renewable generators create RECs. *Id.* ¶ 52. "RECs are competitively traded outside of the wholesale energy markets, so that their value varies based on supply and demand." *Id.*

[11] The U.S. Interagency Working Group on Social Cost of Carbon set the price for the Social Cost of Carbon at $16.50 per megawatt hour in August 2016. 20 ILCS 3855/1-75(d-5)(1)(B)(i).

[12] The market price index each delivery year is the sum of projected energy and capacity prices. 20 ILCS 3855/1-75(d-5)(1)(B)(iii). Projected energy prices are calculated using the energy forward prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year. *Id.* § 1-75(d-5)(1)(B)(iii)(aa). Projected capacity prices are calculated using the sum of fifty percent of the Base Residual Auction price, as determined by PJM, divided by twenty-four hours per day, and multiplied by fifty percent of the resource auction price, as determined by MISO's resource auction, divided by twenty-four hours per day. *Id.* § 1-75(d-5)(1)(B)(iii)(bb). PJM's Base Residual Auction is held each year during the month of May; it determines capacity obligations for a delivery year three years in advance. *See RPM Base Residual Auction FAQs*, PJM, available at https://www.pjm.com/~/media/markets-ops/rpm/rpm-auction-info/rpm-base-residual-auction-faqs.ashx.

exceeds the baseline market price index[13] for the consecutive 12-month period ending May 31, 2016." *Id.* § 1-75(d-5)(1)(B). The purpose of the price adjustment is "to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase." *Id.*

To receive ZECs, facilities must participate in a procurement process and submit eligibility information, such as annual power generation and cost projections, to the Illinois Power Agency. *Id.* § 1-75(d-5)(1)(A). The IPA will publish its proposed zero emission standard procurement plan, which will explain how bids will be selected based on "public interest criteria," such as minimizing carbon dioxide emissions that result from electricity consumed in Illinois, and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of Illinois. *Id.* § 1-75(d-5)(1)(C). The procurement plan will also provide a detailed explanation about how the IPA will consider and weigh each public interest factor. *Id.* In developing the plan, the IPA will review "any reports issued by a State agency, board, or commission [. . .], as well as publicly available analyses and studies performed by or for regional transmission organizations that serve the State and their independent market monitors." *Id.*

---

[13] The baseline market price index for the consecutive twelve-month period ending May 31, 2016 is $31.40 per megawatt hour. 20 ILCS 3855/1-75(d-5)(1)(B)(ii). This is based on the sum of the average of PJM's day-ahead energy auction price, fifty percent multiplied by the Base Residual Auction capacity price, as determined by PJM, divided by 24 hours per day, and fifty percent multiplied by the Planning Resource Auction capacity price, as determined by MISO, divided by 24 hours per day. *Id.*

### C. Effects of the ZEC Program

The sale of ZECs will provide those selected nuclear plants with out-of-market payments for each megawatt hour of electricity they produce, "effectively replacing the auction clearing price received by these plants with the alternative, higher price preferred by the Illinois General Assembly." [1] ¶ 4. This will affect the FERC-approved energy market auction structure not only because the nuclear plants will not retire as scheduled, but also because they will continue to bid into the wholesale market auctions at artificially lower prices. *Id.* ¶¶ 6, 10.[14] Lower auction prices lead to lower revenues for all generators. *Id.* ¶ 10. In turn, low revenues could cause generators that are more efficient than the ZEC recipients to exit the market or it could deter potential new generators from entering the market. *Id.* Additionally, "artificially suppressed wholesale market prices are likely to result in higher energy bills for retail ratepayers as they are forced to pay the nuclear subsidy as a charge on their retail electric bills." *Id.* ¶ 11. ZECs are estimated to cost Illinois' ratepayers $235 million per year over ten years. *Id.* ¶ 3.

The generator plaintiffs believe that they will incur millions of dollars in damages because they will lose auctions they otherwise would have won and they will receive less revenue from auctions they do win. *Id.* ¶ 66. Meanwhile, the consumer plaintiffs will face higher utilities bills as Commonwealth Edison Company and Amaren Illinois increase retail charges pursuant to the automatic

---

[14] At current wholesale prices, for every megawatt hour of energy the subsidized nuclear plants sell into the FERC-jurisdictional market, they will receive the locational price of energy (approximately $18 and $25 per MWh at Quad Cities and Clinton, respectively), plus a ZEC payment subsidy (approximately $16.50 in 2017, with possible increases in future years). [1] ¶ 7.

adjustment tariffs.[15] 17-cv-1163, [28] ¶ 2 (citing 20 ILCS 3855/1-75(d-5)(1)(B) and (d-6)(6)).

Plaintiffs seek to invalidate the ZEC program by arguing that it is preempted by the Federal Power Act and that it violates the dormant commerce clause. *See* [1] ¶¶ 76–93. The consumer plaintiffs also allege that the program denies them the equal protection of federal laws governing the wholesale electricity markets, in violation of the Fourteenth Amendment. 17-cv-1163, [1] ¶¶ 88–94.

## III. Analysis

### A. Standing

Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. Const., art. III, § 2. To establish constitutional standing, plaintiffs must show an "injury in fact" that is "fairly traceable" to the defendant's conduct and that is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). At the pleading stage, the plaintiffs must clearly allege facts that demonstrate each element. *Id.* To establish "prudential"[16] or statutory standing, plaintiffs must show that the statutory cause of action encompasses the plaintiffs' claim. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). The presumption is that "a statutory cause of action extends only to plaintiffs whose

---

[15] Commonwealth Edison Company, a subsidiary of Exelon, filed a proposed tariff modification with the ICC, which will allow Commonwealth Edison Company to bill all retail customers a ZEC charge of 0.195 cents per kilowatt hour beginning June 1, 2017. 17-cv-1163, [65] at 2; [65-1]. One of the consumer plaintiffs has already received a bill for the "Zero Emission Standard" charge. 17-cv-1163, [70] at 2.

[16] *See Lexmark International v. Static Control Components*, 134 S. Ct. 1377, 1386 (2014) (describing the "prudential" label as misleading).

interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). Courts use "traditional tools of statutory interpretation" to decide whether a plaintiff is within the zone of interests and therefore has statutory standing. *Bank of Am.*, 137 S. Ct. at 1303. The inquiry is not whether Congress *should have* authorized the plaintiff's cause of action, but whether Congress *in fact* authorized it. *Lexmark*, 134 S. Ct. at 1388 ("Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, [. . .] it cannot limit a cause of action that Congress has created merely because 'prudence' dictates.").

1.   *The Generator Plaintiffs Do Not Have Article III Standing to Challenge the Price Adjustment*

The generator plaintiffs take issue with the price adjustment feature of the ZEC program. [1] at ¶ 63. The plaintiffs argue that the state has tied, or tethered, its subsidies to auction prices and participation in a manner that is preempted by federal law. The price adjustment is characterized as a "price collar," since it ensures that the ZEC price decreases if wholesale market prices increase, up to a limit, and it increases if wholesale market prices decrease. [83] at 24, 27 (citing [38-3] ¶ 40).[17] A price collar insulates ZEC recipients from changes in wholesale market prices, the generator plaintiffs argue. As Exelon points out, though, eliminating the

---

[17] "The amount of the ZEC payment received by a generator will thus fluctuate between $0 and $16.50/MWh, depending on future wholesale energy and capacity prices in Illinois. A participating nuclear generator (i.e., Exelon) will receive no ZEC payments in a given delivery year if projected energy and capacity prices in Illinois rise above $47.90/MWh for that year (= $31.40 baseline market index + $16.50 SCC). Within these two bookends, the ZEC payment varies in a formulaic way based on current and projected wholesale energy and capacity prices." [38-3] ¶ 39.

price adjustment feature would leave in place a fixed ZEC price that is equal to the Social Cost of Carbon. This would create a larger subsidy for ZEC recipients, which would cause more harm to the generator plaintiffs, under their theory. The injury caused by the ZEC subsidy is not traceable to the price adjustment, because that injury would exist even if the statute were cured of its ties to wholesale auction prices. *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 661–62 (7th Cir. 2015).

The generator plaintiffs argue that *Johnson* is distinguishable from their case because the plaintiffs in *Johnson* were injured by amendments to a different rule than the one they were challenging, whereas the generator plaintiffs challenge the same regulation that they allege injured them. What the generator plaintiffs gloss over, however, is that the court rejected the argument that a plaintiff has standing to challenge a rule as a whole simply because that rule is "indivisible" and one part of the rule injured the plaintiff. *Id.* at 662–63. The court reasoned that "demonstrating an injury caused by one aspect of a legislative action [is] not sufficient to give [. . .] standing to challenge other aspects of that action." *Id.* at 662. The generator plaintiffs do not have standing to challenge the ZEC program's price adjustment.

But the generator plaintiffs have alleged an injury by a ZEC priced at the Social Cost of Carbon, and that injury is traceable to an aspect of the challenged statute—the creation of a minimum subsidy that rewards a nuclear power plant and leads to subsidized participation in the federally regulated market. A court

order prohibiting enforcement of the ZEC program altogether would redress that injury. *See Allco Fin. Ltd. v. Klee*, No. 16-2946, 2017 WL 2782856, at *8–9 (2d Cir. June 28, 2017). The generator plaintiffs present a case or controversy over the ZEC program.

2. *The Consumer Plaintiffs Do Not Have Prudential Standing for Preemption Claims*

The states have the power to regulate retail sales of electricity and to impose charges on retail bills. Nevertheless, the consumer plaintiffs challenge the ZEC program on preemption grounds, arguing that they will be harmed by the resulting charges on their utility bills and that their payments will be used by utilities to purchase ZECs. 17-cv-1163, [1] ¶¶ 9, 11–12. Since the ZEC program authorizes utilities to recover its costs from all retail customers through an "automatic adjustment clause tariff," the consumer plaintiffs note that even customers who purchase electricity from competitive suppliers and not the utilities will see increased charges. *Id.* ¶¶ 52, 62.

The consumer plaintiffs are injured by the ZEC charges on their bills, which are traceable to the Illinois statute and would be redressed if the charges were prohibited. They have Article III standing, but that does not mean that they can bring preemption claims under the Federal Power Act. Courts look to the provision upon which the plaintiff relies, not the overall purpose of the legislation in question, to determine if the plaintiffs' interest is within the statute's zone of interests. *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). The consumer plaintiffs' complaint refers to 16 U.S.C. §§ 824 and 824d. Section 824 states that "the business of

14

transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that while federal regulation "of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" is necessary, it should not extend to matters that are subject to regulation by the states. 16 U.S.C. § 824(a). The consumer plaintiffs' claim is expressly excluded from § 824's interests because the states have the power to regulate retail sales of electricity and impose retail charges that are subject to state regulation.

Although § 824d is titled, "Rates and charges; schedules; suspension of new rates; automatic adjustment clauses," it refers only to FERC's authority and obligation to ensure that wholesale electricity rates, and the rules and regulations affecting them, are "just and reasonable." 16 U.S.C. § 824d. It describes what public utilities may and may not do with respect to charges, but those directives refer to FERC as the enforcer. *Id.* § 824d(b)–(e). Section 824d also provides that FERC must review public utilities' practices under automatic adjustment clauses and, after an evidentiary hearing, FERC may order a public utility to modify the terms or practices in connection with an automatic adjustment clause. *Id.* § 824d(f). Section 824d does not grant similar authority or establish any such obligation on public utilities or retail consumers. Given that the consumer plaintiffs' injury involves the retail surcharge, their interests are outside of the zone of interests of the federal statutes. *See Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 809 (9th Cir. 2015).

3.   *Plaintiffs Do Not Have Article III Standing for Dormant Commerce Clause Claims*

"[A] plaintiff must demonstrate standing for each claim he seeks to press. This means that, for each claim of wrongdoing alleged, a plaintiff must demonstrate [. . .] that he has suffered (or is imminently threatened with) an injury that is traceable to the wrongdoing alleged *in that* particular claim." *Johnson*, 783 F.3d at 661 (internal citations omitted) (emphasis original). The dormant commerce clause challenges raise a standing issue distinct from the other claims. The injuries are similar—the market impact on wholesale prices and increased rates passed onto consumers—but if those harms are not traceable to discrimination against the commerce of other states, then plaintiffs do not present a case or controversy under the dormant commerce clause.

The generator plaintiffs say the ZEC program favors the Clinton and Quad Cities nuclear plants (because of the weighted factors in the ZEC procurement process), and thereby discriminates against non-Illinois nuclear generators. [1] ¶ 90. But the injury to the generator plaintiffs is from the ZEC subsidy, not the identity of the ZEC recipient.[18] If the procurement process were non-discriminatory, the out-

---

[18] One of the members of plaintiff EPSA is a nuclear plant in Pennsylvania, [38-3] at 47 n.93, and it claims that it is injured by not being able to receive ZECs. Although this allegation was not in the complaint, I do consider it. This entity is more likely to have an injury traceable to in-state favoritism, but it does not allege that it intends to seek ZECs or that it is in fact prohibited from participating in the ZEC procurement process. Its injury, then, is like the other generator plaintiffs'. It is harmed by the subsidy, whether or not that subsidy is awarded on the basis of in-state economic protectionism. Moreover, EPSA brings this action "as an organization," *see* [1] ¶ 15 n.3, so this additional fact about one of its members does not change the organization's discrimination theory, and it remains true that the allegations in the complaint are insufficient to confer standing for the dormant commerce clause claims.

of-state, non-nuclear plaintiffs would still be injured. Similarly, the general market-distorting effects on non-nuclear plants outside of Illinois would still be felt if the ZEC procurement process subsidized nuclear plants without favoring in-state interests. Finally, the retail surcharges passed onto the consumer plaintiffs would be the same even if the utilities purchased ZECs from out-of-state facilities.

The generator plaintiffs respond that they have alleged an inability to compete "on equal footing" in the interstate market and that courts have found Article III standing for similarly injured plaintiffs. *See All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (quoting *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993)). But in these cases, the discrimination against out-of-state plaintiffs caused the injury; here, favoritism for Clinton and Quad Cities is a feature of the overall legislation, but it is not the source of the injury. The plaintiffs' "injur[ies] would continue to exist even if the [legislation] were cured" of the alleged discrimination. *Johnson*, 783 F.3d at 662. Regardless of whether ZEC recipients are in Illinois or not, the generator plaintiffs' injury from lower wholesale prices remains the same, and the consumer plaintiffs will receive higher bills. Since plaintiffs' injuries are not traceable to the alleged in-state favoritism, they do not have Article III standing to challenge it.[19]

---

[19] I do not reach Exelon's arguments that plaintiffs do not fall within the zone of interests of the dormant commerce clause. I note, however, that the consumer plaintiffs are not like the plaintiffs in *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997). The plaintiffs in *Tracy* were directly burdened by the challenged law. The consumer plaintiffs here are not the direct target of discrimination by the ZEC program; their activity in interstate commerce is not altered by Illinois's statute. The consumer plaintiffs also argue that since the ZEC

The plaintiffs' preemption and dormant commerce clause claims are, in large part, not justiciable. But since the generator plaintiffs have adequately alleged standing to challenge the ZEC program in part, and since the consumer plaintiffs bring an equal protection claim (the increased electricity rates they will pay give them standing to bring such a claim), the cases do present controversies that are within the judicial power to adjudicate. I therefore address the merits of defendants' motions to dismiss for failure to state a claim. *But see Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 805 (7th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) (courts must not reach the merits if standing is lacking).

### B.    The Preemption Cause of Action

The ability to sue to enjoin unconstitutional actions by state or federal officers is a judge-made remedy that does not rest on an implied right of action in the supremacy clause. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). While federal courts retain the power to enjoin such unlawful action, that power is subject to express and implied statutory limits. *Id.* at 1385.

In *Armstrong*, the Supreme Court considered § 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(30)(A), and found that Congress explicitly conferred enforcement of a "judgment-laden standard" exclusively on the Secretary of Health and Human Services, and held that plaintiffs could not bring a private right of action to enforce

program provides for an automatic pass-through of the costs, it harms the consumers and not the utilities, which are mere conduits. But, it does not follow from the automatic pass-through of costs that the utilities have no injury and no standing. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (wholesalers paying a discriminatory tax have standing to challenge the tax even though they pass the costs of the tax onto their customers).

the act. *Id.* at 1385. Specifically, the Court explained: "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.* Plaintiffs distinguish the Federal Power Act from § 30(A) of the Medicaid Act by arguing that the Federal Power Act does not provide a sole remedy and it expressly gives district courts exclusive jurisdiction over "all *suits in equity* and actions at law." [83] at 42 (citing 16 U.S.C. § 825p). The act does not expressly prohibit a private suit for injunctive relief, but that is not the only way for Congress to signal a limitation on judicial power, and the cause of action it did authorize does not provide the answer plaintiffs suggest. Section 825p of the Federal Power Act gives district courts jurisdiction over suits that FERC is authorized to bring under § 825m(a), but such vesting jurisdiction in the district courts does not create a *private* cause of action. *See Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951).

Plaintiffs' preemption claims do not constitute "proper cases" for private suits for injunctive relief. *See Armstrong*, 135 S. Ct. at 1384. First, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996); *see also Ex parte Young*, 209 U.S. 123 (1908). In the wholesale electricity markets arena, parties can bring a complaint to FERC if they believe a practice interferes with the markets or creates

19

unjust or unreasonable rates or practices[20]; FERC can take corrective actions to ensure that wholesale rates and practices remain just and reasonable; and parties that disagree with FERC's decision can seek review in the circuit courts. 16 U.S.C. §§ 824d(e), 824e(a), 824l(b). Relatedly, if FERC discovers that rates or the practices affecting rates are unjust or unreasonable, it is expressly authorized to bring an action in federal court to enjoin such acts or practices. 16 U.S.C. § 825m(a). Express provisions, such as these, which provide for the enforcement of a substantive rule, signal Congress's intention to preclude other methods of enforcing the same substantive rule. *Armstrong*, 135 S. Ct. at 1385 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

Additionally, Congress provided a private cause of action under the Federal Power Act in the Public Utility Regulatory Policies Act. The act authorizes a private cause of action to challenge state rules governing small power production facilities if the private party had already petitioned FERC to bring suit itself. 16 U.S.C. § 824a-3(h)(2)(B). By its terms, the act does not apply to this case. It demonstrates, however, Congress's intention to create only a limited private remedy in the Federal Power Act. As Exelon asserts, the omission of a general private right of action in the Federal Power Act should, therefore, be understood as intentional. *See also Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of

---

[20] Exelon points out that some plaintiffs have already brought such a complaint to FERC. [53-1] at 35 n.12. FERC does not have a quorum, [91] at 2, so it is not surprising that plaintiffs look to the courts. But FERC's current paralysis does not change the structural limitations on judicial power.

reading others into it." (citation omitted)). It also shows that even when Congress chose to create a private cause of action in the Federal Power Act, it required administrative exhaustion, *see* 16 U.S.C. § 824a-3(h)(2)(B), which would suggest that plaintiffs' failure to exhaust here is also problematic. Finally, a coherent regulatory policy for interstate electricity markets is a desirable outcome, and it is one that private suits undermine. *See Armstrong*, 135 S. Ct. at 1385. Following the reasoning of *Armstrong*, I conclude that the Federal Power Act does not authorize a private cause of action for injunctive relief against the defendants.

Plaintiffs argue that this court can issue a declaratory judgment or an injunction against defendants in their official capacities under *Ex parte Young*. The doctrine of *Ex parte Young* provides a narrow exception to Eleventh Amendment immunity for claims brought against state officers in their official capacities if the complaint seeks prospective injunctive relief in order to end a continuing federal law violation. *Seminole*, 517 U.S. at 73. *Ex parte Young* actions historically involved a party bringing a preemptive action against a state official, to challenge a possible enforcement proceeding under state law. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring). Plaintiffs agree that they are not the potential target of any state enforcement proceedings. That leaves the prospect of an *Ex parte Young*-style equitable action discussed in *Armstrong*, 135 S. Ct. at 1385. Such an action is foreclosed if it would require the application of "judicially unadministrable" standards. *Id.*

The Federal Power Act directs FERC to ensure that wholesale electricity rates, and the rules and practices affecting those rates, are "just and reasonable." 16

U.S.C. § 824e(a). This is the kind of "judgment-laden" standard that is "judicially unadministrable." *Armstrong,* 135 S. Ct. at 1385; *see also Montana-Dakota Utilities*, 341 U.S. at 251 ("Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of [FERC].").

Plaintiffs insist that the relief they seek is not judicially unadministrable because they are "ask[ing] the Court only to decide whether, as in *Hughes*, a state regulatory program 'impermissibly intrudes upon the wholesale electricity market, a domain Congress reserved to FERC alone.'" [83] at 43 (citing *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016)). But, the parties in *Hughes* did not challenge whether the plaintiffs were entitled to seek declaratory relief under the Supremacy Clause, so the Court "assume[d] without deciding that they may." 136 S. Ct. at 1296 n.6. Therefore, citing to *Hughes* on this point does not advance plaintiffs' claim. Furthermore, as Exelon argues, as a practical matter, plaintiffs are asking the court to do more than just declare the ZEC program unlawful. While it may be possible to simply declare a program preempted and enjoin it in its entirety, the gist of plaintiffs' claims requires more. Plaintiffs agree that states can affect the wholesale market by subsidizing local industry, but they argue that this program distorts the market too much. [83] at 12, 38. The declaration sought by plaintiffs would require a court to draw some lines, to give the state direction on how not to interfere with

22

wholesale rates while acting within its undisputed authority to regulate, and once a court enters that arena, it treads on FERC's exclusive expertise.

Plaintiffs cannot bring an equitable cause of action to enjoin the ZEC program on the basis of preemption.[21]

### C.    Federal Power Act Preemption

Preemption of a state law by federal law may be express or implied; it "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983) (citation omitted). Implied preemption takes two forms: field preemption, "where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," and conflict preemption, where "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Preemption results from congressional action and agency action when the federal agency acts within the scope of its authority. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986).

The plaintiffs argue that Illinois's ZEC program is preempted by the Federal Power Act and FERC's exclusive authority. The parties rely on and discuss at length three Supreme Court cases: *Oneok, Inc. v. Learjet, Inc.*,[22] *F.E.R.C. v. Elec. Power Supply Ass'n*,[23] and *Hughes*,[24] as well as one FERC decision: *WSPP*.[25]

---

[21] I nevertheless reach the merits of plaintiffs' preemption claims, in the event their claims can be read to seek a blanket injunction with no reference to the reasonableness of wholesale pricing.

[22] 135 S. Ct. 1591 (2015).

[23] 136 S. Ct. 760 (2016) *as revised* (Jan. 28, 2016).

In *Oneok*, the Supreme Court warned courts to proceed cautiously when considering a state law that may apply to energy sales within the federal agency's jurisdiction, and find "pre-emption only where detailed examination convinces [the court] that a matter falls within the pre-empted field as defined by our precedents." 135 S. Ct. at 1599. Like earlier cases, *Oneok* reiterated "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Id.* (emphasis original). *Oneok* upheld an antitrust law that a state applied to regulate wholesale gas prices, which inevitably affected the wholesale market, because its purpose was to combat antitrust violations, not regulate wholesale prices. *Id.* at 1599–60.

Defendants assert that under *Oneok*, FERC does not have exclusive jurisdiction over *everything* that affects wholesale sales or rates. Since *Oneok* rejected the argument that state laws affecting wholesale rates or sales are field preempted, defendants conclude that the Federal Power Act does not impliedly occupy the entire field of things affecting wholesale rates or sales. Plaintiffs acknowledge that laws "aimed at 'subjects left to the States to regulate,' such as generally applicable state antitrust laws, blue sky laws, tax laws, and recycling laws, are not field preempted because their impact on interstate wholesale rates is incidental or indirect." [83] at 22 (citing *Oneok*, 135 S. Ct. at 1600–01). But, plaintiffs argue that the ZEC program is not a broadly applicable law because ZECs are only available to specifically selected, non-viable nuclear plants, as determined

---

[24] 136 S. Ct. 1288.

[25] 139 FERC ¶ 61061 (Apr. 20, 2012).

by the Illinois Power Agency.[26] Moreover, they believe that the program was aimed at the wholesale market, because the point of the ZECs is to keep the nuclear power plants generating electricity for sale into the wholesale market.

Plaintiffs' theory that the ZEC program is preempted because it intends to alter the outcomes of the wholesale auctions is not supported by *Oneok* or *Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas*, 489 U.S. 493 (1989), on which *Oneok* relied. *Northwest Central* upheld state regulation that was "[d]esigned as a counterweight to market, contractual, and regulatory forces," and it expressly rejected a version of plaintiffs' argument: "To find field pre-emption of [state] regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production" because "there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations." 489 U.S. at 497, 514. *Oneok* does not stand for the proposition that a state law that regulates generation is invalid if the state knew the law would affect the wholesale market.

States may influence, through regulation, which generators participate in FERC's market, even though the end result may affect the wholesale market. Plaintiffs do not dispute that REC programs, tax incentives, and carbon taxes, which are within the states' jurisdiction, are lawful. *See* [83] at 26 n.12, 31–32. REC

---

[26] The ZEC program does not expressly exclude any generators from applying. It describes a detailed bid selection process and the criteria that will be considered in that process, but plaintiffs do not explain how those or other provisions lead to the conclusion that the ZEC program does not apply broadly.

programs and tax incentives encourage renewable generators to produce, while carbon taxes discourage fossil fuel generation. Similarly, the ZEC program is aimed at a certain type of electricity generation facilities. Although the ZEC program will affect wholesale electricity rates, those rates were not its target[27]; thus, the general rule supplied by *Oneok* (and *Northwest Central*) does not require preemption.

The parties agree that *EPSA* defined FERC's exclusive jurisdiction as that which "directly affects" the wholesale rate. [52] at 19; [83] at 27–28; *see also* 136 S. Ct. 760. The Supreme Court explained:

> FERC has the authority [. . .] to ensure that rules or practices 'affecting' wholesale rates are just and reasonable. [. . .] [T]hat statutory grant could extend FERC's power to some surprising places. [. . .] So if indirect or tangential impacts on wholesale electricity rates sufficed, FERC could regulate now in one industry, now in another, changing a vast array of rules and practices to implement its vision of reasonableness and justice. We cannot imagine that was what Congress had in mind. For that reason, [. . .] we now approve, a common-sense construction of the [Federal Power Act]'s language, limiting FERC's 'affecting' jurisdiction to rules or practices that 'directly affect the [wholesale] rate.'

*EPSA*, 136 S. Ct. at 774 (citation omitted).

Plaintiffs allege that ZECs, by providing out-of-market payments, effectively replace the auction clearing price, and they argue that *EPSA* should not be read to limit FERC's jurisdiction to only those transactions that establish the amount of money a purchaser will hand over in exchange for wholesale power. Plaintiffs also

---

[27] Defendants note that while plaintiffs argue that the statute's stated purpose was pretext, the complaint does not allege that the statute's true aim or purpose was to adjust or disregard wholesale rates. Instead, plaintiffs allege that its actual purpose was to save jobs and generate local tax revenues. *See* [1] ¶ 58.

argue that "a state regulation that substantially affects the quantity or terms of wholesale sales is preempted." [83] at 28 n.14 (citing *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 307–08 (1988); *N. Nat. Gas. Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 90–93 (1963); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014), *aff'd sub nom. Hughes*, 136 S. Ct. 1288).

*EPSA* stands for the opposite of what plaintiffs describe. First, *EPSA* defined rate-setting as establishing the amount of money a purchaser will "hand over in exchange for [wholesale] power." *EPSA*, 136 S. Ct. at 777. Second, *EPSA* expressly rejected the argument that a law could "effectively" regulate wholesale rates when it did not do so "nominal[ly]"; the Supreme Court reasoned that such an argument made "[t]he modifier 'effective' [do] more work than any conventional understanding of rate-setting." *Id.* Nothing in the Federal Power Act, the Court said, even "suggest[ed]" that "expansive" of a definition of rate-setting. *Id.* at 777–78. Furthermore, as Exelon notes, *EPSA* explained that FERC cannot take action that transgresses states' authority over generation, "no matter how direct, or dramatic," the program's "impact on wholesale rates." [92] at 19 (quoting 136 S. Ct. at 775, 780 n.10).

*EPSA* recognized that wholesale and retail markets in electricity cannot be "hermetically sealed" from one other. 136 S. Ct. at 776. As a result, transactions in the wholesale market will have "natural consequences" at the retail level, as will FERC's regulation of wholesale matters. *Id.* Although the opinion addressed a

question of FERC encroaching on the state, the analysis applies equally to the states encroaching on FERC. Thus, under *EPSA*, a state regulation that substantially affects the quantity and terms of wholesale sales is not necessarily preempted. *Id.* ("[A] FERC regulation does not run afoul of § 824(b)'s proscription just because it affects—even substantially—the quantity or terms of retail sales."). The key inquiry is whether FERC or the state is regulating what takes place in their respective markets, because when the state regulates what takes place in the retail market, in furtherance of its charge to improve that market, then the effect on wholesale rates is irrelevant. *Id.* ("whatever the effects at the retail level," when "every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules" there is no preemption).

*Hughes* involved a state regulatory program that provided subsidies through state-mandated contracts benefitting new generators on the condition that the new generator would sell its capacity into a FERC-regulated wholesale auction. 136 S. Ct. at 1292. Competitors of the new generators brought suit, and ultimately, the Supreme Court held that the state's regulatory scheme invaded FERC's exclusive jurisdiction. *Id.* The Court's holding was "limited":

> We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC. [. . .] Nothing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.' So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable.

28

*Id.* at 1299 (internal citations omitted). Based on this passage, defendants and Exelon argue that the ZEC program is distinguishable from the regulatory scheme that *Hughes* rejected. They argue that because the ZEC program exclusively regulates separate sales of credits that represent environmental benefits of nuclear power generation and it does not regulate the rate or transaction terms of wholesale power, the program does not run afoul of *Hughes.*

Plaintiffs respond that *Hughes* is not distinguishable because the facilities' receipt of ZECs is conditioned on their participation in the wholesale auction. Plaintiffs explain that generators can only receive ZECs if they produce electricity and they can only dispose of that electricity by selling it in the wholesale auctions; and since generators have to dispose of electricity to be able to make more, they have to sell electricity to the wholesale auctions to continue receiving ZECs. According to plaintiffs, *Hughes* "[cannot] be read to allow state measures that in reality intrude on exclusive federal jurisdiction just because they do not contain express language to that effect. A *de facto* implicit requirement is enough." [83] at 23 n.10 (citing *N.J. Realty Title Ins. Co. v. Div. of Tax Appeals in Dep't of Taxation & Fin. of N.J.*, 338 U.S. 665, 673 (1950); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192–95 (4th Cir. 2007); *S. Dakota Min. Ass'n, Inc. v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers*, 27 F.3d 1499, 1508 (10th Cir. 1994)).[28]

---

[28] In these cases, the state effectively prohibited conduct that federal law authorized.

PJM requires all generators in its region to offer their capacity into the PJM capacity auction; if a generator's capacity clears, PJM requires the generator to sell into PJM's energy market.[29] Since the ZECs provide insufficient revenue to support the plant, PJM argues in its amicus brief, "the nuclear plant must offer below its real costs to ensure it clears the wholesale auction," which gives them revenue from the auction in addition to revenue from future ZECs for continued operation. [88] at 12. Finally, PJM argues that because PJM requires generators to participate in the wholesale markets, the ZEC program did not need to include a condition similar to the one included in *Hughes*; therefore, in practice, the ZEC program is not distinguishable from the regulatory scheme in *Hughes*.

Illinois does not require participation in wholesale auctions in order to receive ZECs. PJM requires participation in the capacity auction, but generators are not required to clear that auction. In fact, they can receive ZECs even if they do not clear the capacity auction and even if they do not participate in the energy auction. Generators in MISO's region are not required to participate in or clear any auctions in order to receive ZECs.[30] It is true that: (1) bid stacking creates an incentive for generators to submit low enough bids to clear the auction so that they can offload their supply; and (2) ZEC-selling generators will have an additional

---

[29] PJM "is exploring" ways to change its participation requirement to "remove subsidized resources from the price formation process and thus accommodate state subsidies in a manner that might be acceptable to FERC and PJM's stakeholders." [88] at 12 n.6.

[30] Plaintiffs argue that because Clinton is designated as an Exempt Wholesale Generator under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et seq.*, it can only sell its electricity in MISO's wholesale auction. But, Clinton could forego its EWG status and seek ICC approval to sell its energy at retail, and then it would no longer be limited to selling its electricity in MISO's wholesale auctions.

30

incentive to clear the auction, and therefore, they are perhaps more likely to submit low bids. Nevertheless, the ZEC program does not *mandate* auction clearing in PJM or MISO, and the state, while taking advantage of these attributes to confer a benefit on nuclear power, is not imposing a condition directly on wholesale transactions.[31]

Plaintiffs also argue that the ZEC program is analogous to the state regulatory scheme in *Hughes* because ZECs are "tethered" to the generators' wholesale market participation through the program's price adjustment feature. [83] at 24. As discussed above, the initial price of ZECs (the Social Cost of Carbon) has nothing to do with wholesale prices. *See* 20 ILCS 3855/1-75(d-5)(1)(B). The price adjustment allows the price of ZECs to fall below that initial price, and the amount by which it decreases is calculated using a composite of projected prices from the energy and capacity markets; therefore, even an adjusted ZEC price is not based on the wholesale price a ZEC recipient receives. *Id.* § 1-75(d-5)(1)(B). These projected and composite prices are not within FERC's jurisdiction. Thus, the "tether" in this case is not to wholesale participation or transactional pricing; the tether is to broader, indirect wholesale market forces.

Read together, *EPSA* and *Hughes* stand for the proposition that preemption applies whenever a tether to wholesale rates is indistinguishable from a direct effect on wholesale rates. The qualifier "direct" is important; influencing the market

---

[31] *See Allco*, No. 16-2946, 2017 WL 2782856, at *10 (rejecting a claim that a state program compelled wholesale transactions where the program directed certain contracts, but did not guarantee that the wholesale transaction would occur).

by subsidizing a participant, without subsidizing the actual wholesale transaction, is indirect and not preempted. Since a generator can receive ZECs for producing electricity and the credits are not directly conditioned on clearing wholesale auctions, ZEC payments do not suffer from the "fatal defect" in *Hughes*, *see* 136 S. Ct. at 1299, nor do they alter the amount of money that is exchanged for wholesale electricity, *see EPSA*, 136 S. Ct. at 777. *Hughes* should not be extended to invalidate state laws that do not include an express condition, but that in practice (and when combined with other market forces), have the effect of conditioning payment on clearing the wholesale auction. That is not the kind of market participation that worried the Court in *Hughes*, and to read *Hughes* to apply to this program would intrude on the state's authority to regulate power generation.

RECs are similar to ZECs, and the parties do not suggest that RECs are preempted. In *WSPP*, FERC held that when RECs are "unbundled" and sold independently of electricity, the REC transaction falls outside of FERC's jurisdiction. 139 FERC ¶ 61,061, ¶ 24 (2012). FERC reasoned that an REC sale is "not a charge in connection with a wholesale sale," and it does not set or even "affect wholesale electricity rates." *Id.* Plaintiffs note that *WSPP* was not a "sweeping ruling," it was an uncontested proceeding that was limited to facts involving RECs; it does not require this court to reach a similar decision as to ZECs. [83] at 34. That is true, but FERC's conclusion that it is possible to unbundle an environmental attribute credit from the sale of electricity without stepping on FERC's toes is persuasive when applied to ZECs. Illinois's ZECs, unlike RECs, must be purchased

by utilities in an amount proportional to their retail sales, which in turn are proportional to their wholesale electricity purchases, but this does not mean the ZEC transaction is bundled with wholesale transactions. A bundled, or dependent transaction is one where a credit sale takes place as part of the same transaction as a wholesale energy sale. 139 FERC ¶ 61,061, at ¶ 24. The ZEC transactions required by the Illinois statute are distinct from wholesale energy sales. While not dispositive, FERC's acknowledgment that RECs are outside its jurisdiction indicates that similar programs that authorize transactions in state-created credits that are distinct from wholesale transactions are not preempted.

Plaintiffs argue that the ZEC program invades FERC's field of exclusive jurisdiction because it provides nuclear plants with substantial out-of-market payments, thereby directly affecting the revenue that nuclear generators will be paid and effectively replacing the auction clearing price. I conclude, however, that the ZEC program falls within Illinois's reserved authority over generation facilities; Illinois has sufficiently separated ZECs from wholesale transactions such that the Federal Power Act does not preempt the state program under principles of field preemption.

State law that conflicts with federal law is preempted. *English*, 496 U.S. at 79 (citations omitted). Such conflicts occur where: (1) "it is impossible for a private party to comply with both state and federal requirements," or (2) "[the] state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Conflict preemption asks whether the state law does "clear damage" to the goals of federal legislation. *Nw. Cent.*, 489 U.S. at 522

33

("Unless clear damage to federal goals would result, FERC's exercise of its authority must accommodate a State's regulation of production.").

Plaintiffs contend that the ZEC program conflicts with federal law because it interferes with the wholesale auction process, which FERC has selected as the method for establishing just and reasonable rates. A core principle of conflict preemption is that "courts must be careful not to confuse the 'congressionally designed interplay between state and federal regulation,' [. . .] for impermissible tension that requires pre-emption under the Supremacy Clause." *Hughes*, 136 S. Ct. at 1300 (Sotomayor, J., concurring) (quoting *Nw. Cent.*, 489 U.S. at 518).

Plaintiffs' allegations that the ZEC program will affect FERC's wholesale auction process do not support a finding that the ZEC program does "clear damage" to FERC's goals. The market distortion caused by subsidizing nuclear power can be addressed by FERC and the interplay between state and federal regulation can continue to exist.[32] Plaintiffs' theory of conflict preemption is that distorting the wholesale market conflicts with FERC's preference for competitive auctions. This is too broad a theory of preemption and would inappropriately limit state authority. So long as FERC can address any problem the ZEC program creates with respect to just and reasonable wholesale rates—and nothing in the complaints suggest that

---

[32] Not surprisingly, Exelon was opposed to these kinds of subsidies until it was a beneficiary of them. *See* [83] at 37. That it has taken both sides of the policy debate over subsidies is irrelevant to whether the state-created market distortions at issue here conflict with federal regulations. There is no dispute that ZECs will affect the market and that Illinois has created a subsidy that favors certain participants in the wholesale auctions. The program, however, does not require auction clearing and does not prevent FERC from setting wholesale rates. Exelon's biases notwithstanding, Illinois is not in conflict with FERC.

FERC is hobbled in any way by the state statute—there is no conflict. The complaint certainly alleges that ZECs will cause billions of dollars in market impact, but it does not allege that FERC is damaged in its ability to determine just and reasonable rates. The regulatory structure remains unaltered, and FERC's power undiminished.[33] Consequently, the ZEC program does not conflict with the Federal Power Act.

### D. The Commerce Clause

The commerce clause provides that Congress shall have power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const., art. I, § 8, cl. 3. The clause includes an implicit restraint on state authority to regulate interstate commerce, even in the absence of a conflicting federal statute. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This dormant commerce clause guards against "the evils of 'economic isolation' and protectionism," while also "recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24 (1978).

---

[33] Plaintiffs argue that the subsidies will stand as an obstacle to the federal plan for competitive wholesale auctions and that Illinois is doing indirectly what it cannot do directly—adjusting wholesale auction-clearing prices. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987). But indirect effects are permissible under *EPSA* and *Hughes*, and, in my view, the proper articulation of the federal interest here is in setting just and reasonable wholesale rates. FERC can continue to use all the tools at its disposal to set just and reasonable rates, and the possible need to react to ZECs is not sufficient to amount to clear damage to wholesale rate-setting.

A law that discriminates against interstate commerce on its face, has the effect of favoring in-state economic interests over out-of-state interests, or harbors a discriminatory purpose, is subject to a per se rule of invalidity. *United Haulers*, 550 U.S. at 338. The state may only overcome the per se rule of invalidity by showing that it has no other means to advance a legitimate local purpose. *Id.* at 338–39. By contrast, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In balancing the *Pike* factors, courts consider the nature of the local interest involved and whether an alternative existed that could promote the local interest with a lesser impact on interstate commerce. *Id.* Accordingly, dormant commerce clause claims, especially of the latter category, turn on a "sensitive, case-by-case analysis" of the facts, including the "purposes and effects" of the law at issue. *See*, *e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). Cases involving facially neutral laws typically require an evidentiary record to be developed before resolution is possible. *See United Haulers*, 550 U.S. at 337.

Plaintiffs argue that the state statute discriminates against interstate commerce on its face because: (1) "ZECs solely benefit certain in-state wholesale producers of nuclear energy in Illinois, to the disadvantage of out-of-state producers who compete in the wholesale market," [83] at 46 (citing [1] ¶¶ 58–59); and (2) "the purported 'procurement process,' based on 'public interest criteria,' is a sham, as

36

Clinton and Quad Cities have been pre-determined to be the 'winners' of the ZEC contracts," *id.* (citing [1] ¶ 59).[34] I disagree. The statute is not facially discriminatory because it does not preclude out-of-state generators from submitting bids for ZECs. The alleged sham process to select ZEC recipients indicates that the scales are tipped in favor of Clinton and Quad Cities, but that does not mean that the agencies charged with selecting the recipients will discriminate. The statute gives neutral, non-discriminatory standards to the agencies, and plaintiffs do not allege that the agencies will deliberately flout the ZEC bid-selection process. *See Pac. States Box & Basket Co. v. White*, 296 U.S. 176, 186 (1935). Since the complaint does not include any plausible allegations that the ICC will ignore its statutory duties, there is no support for the conclusion that the procurement process is facially discriminatory. *See Godfrey v. United States*, 997 F.2d 335, 338 n.4 (7th Cir. 1993) (only "clear evidence to the contrary" will persuade a court that "public officers" have not "properly discharged their official duties").

Plaintiffs also contend that the statute has the clear effect of favoring in-state economic interests over out-of-state interests. Assuming that only Illinois nuclear

---

[34] Plaintiffs say that "[the statute] directs the IPA to consider reports under House Resolution 1146," and one such report identifies the Clinton and Quad Cities plants as plants that will potentially close; this is relevant because preserving zero emission facilities is a factor in the "public interest" criteria of the bid selection process. [83] at 46. The same provision that plaintiffs draw on, however, directs the IPA to consider other reports, some of which, Exelon argues, are about out-of-state plants. 20 ILCS 3855/1-75(d-5)(1)(C). Considering such reports does not facially favor in-state plants. Additionally, the ICC and not the IPA selects the plants that will receive ZECs. Since the ICC may only consider three neutral environmental criteria—(1) "minimizing carbon dioxide emissions that result from electricity consumed in Illinois," (2) "minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State," and (3) "the incremental environmental benefits resulting from the procurement," *Id.* § 1-75(d-5)(1)(C-5)(i)–(ii)—it does not discriminate based on a plant's geographic location.

generators are selected, the ZEC program would not be invalid, necessarily, because there are many ways to explain how a valid program could produce that end. For example, it is possible that no out-of-state generator will submit a bid, thereby mooting plaintiffs' discriminatory effects claim. It is also possible that the ICC will decide that Illinois generators are in the best position to reduce air pollutants in Illinois, which would justify a decision to select only Illinois generators. In light of plaintiffs' facial challenge, and accepting the allegations of how the program will work in practice, I conclude that there is a substantial possibility that the statute will be non-discriminatory in effect.

Plaintiffs also argue that the statute has a discriminatory purpose. They say that it was enacted for political reasons, to save jobs and property tax revenues tied to Clinton and Quad Cities. Plaintiffs point to the statements Governor Rauner made when he signed the bill into law: "The Future Energy Jobs bill protects taxpayers, ratepayers, and the good-paying jobs at the Clinton and Quad Cities' plants." [83] at 47. Plaintiffs argue that the stated environmental purpose was a mere pretext; they cite the original version of the statute, which set the ZEC price as the difference between the nuclear generator's costs and revenues from energy and capacity markets.[35] Plaintiffs explain that this price formula was changed in the final version in response to *Hughes*. *Id.* (citing 20 ILCS 3855/1-75(d-5)(1)(B)).

Defendants say that the statute was intended to advance public health and protect the environment by reducing the emissions of air pollutants created by

---

[35] [83] at 19 n.7 (citing S.A. 3, S.B. 1585, at 82–83, 99th Gen. Assemb. (Ill. May 12, 2016), available at http://www.ilga.gov/legislation/99/SB/PDF/09900SB1585sam003.pdf.

energy generators; it attempts to achieve these goals by offering credits to zero-emission generators. Courts must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the Court] to conclude that they 'could not have been a goal of the legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (citation omitted). The statute was both environmental legislation and job-saving legislation. Notwithstanding the allegations of the complaint, the circumstances surrounding the enactment of the statute do not warrant an inference of discrimination. Plaintiffs do not cite any language in the legislation that would support such an inference. The governor's and some legislators' celebratory remarks about the potential job-saving effects of the law do not negate the ZEC program's environmental purpose and public health interests. These statements suggest political favoritism on the part of some for the local economy, but they do not evince an intent to discriminate against out-of-state commerce. The law may have been underinclusive in the breadth of the subsidy, because Illinois could have subsidized more nuclear power, but that does not mean its purpose was protectionist, instead of environmental.

The statute is not subject to a per se rule of invalidity. Plaintiffs argue that the ZEC program fails the *Pike* test because its impacts on interstate commerce far outweigh any claimed environmental benefits. Specifically, the complaint alleges that the ZEC program distorts the market by driving out and deterring the entry of more cost-efficient, environmentally-friendly, out-of-state generators, [1] ¶¶ 45–50;

39

and that the reduction of carbon emissions can be achieved through means that do not discriminate against interstate commerce, *id.* ¶¶ 14, 89. Exelon notes that the state offers a payment through the ZEC program, but the state allows all other actors to participate in commerce freely, which does not make interstate commerce more difficult. The commerce clause is not concerned with the burdens created when a state participates in a market and exercises the right to favor its own citizens over others. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976). The creation of the ZEC has created a new market, and while that market may affect the wholesale energy market, it is an incidental burden on the channels of interstate commerce in which plaintiffs participate.

Ordinarily, the fact-dependent balancing required to assess a dormant commerce clause challenge would preclude dismissal under Rule 12(b)(6). But here, where the complaints allege a state-created commodity that only indirectly burdens other generators' ability to compete in wholesale auctions, they fail to state a dormant commerce clause claim. As a matter of law, the state's legitimate interests include not only environmental concerns, *see Clover Leaf*, 449 U.S. at 471, but also the right to participate in or create a market, *see Alexandria Scrap*, 426 U.S. at 810, and the right to encourage power generation of its choosing, *see Hughes*, 136 S. Ct. at 1299. The alleged harm to out-of-state power generators who will be competing in auctions against subsidized participants is not clearly excessive when balanced against these weighty and traditional areas of permissible state regulation.

40

### E.    The Equal Protection Clause

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV). Under the rational basis test, which the parties agree applies in this case, "the [state's] action simply 'cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001)).

The consumer plaintiffs allege that the ZEC program violates the equal protection clause because it favors Illinois-based nuclear generators over other electricity producers by imposing wholesale electricity costs on Illinois consumers but not on electricity consumers of the several other states in the MISO and PJM regions. 17-cv-1163, [1] ¶ 65. They argue that the ZEC program does not pass the rational basis test because it makes Illinois electricity consumers "second-class consumers" in the MISO or PJM regions for ten years. 17-cv-1163, [58] at 19–20 (citing *Zobel v. Williams*, 457 U.S. 55 (1982); *Williams v. Vermont*, 472 U.S. 14 (1985); and *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612 (1985)). Specifically, plaintiffs argue, "an additional ZEC charge will be added to the bills of Illinois electricity consumers, but not to bills of electricity consumers in other states in PJM or MISO *even if they purchase electricity generated by Clinton or Quad Cities*, for the wholly

41

arbitrary reason that Clinton and Quad Cities are located in Illinois." 17-cv-1163, [58] at 20 (emphasis original). The Constitution only requires Illinois to treat equally the people within its jurisdiction. As such, Illinois does not run afoul of the Fourteenth Amendment by treating Illinoisans differently from citizens from other states that live in the MISO or PJM regions. Furthermore, the complaint does not allege that Illinois could have imposed a surcharge on people in the MISO and PJM regions that lived outside of Illinois.

The consumer plaintiffs also allege that the ZEC program does not pass the rational basis test because the stated environmental purpose of the ZEC program was an attempt to mask the legislature's true goal of subsidizing the Clinton and Quad Cities plants and such "[*u*]*ltra vires* and unlawful purposes can never be legitimate government purposes." 17-cv-1163, [58] at 21. Yet, "[w]hen dealing with local economic regulation, 'it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (citation omitted). The rational basis test requires courts to presume legislation is valid and to uphold it as long as there is a rational relation to some legitimate end. *Id.* (citation omitted). "Once [the court] identif[ies] a plausible basis for the legislation, [the] inquiry is at its end." *Id.* (citation omitted).

The rational basis for the ZEC program is outlined in § 1.5 of the statute, which states in relevant part: "The General Assembly therefore finds that it is necessary to establish and implement a zero emission standard, which will increase

the State's reliance on zero emission energy through the procurement of zero emission credits from zero emission facilities, in order to achieve the State's environmental objectives and reduce the adverse impact of emitted air pollutants on the health and welfare of the State's citizens." *See* SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016).[36] These reasons are plausible; accordingly, I look no further. The consumer plaintiffs do not state an equal protection claim.

## IV. Conclusion

Defendants' and Exelon's motions to dismiss are granted. The plaintiffs' claims are dismissed in part for lack of subject-matter jurisdiction and in part for failure to state a claim. The plaintiffs' motions for a preliminary injunction are denied.[37] The Clerk shall enter final judgment and terminate these cases.

ENTER:

Manish S. Shah
United States District Judge

Date: July 14, 2017

---

[36] Available at http://www.ilga.gov/legislation/publicacts/99/099-0906.htm.

[37] Because the complaints fail to state a claim, plaintiffs cannot show a likelihood of success on the merits and preliminary injunctive relief would not be appropriate. Courts usually give plaintiffs an opportunity to amend a complaint after a first dismissal. Here, however, the deficiencies in plaintiffs' claims cannot be cured with different allegations. These plaintiffs cannot pursue the legal theories they have articulated (or they do not have standing to do so). Therefore, I decline to give them leave to amend.

43